Counsel of Record:
LARA S. MEHRABAN
Associate Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place, 200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | **17 Civ.    (    )** |
| | : | |
| -against- | : | **COMPLAINT AND** |
| | : | **JURY DEMAND** |
| **ROBERT DONALD BRUCE GENOVESE,** | : | |
| **B.G. CAPITAL GROUP, LTD.,** | : | |
| and **ABRAHAM "AVI" MIRMAN,** | : | |
| | : | |
| **Defendants.** | : | |

------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendant Robert Donald Bruce Genovese ("Genovese"), B.G. Capital Group, Ltd. ("BGC"),

and Abraham "Avi" Mirman ("Mirman"), alleges:

<u>SUMMARY</u>

1.      This case involves a penny stock promotion, manipulation and unlawful

distribution scheme perpetrated by Genovese and BGC in the late summer and early fall of 2012,

involving the stock of Liberty Silver Corporation ("LBSV" or the "Company"), a thinly-traded,

purported silver exploration company.  Mirman aided and abetted Genovese's and BGC's

fraudulent sales, and acted directly to unlawfully distribute at least part of Genovese's and

1

BGC's LBSV shares.  All told, the scheme generated over $17 million in illegal gross stock sale proceeds for Genovese and BGC, and significant profits in the form of commissions for Mirman.

2.     Beginning in 2010, Genovese, in part through offshore entities he controlled, obtained control of substantial blocks of LBSV's purportedly unrestricted and restricted shares by acquiring them from LBSV and affiliates of LBSV, and through market purchases.  After pumping up the price of the shares through a promotional campaign he orchestrated and paid for, Genovese intended to sell a portion of his beneficially owned LBSV stock through an illegal unregistered distribution to generate funds to pay for a second, more elaborate promotion of LBSV, to repay personal loans, and to fund his extravagant lifestyle.

3.     Genovese offered to compensate Anastasios "Tommy" Belesis ("Belesis"), who was the owner of John Thomas Financial ("JTF"), a now-defunct New York broker-dealer, and Mirman, JTF's head of Investment Banking, by kicking back 50% of the proceeds of sales of his LBSV shares through JTF.  In return, Mirman and Belesis agreed to help Genovese sell his LBSV securities and assist his promotion by encouraging JTF customers to buy LBSV. Accordingly, they negotiated a $2 million "loan" from BGC to JTF's holding company, which was wholly owned by Belesis.  Mirman stood to receive a bonus of 20% of the value of this "loan," or $400,000.

4.     To inflate the price of the shares prior to selling them through JTF, Genovese made or orchestrated the making of multiple statements touting LBSV, which he knew or was reckless in not knowing were materially false and misleading.  With Mirman's knowing assistance, Genovese made misleading presentations to registered representatives of JTF to encourage them to solicit their customers to buy LBSV stock and increase the price of the stock, allowing Genovese to profit significantly from his sales.

5.     As part of his promotional efforts, Genovese also hired two "newsletter" writers and compensated them to write and publish materially misleading articles recommending that investors purchase LBSV stock.  Genovese subsequently made knowing or reckless false and misleading statements in press releases and emails under his and BGC's name that repeated the misleading claims made in the newsletters without disclosing that he had compensated the writers, and touted LBSV stock while hiding the fact that he was already selling his LBSV shares.  Mirman was aware that Genovese was orchestrating the production and distribution of promotional materials, and assisted with disseminating them.

6.     Genovese's and BGC's statements falsely or misleadingly stated, or omitted key facts about, the extent of Genovese's beneficial ownership of LBSV stock, his intention to sell his LBSV stock, his promotional efforts including his compensation of the writers, and the separate financial deals between himself, Mirman and Belesis.

7.     Genovese's and Mirman's efforts to increase the share price and volume of LBSV sales were successful.  The stock price rose from $.70 on August 13, 2012 to $1.43 on September 27, 2012, and the weekly trading volume increased from about 25,000 shares traded during the week of August 13, 2012 to 2,431,927 shares traded during the week of September 24, 2012.

8.     Through his entities, Genovese dumped millions of LBSV shares in the U.S. as the stock price dramatically increased.  This included a block of 6.6 million shares sold through JTF to Belesis' customers – with Mirman as his account representative – and millions more through offshore brokerage accounts.

9.     Genovese and Mirman also intentionally created the materially false and misleading appearance that a second block of 6.5 million LBSV shares beneficially owned by Genovese was eligible for resale pursuant to the Rule 144 safe harbor.  These securities were

offered to JTF customers, but before the sales were executed, the Commission suspended trading in LBSV shares on October 5, 2012.

10.     On October 3, 2012, to further maintain the artificial price levels for LBSV shares that Genovese had manufactured through the misleading press releases, newsletter touts and presentations, Genovese also engaged in manipulative trading.  Genovese placed a series of manipulative trade orders and executed trades in LBSV in his BGC account at JTF and other accounts he controlled, including wash sales between those accounts, in order to create a false impression of trading activity in LBSV, to increase its price, and to induce other investors to purchase LBSV.

11.     The stock price hit a high of $1.55 on October 4, 2012.  On October 5, 2012, the Commission suspended trading in LBSV.  Between August 21, 2012 and October 5, 2012, Genovese, through his entities, sold nearly 13 million shares of LBSV common stock in the U.S. for proceeds of over $17.5 million.  Mirman earned profits of over $300,000 from commissions on Genovese's LBSV stock trades through JTF.

12.     Genovese and BGC violated the anti-fraud provisions of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") with their false and misleading statements and by engaging in this scheme, and also violated the stock manipulation provisions of the Exchange Act.  Mirman aided and abetted Genovese's and BGC's violations of the anti-fraud provisions of the Securities Act and the Exchange Act, and also directly violated the antifraud provisions of the Securities Act.  Genovese, BGC and Mirman's unregistered sales of LBSV failed to satisfy the registration requirements as to such securities, or to comply with any exemption from registration available under the federal securities laws, and as such violated the securities registration requirements of the Securities Act.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

13.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), seeking a final judgment: (a) permanently restraining and enjoining Defendants from engaging in the acts, practices and courses of business alleged herein; (b) requiring Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon; (c) imposing civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and (d) permanently prohibiting Genovese and Mirman from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), 22(a) and 22(c) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), 77v(a), and 77v(c) and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

15.     Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Some of the acts, practices, courses of business and transactions constituting the violations alleged herein occurred within the Southern District of New York.  For example, Genovese sold LBSV securities in unregistered sales and executed manipulative trades in those securities, in part, through JTF, which was located in the Southern District of New York.

16.     Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a

national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.

## DEFENDANTS

17.     **Genovese**, age 55, is a citizen of Canada.  Although Genovese's purported primary residence is Paradise Island, the Bahamas, he owns a residence in Marion County, Florida where he lives at least part-time.  Genovese is the Chairman, and an officer, of BGC.

18.     **BGC,** a private Barbados company headquartered in Plantation, Florida, is a purported venture capital and private equity firm wholly owned and controlled by Genovese.

19.     **Mirman**, age 47 of East Northport, NY, was a registered representative associated with JTF, and the head of JTF's Investment Banking Department, at the time of the conduct alleged herein.  He is currently employed as an officer of a publicly traded company.

## OTHER RELEVANT PERSONS AND ENTITIES

20.     **LBSV** is a Nevada corporation headquartered in Toronto, Ontario.  During the scheme alleged herein, LBSV was purportedly engaged in silver exploration and its common stock was quoted on the OTC Bulletin Board ("OTCBB") under the symbol "LBSV," and listed on the Toronto Stock Exchange ("TSX") under the symbol "LSL."  LBSV was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act, 15 U.S.C. § 78c(a)(51), and Rule 3a51-1 thereunder, 17 C.F.R. § 240.3a51-1.  On October 5, 2012, the Commission suspended trading on the OTCBB in LBSV securities through October 18, 2012.  On October 12, 2012, the Ontario Securities Commission ("OSC") entered a cease trade order for the Company's shares traded on the TSX.  Trading on the TSX resumed on October 22, 2012, but the TSX ultimately delisted LBSV on August 5, 2014.  Quotation of LBSV's common shares on the OTCBB has not resumed.  On May 18, 2017, the Company's shares were approved for listing on the Canadian

Securities Exchange.  LBSV has never earned any revenue; it recorded an accumulated deficit of over $16 million in its unaudited financial statements dated May 15, 2017 for the period ended March 31, 2017.

21.     **Belesis**, age 42, is a U.S. citizen who, at the time of the conduct alleged herein, resided in New York, NY, and was the CEO of JTF.

22.     **JTF** was a registered broker-dealer located in New York, New York, from 2007 until September 2013.  During the relevant period, it employed nearly 200 registered representatives.  JTF was controlled and indirectly owned by Belesis through ATB Holding Co., LLC ("ATB Holding").

23.     **Outlook Investments** ("Outlook") is a Panama corporation beneficially owned and controlled by Genovese.  It has no operations other than to engage in transactions in securities beneficially owned by Genovese.

24.     **Look Back Investments** ("Look Back") is a Panama corporation beneficially owned and controlled by Genovese.  It has no operations other than to engage in transactions in securities beneficially owned by Genovese.

## FACTS

### I.     LBSV's Corporate Background

25.     LBSV was incorporated in Nevada in or about February 2007 under the name Lincoln Mining Corp.  In its public filings, the company claimed that it was in the business of mineral exploration.  In reality, however, the company was a shell created and controlled by several individuals (the "LBSV Owners"), including the company's sole officer and director (the "LBSV Director") at the time.

26.     In March through May 2007, the Company conducted three purported private placements of 2.42 million of its common stock under Regulation S.  Nearly all of the individuals who received stock in the offerings were nominees of the LBSV Owners, and not true owners of the stock.  The LBSV Director himself separately acquired 3 million restricted shares during this period.

27.     In or about April 2008, the Company filed with the Commission a registration statement on Form SB-2, purporting to register the resale of the 2.42 million shares, which became effective in or about February 2009.  Subsequently, the nominee shareholders, at the LBSV Owners' direction, transferred their shares to the LBSV Owners' various designees.  The shares were deposited into accounts controlled by the LBSV Owners.

28.     The LBSV Owners devised a stock manipulation and promotion scheme that would artificially increase the stock price and trading volume for the stock, and create significant profits for the LBSV Owners, who planned to sell the LBSV shares that they had acquired at no or nominal cost.

29.     As part of this plan, in or about February 2010, the Company changed its name to Liberty Silver Corp. and carried out a 20:1 forward stock split.  As a result of the stock split, as well as restricted stock cancellations and issuances, LBSV had approximately 70 million shares of common stock issued and outstanding.  The LBSV Owners held 20 million in restricted shares and approximately 40 million shares traceable to the Regulation S offerings and purportedly covered by the subsequent resale registration statement.

30.     To obscure their connection to and control of the purportedly unrestricted LBSV stock, the LBSV Owners deposited a majority of their purportedly unrestricted share blocks in offshore accounts in the names of companies controlled by the LBSV Owners.

8

II.   **Genovese Joins the LBSV Stock Promotion Scheme, Accumulates Shares and Consolidates Influence over LBSV**

31.     In or around the summer of 2010, the LBSV Owners invited Genovese to participate in the LBSV "deal" by helping them to promote and manipulate LBSV stock.  As the LBSV Owners and Genovese discussed, Genovese's role in the LBSV deal would include (a) conducting a promotional campaign involving stock recommendations, which would be funded by the LBSV Owners, and (b) manipulative trading that would create the false impression of liquidity and active interest in the stock and, ultimately, inflate the price of the stock.

32.     The LBSV Owners invited Genovese's participation because they had recently worked together on an earlier scheme involving a different penny stock that generated millions in profits for themselves and Genovese, and they wanted to repeat their success.  Genovese described to the LBSV Owners his manipulative trading strategy for inflating the stock price and creating the false appearance of market interest in order to induce investors to purchase shares. This included trading between accounts he controlled with no change in beneficial ownership to achieve purposefully modest increases in share price and apparent liquidity which, in turn, would attract investors to purchase shares without encouraging existing investors to sell.

33.     Prior to recruiting Genovese, the LBSV Owners had sold some LBSV shares into the market during failed efforts to promote the stock.  So that the LBSV Owners and Genovese would have greater control over the public market "float," and thus greater control over the stock price and trading volume during the ensuing stock manipulation, the LBSV Owners agreed with Genovese that he would buy back shares in the public market.

34.     The LBSV Owners agreed to give Genovese 40% ownership of the restricted and purportedly unrestricted LBSV shares they controlled (the "pooled shares") in exchange for Genovese's participation in the LBSV stock promotion.  A majority of the pooled shares were

expected to be retained in existing accounts controlled by the LBSV Owners until they could be sold into a manipulated market for a significant profit.

35.   In or around September 2010, Genovese recruited hand-picked new management and directors to serve on LBSV's Board of Directors.  The LBSV Director retained an officer position until January 2012, and held a position on the Board during the entirety of the period of the events described herein.

36.   In February 2011, Genovese acquired approximately 3.2 million shares of purportedly unrestricted LBSV stock at no or nominal cost from the LBSV Owners and deposited these shares in an account he controlled in Outlook's name at Verdmont Capital, S.A. ("Verdmont"), a now-defunct Panamanian broker-dealer.  Later in 2011 through July 2012, Genovese used this account to execute hundreds of transactions in LBSV, primarily stock purchases on a near-daily basis, consolidating his control over the public float.

37.   In December 2011, at Genovese's direction, LBSV conducted a private placement to raise capital to enable LBSV's securities to be listed on the TSX.  Genovese structured the private placement so that his control of LBSV was not diluted; through Look Back, he acquired 6.5 million LBSV shares, which were issued with a restrictive legend, and 6.5 million warrants which converted, in May 2012, to 650,000 common shares, which were also issued with a restrictive legend.

38.   In January 2012, Genovese insisted, and the LBSV Owners agreed, to increase Genovese's ownership of the pooled shares held in accounts controlled by the LBSV Owners to 80%.  Genovese also insisted that the LBSV Owners sell LBSV stock only with his approval, so as not to undermine Genovese's efforts to drive up the stock price.  The LBSV Owners agreed to

provide Genovese regular brokerage account statements to prove that they were not selling shares into the market.

39.    Genovese regularly acknowledged and enforced these agreements in meetings with, and strongly worded emails he sent to, the LBSV Owners he suspected of selling shares into the market, and other individuals.

40.    Genovese knew that LBSV was a thinly-traded stock.  He explained in emails in April and May 2012 that he was "buying everything out of the market…there is no market other then [*sic*] me."  Genovese's emails show that his purchases of LBSV were intended to support the market price of the stock, create the false impression of independent market interest, and allow for better control of the stock in the planned manipulation.

41.    By July 30, 2012, Genovese had accumulated beneficial ownership of over 10.4 million purportedly unrestricted LBSV common shares through market purchases and over 25 million shares through private transactions with LBSV and its affiliates.  The latter included the 7.15 million restricted Look Back shares, and Genovese's 80% share of the pooled shares held by the LBSV Owners, which consisted of at least 11,781,535 shares that were purportedly unrestricted but traceable to the Regulation S offering and 10,833,333 shares bearing a restrictive legend.  In sum, Genovese beneficially owned at least 44% of LBSV's approximately 80.7 million outstanding shares.

42.    From July 1, 2008 through the period described herein, LBSV was not a mandatory reporting company, but it filed Form 10-K reports with the Commission on a voluntary basis that purported to disclose "each person who …[beneficially owned] more than 5%" of LBSV's issued and outstanding common stock.  Genovese's beneficial ownership was not disclosed in any SEC filing.

III.    **The Fraudulent Promotion of LBSV Stock**

43.    In the summer of 2012, Genovese embarked on a scheme that involved the dissemination of false and misleading promotional materials and the recruiting of Belesis, Mirman and JTF's sales force to entice their customers to buy some of Genovese's LBSV holdings at inflated prices.  As Genovese described it, he was "organizing a few things" for August and September of 2012 "to create more liqui[di]ty," *i.e.*, to increase LBSV's trading volume, and "to move it a little higher," *i.e.*, to increase the price of the stock.

A.    **Genovese Recruits JTF to Create a Market for LBSV**

44.    By 2012, Mirman had extensive experience in the penny stock industry, including almost 20 years of experience as a stock broker in firms that specialized in penny stock sales to retail customers.  Mirman had passed multiple securities industry examinations.  Mirman had known Genovese for over a decade, and knew him to be a penny stock promoter.

45.    In July 2012, Mirman and Genovese were re-connected by Adam Gottbetter, himself a well-known penny stock promoter who was later convicted of conspiracy to commit securities fraud.  Over the weekend of August 18, 2012, Genovese invited Mirman and Belesis to join him at his luxury lakeside estate near Toronto.  There, Genovese pitched Mirman and Belesis to sell LBSV to JTF customers.  Genovese told Mirman and Belesis that he was a significant shareholder in LBSV, that he had purchased a large quantity of LBSV shares on the market and through a private placement, and that he was interested in increasing LBSV's trading volume.

46.    Belesis and Mirman, in turn, sought Genovese's pledge to provide funding for JTF of $10 million or $20 million.  Mirman's contract with ATB Holding – JTF's holding company – entitled him to 20% of any investment capital Mirman brought to ATB Holding.

Immediately after this weekend, Genovese, Mirman and Belesis started negotiating both Genovese's investment in ATB Holding and JTF's involvement with LBSV. As a first step, Genovese, Mirman and Belesis planned for Genovese to make a presentation about LBSV to JTF's sales force.

47.     On or about August 21, 2012, Belesis began soliciting his own JTF customers to buy LBSV. On the same day, after over a year of almost exclusively purchasing LBSV shares through hundreds of transactions, Genovese began to sell LBSV shares in the U.S. from his Outlook account at Verdmont.

48.     On August 28, 2012, Genovese made his planned presentation on LBSV to JTF's brokers. Mirman arranged the presentation and assisted Genovese with it, including by helping Genovese draft a one-page document in BGC's name to give to the brokers to encourage them to solicit their customers to purchase LBSV. The document disclosed the amount of LBSV shares outstanding – 80.7 million – but did not disclose BGC's or Genovese's beneficial ownership. Instead, it stated that the Company's management and the Board owned about 30% of LBSV's outstanding shares. This was misleading, as Genovese knew, or recklessly disregarded, since the LBSV Director's 10 million restricted shares constituted a majority of the purported management and Board shares, but Genovese himself owned 80% of the 10 million restricted shares by virtue of the pooled share agreement.

49.     Mirman introduced Genovese to the sales floor by describing him favorably as a client, and a wealthy, successful investor. Mirman attended the presentation, along with over 100 JTF stockbrokers.

50.     In his presentation, Genovese encouraged the JTF sales force to solicit their customers to purchase LBSV. Genovese described LBSV as a "tremendously undervalued,"

"long-term play," and told the representatives to expect the share price for LBSV to hit a target equivalent to $7.00 or more.  Genovese described himself as a shareholder of LBSV, through BGC, but claimed he owned less than 10% of the Company's shares.  Belesis also encouraged JTF's sales force to solicit their customers to buy LBSV.

51.     The purpose of Genovese's presentation, and later presentations he made at JTF, was to induce purchases of LBSV stock by JTF customers and inflate LBSV's stock price to a level that would allow Genovese to sell his LBSV position for a significant profit.

52.     Genovese's presentation was scalping.  He intentionally omitted from the rosy presentation about LBSV's prospects the true level of his ownership in the Company and that he had the present intention to sell his own shares, taking advantage of the price increases he hoped the JTF customer buying would achieve.  Nor did he disclose his intention to drive LBSV's stock price up and increase liquidity by coordinating a series of false and misleading and widely distributed promotional materials.

53.     Between August 28 and August 30, Genovese sold, from his Outlook account at Verdmont, approximately 123,000 LBSV shares at prices ranging from $.70 to $.76.  JTF customers purchased over 553,000 LBSV shares, including at least 46,000 shares that were sold from Genovese's Outlook account at Verdmont.  Total trading volume spiked from about 300,000 shares the prior week to over 1.3 million the week of August 27.  The closing share price rose from $.71 on August 27 to $.76 on August 30.

54.     At the time of Genovese's presentation, as a result of his discussions with Genovese about Genovese's share ownership and his experience as a stock broker in the penny stock industry, Mirman knew or was reckless in not knowing that Genovese beneficially owned more than 10% of LBSV's shares.  Shortly after the presentation, Mirman circulated at least one

promotional video touting LBSV – which he knew Genovese had commissioned – to Belesis, who then forwarded it to JTF's sales force.  Mirman knew Belesis had forwarded this video to the brokers.  Mirman also knew that customers of JTF brokers had started to purchase LBSV, but he never informed the JTF sales force that Genovese had orchestrated this and other promotions of LBSV.  Nor did he disclose what he knew of Genovese's beneficial ownership of LBSV or about his efforts to secure a "loan" or "investment" from Genovese that would indirectly benefit himself Mirman personally.  These facts were material, because they would have led the brokers to question both Genovese's and Mirman's reliability and objectivity in endorsing LBSV.

**B.**   **August 2012 False and Misleading Promotional Publications**

55.   At the beginning of their collaboration, Genovese informed Mirman of his efforts to obtain promotional endorsements for LBSV from industry newsletter writers.  In an email to Mirman, dated August 7, 2012, Genovese forwarded Mirman "a small blurb from [a writer] on Liberty Silver" and he noted that "[w]e are working with him for a full blown buy recommendation in his September letter."  Mirman forwarded this email to another JTF representative after the weekend at Genovese's Canadian estate.  Subsequently, Genovese sent emails to Mirman's private gmail account that contained communications with various promotional writers and promotional pieces.

56.   As part of an effort to coordinate the release of promotional pieces from newsletter writers with the push by JTF to get their customers to buy LBSV and his own planned stock sales, in late August, Genovese commissioned "Writer A," a mining stocks "newsletter" writer, to publish a recommendation of LBSV.  Genovese agreed to compensate Writer A for the recommendation by paying for Writer A's purchase of $30,000 designer stereo loudspeakers.

57. Writer A's recommendation touted the expertise of LBSV's management and board, and stated that "[i]nsiders own about 30 percent of Liberty's common shares." It described Genovese's and BGC's role, claiming that Genovese dropped "several million of his own money into the project" for research and development, and quoted Genovese touting LBSV's "potential upside," including a potential 816% increase in stock price. The owner of the newsletter subscriber list who disseminated the recommendation included a disclaimer, falsely claiming that Writer A had researched LBSV in response to requests from newsletter subscribers when, in reality, Genovese had commissioned the recommendation.

58. Genovese reviewed, edited and approved Writer A's recommendation, and coordinated with the owner of the newsletter subscriber list the timing of its release on August 27, 2012, shortly after Genovese had started selling his shares. The newsletter purportedly authored by Writer A was false and misleading in that it failed to disclose both Genovese's review and approval of its content, and the compensation he had furnished in the form of the $30,000 speakers. Nor did it accurately disclose the real reason that Genovese had bought LBSV private placement shares: to consolidate his control over LBSV shares and to fund its listing on the TSX. On August 29, Genovese circulated the recommendation to Mirman, among others, and caused it to be posted to a website that aggregated, at Genovese's direction, the various promotional pieces Genovese had arranged.

59. On August 30, 2012, Genovese circulated Writer A's recommendation to a database of contacts BGC maintained containing over 1500 email addresses. Genovese reviewed and approved the cover email, which also excerpted Writer A's recommendation.

60. Genovese's cover email was purposefully and materially misleading because: (i) it constituted scalping; (ii) it omitted that Genovese had commissioned Writer A's

recommendation in exchange for compensation and pre-approved its content; and (iii) it concealed the reality that Genovese was a controlling shareholder who had acquired a large block of shares for no or nominal cost, and that his investment was primarily the result of acquiring additional LBSV shares to consolidate his control and to obtain LBSV's TSX listing, not to fund research and development.

61.     The misstatements were material because failing to acknowledge that it was a paid promotion placed on behalf of and in coordination with Genovese, who planned to profit from it, deprived readers of the ability to reasonably assess the reliability of Writer A's recommendation.  Similarly, Genovese's true ownership and the purposes for which his holdings had been acquired were material because that information would have allowed readers to evaluate the reliability of his direct statements and the quotes attributed to him by Writer A.

62.     Genovese also paid for, reviewed, authorized, and coordinated the timing of an August 28 press release, under BGC's name, that touted LBSV.  As with the other August publications, the press release recommended the purchase of LBSV shares but failed to disclose the truth of Genovese's ownership and control of LBSV and his present intention to sell his own shares.

**C.**     **September Collusion Between Genovese and Mirman**

63.     Throughout the late August and early September period, Genovese and Mirman, along with Belesis, had numerous phone and email communications to coordinate efforts to maintain JTF customers' buying of LBSV securities in the market.

64.     During this period, as the share price increased to, and then surpassed, $1.00, Mirman received communications from Genovese that indicated that Genovese was closely monitoring the share price and trading volume of LBSV, and that he intended to cause increases

in LBSV's trading price and volume.  Genovese also informed Mirman that he had bought more than 2 million LBSV shares from "an original guy in the deal who had 3,000,000 shares."   This raised the inference that Genovese purchased a sizeable block of shares from an individual who was part of the original LBSV control group, with a view to distributing those shares.

65.     Genovese also continued to send Mirman promotional recommendations of LBSV, which he continued to confirm he had orchestrated, for example, by adding a note to one message to Mirman, that he was "[w]orking it from my end!!!!"  Mirman forwarded some of these messages to Belesis, who, in turn, circulated some of the promotional pieces to JTF brokers after stripping any information that indicated that Genovese was the source of the pieces. Mirman was included in the mailing list Belesis used to send mass emails to the JTF brokers, and Genovese was added to it no later than September 2, 2012.  Accordingly, both Genovese and Mirman knew or were reckless in not knowing that Belesis was forwarding the LBSV promotions to the brokers.

66.     Over the course of the week of September 3, Genovese sold over 2.4 million LBSV shares from the Outlook account at Verdmont.  JTF customers purchased almost 3.2 million shares, including 1,233,100 shares purchased by Belesis's own customers.  JTF customer purchases represented almost 60% of the week's total volume of 5.373 million.  The closing share price of $1.06 on September 7 was a significant increase from the prior week's closing price of $.75.

67.     On or about September 12, 2012, Mirman provided Genovese with access to the JTF sales force for another presentation.  In that presentation, Genovese touted LBSV's prospects, emphasizing its recent increase in share price, and encouraging the representatives to get their customers to buy LBSV shares.  Belesis added his own encouragement to his sales force

to solicit their customers to purchase more LBSV shares. Genovese again made no mention of his true beneficial ownership, his intention to sell his shares or his promotional scheme. Mirman was present at the meeting but again did not inform the brokers about the financial negotiations between Genovese and JTF, of Genovese's promotional scheme, or what he knew of Genovese's ownership in LBSV.

68.     At a separate meeting with Belesis and Mirman that day, Genovese proposed that JTF sell a large block of Genovese's LBSV shares to its customers and that, in exchange, he would return 50% of the profits as an investment in JTF. Belesis agreed to the *quid pro quo* proposal and frequently referred to it thereafter. But understanding that the arrangement had to be disguised so that it did not appear to be a kick-back, Belesis and Genovese agreed to structure and paper the kick-back as an unrelated loan from Genovese to JTF. Thereafter, JTF's attorney drafted and circulated documentation for a $2 million "loan" from Genovese to ATB Holding, JTF's holding company.

69.     Also this same day, Mirman invited Genovese to open an account at JTF under the name of BGC, with the understanding that Genovese would be selling the large block of LBSV shares through it. Mirman became the representative of record for the BGC account, entitling him to substantial commission income on any transactions through it.

70.     Genovese subsequently directed the transfer of a total of 6.6 million purportedly unrestricted LBSV shares – approximately 8% of the Company's outstanding shares – from the Outlook account at Verdmont in Panama to the BGC account at JTF (the "BGC shares") in preparation for selling them to JTF customers.

71.     A few days after he began transferring the BGC shares to JTF in preparation for their sale, Genovese also began preparations for the sale, through JTF, of 6.5 million restricted

19

LBSV shares – another approximately 8% of LBSV's outstanding shares – registered to Look Back (the "Look Back shares"), preparations Mirman knew he was making.  Genovese directed that the shares, in the form of a physical certificate bearing a restrictive legend, be deposited with JTF's clearing broker-dealer.  As the efforts to clear the shares proceeded, Genovese caused an account in Look Back's name to be opened at JTF, again with Mirman as the account representative.

72.     Mirman regularly received information and updates on the status of the transfer and deposit of LBSV shares into both the BGC and Look Back accounts, which he knew were controlled by Genovese.  Mirman was aware that Genovese was preparing to sell both the BGC shares and the Look Back shares, for a total of 13.1 million shares, and that Belesis and other JTF representatives were soliciting their customers to purchase these shares.  He also knew the approximate quantity of shares LBSV had issued and outstanding, and therefore knew, or was reckless in not knowing, that Genovese beneficially owned at least 16% of LBSV's outstanding shares.

73.     Genovese, Belesis and Mirman had dozens of phone calls and meetings between August and mid-September 2012, including meetings that took place on Genovese's yacht and private jets.  Genovese and Mirman also advanced the promotional scheme by meeting with several penny stock promoters whom they were recruiting to assist in more elaborate steps to promote LBSV, which they were planning to execute several months in the future.  Genovese informed the promoters that Belesis and Mirman were "100% on board" with the LBSV "deal."

74.     Genovese continued to sell LBSV shares from his Outlook account at Verdmont into the market.  As of September 20, 2012, Genovese had sold over 4 million LBSV shares in

the U.S. through Outlook and another account he controlled at a Canadian broker-dealer (the "Canadian Broker-Dealer"), also in the name of BGC.

75.   On or about the morning of September 20, Genovese made a third presentation at JTF in which he again recommended that the registered representatives solicit their customers to buy LBSV without disclosing his intentions to sell his own LBSV shares.  Genovese touted LBSV's increasing stock price, and added that he was "going into the market and grabbing a little more," *i.e.*, buying more LBSV.  Both Belesis and Mirman were present at the meeting and encouraged the registered representatives to recommend LBSV stock to their customers, but made no other disclosures, including any disclosure about their understanding that Genovese had the present intention, and was taking steps, to sell a sizeable position in LBSV shares.

76.   As Genovese knew or was reckless in not knowing, his September presentations to the JTF representatives were materially false and misleading because: (i) they recommended the purchase of LBSV but did not disclose that he was imminently planning to sell an additional 13.1 million LBSV shares; (ii) he had already dumped millions of shares of LBSV; and (iii) the increase in stock price was due to Genovese's promotional scheme and the JTF customers' buying, not to LBSV's fundamental prospects.  Neither Genovese nor Mirman disclosed any of these facts to the sales force.  Nor did any of them disclose that Genovese and Belesis and Mirman were then negotiating the terms of the purported "loan" that Genovese had agreed to make to JTF's holding company.

77.   On September 20, 2012 the 6.6 million BGC shares were sold by BGC and purchased by four of Belesis's customers.  The trades were purposefully arranged so that no open orders were placed on the market, but were reported to the tape after the sale was executed.  This

allowed the entire block to be sold, and the trades to be reported, without causing the stock price to fall.

78.     The BGC trades generated $8,646,000 in gross proceeds, which resulted in over $8.235 million in net proceeds for BGC.  Over $410,000 was directed to JTF as gross commissions.  At the end of the day, Mirman celebrated the trades over the loudspeaker at JTF.

79.     After the BGC trades settled, Genovese directed $7 million of BGC's proceeds to be wired to his BGC bank account.  As soon as those funds were received, Genovese directed $2 million of the proceeds to an escrow account, with a notation that Belesis was the intended beneficiary of the funds.  Several days later, documents for the purported $2 million loan between BGC as the lender and ATB Holding as the borrower were finalized, and an ATB Holding account subsequently received $1,997,550.00 from the escrow account.

80.     Genovese used part of the remaining $5 million in proceeds to repay personal loans and to compensate an associate whom he promised to pay for introducing him to the LBSV deal.  The rest of the proceeds were ultimately, and indirectly, deposited to Genovese's personal bank account.

81.     No registration statement was filed or in effect with respect to any of Genovese's stock sales.  Because Genovese obtained LBSV stock from persons controlling the issuer, LBSV, with a view to selling it to the public, Genovese was a statutory underwriter, and the unregistered sales of his stock violated the securities registration requirements of the Securities Act.

**D.     September False and Misleading Publications**

82.     On or about September 24, 2012, Genovese paid "Writer B," a Canadian citizen, 25,000 Canadian dollars to publish a positive newsletter article touting LBSV.  As he had agreed with Genovese, Writer B used half of the compensation to purchase 10,000 LBSV shares.

83.     Genovese reviewed, revised and approved the content of Writer B's newsletter recommendation.  Genovese controlled the timing of the publication of Writer B's promotion, which was published shortly after the market opened on September 27, 2012, in anticipation that it would coincide with that day's anticipated trade of the Look Back shares.

84.     Writer B's newsletter recommendation touted that LBSV had "traded over 20 million shares and doubled in value" in September, and that "[a] major Wall Street firm is actively accumulating a position," and it quoted Genovese as saying "'BG[C] is betting big on silver, and Liberty Silver Corp is our biggest bet.'"

85.     Writer B did not disclose that Genovese had commissioned and compensated him for the publication, or that Genovese had pre-approved its content.  Writer B included a disclaimer that Writer B was a LBSV shareholder, but did not disclose that he had purchased his shares at Genovese's direction and as a condition to his compensation.

86.     Later the same day, Genovese published a press release, under BGC's name, headlined "Liberty Silver Doubles in Value and Trades over $20 [*sic*] Million Shares in September."  It quoted from Writer B's recommendation touting the increase in LBSV's volume and share price and BGC's role.  On the morning of September 28, Genovese caused a mass email to be sent to his database of contacts directing recipients to Writer B's LBSV recommendation.

87.     Genovese's and BGC's publications were materially false and misleading, as Genovese knew or was reckless in not knowing, because they: (1) constituted scalping; (2) concealed Genovese's compensation for and control of Writer B's recommendation; (3) did not disclose that the increase in share price and trading was due to Genovese's scheme; and (4)

falsely implied that the "major Wall Street firm" had taken a proprietary position, when in reality JTF had invested none of its own capital in LBSV.

88.     The email to Genovese's database of contacts contained a disclaimer that was further misleading.  It stated, in relevant part, that "BG[C] has a long position in this security via its subsidiary, Look Back Investments[,] and may trade in and out of this security at their own discretion without informing any person or entity."  Among other things, as Genovese knew or was reckless in not knowing, the disclaimer was materially misleading because it did not disclose Genovese's true level of beneficial ownership, nor his ownership through Outlook or other BGC accounts, nor the fact of his actual and imminent sales of millions of LBSV shares.

89.     Genovese forwarded to Mirman a copy of Writer B's recommendation and a draft of BGC's press release before it was published, and informed Mirman of other promotional efforts that he expected to be made public at or around the same time as the planned trade of the Look Back position.

90.     Between August and October, Genovese personally made or directed others, including stock promoters who were compensated or promised compensation, to make or publish additional false and misleading statements concerning LBSV, including scalping statements.  For example, on September 10, 2012 and September 27, 2012, Genovese caused mass emails to be sent, under BGC's name and his own name, which trumpeted the increased volume and share price of LBSV but did not disclose that he planned to sell millions of LBSV securities.  Other efforts included paying, contracting for, or otherwise promising to compensate, individuals or entities for: (i) publishing written and video recommendations touting LBSV starting August 23, 2012; (ii) direct solicitation of retail investors to invest in LBSV; (iii) posting positive comments and minimizing negative comments concerning LBSV on internet stock message boards; and (iv)

publishing additional touts of LBSV, including one that was published to a different email subscriber list for OTC stocks on August 28, 2012 and another that was scheduled to be broadly disseminated on October 10, 2012.

91.   Mirman was aware of, and celebrated, the fact that JTF customers were buying large quantities of LBSV shares.  He was also aware that LBSV's share price dramatically increased during this time period.

### E.   The Look Back Offering

92.   Because Genovese had acquired the Look Back shares directly from LBSV, they bore a legend indicating that they were "restricted securities" as defined in Securities Act Rule 144 and could not be offered for sale, sold, or otherwise transferred except pursuant to registration or an exemption from registration.

93.   To obtain the unrestricted stock certificate required for reselling the Look Back shares to JTF customers without registration, Genovese and Mirman knowingly or recklessly created the false appearance that the Look Back transaction complied with Rule 144 under the Securities Act, which is a safe-harbor provision that allows public resale of restricted securities under certain conditions.

94.   Genovese knowingly or recklessly falsely represented to LBSV officers that neither he nor Look Back owned more than 5% of LBSV's shares, which induced the Company and others to process the proposed sale of the Look Back shares pursuant to Rule 144 as if Look Back was a "non-affiliate" of LBSV.  Genovese also directed his assistant and the purported officers of Look Back to represent, in Seller's Representation Letters, that Look Back did not beneficially own more than 10% of LBSV's shares, and was not at the time, nor within the preceding three months, an affiliate of LBSV.

95.     In reality, as Genovese knew or was reckless in not knowing, he was the sole owner of Look Back and beneficially owned well more than 10% of LBSV's shares within the prior three months.  Both Genovese and his entities, including Look Back, were affiliates of LBSV as defined by Rule 144(a)(1), because by virtue of their direct and indirect ownership and management of LBSV, they directly, or indirectly controlled, or were under common control with LBSV.  Genovese's control of LBSV was established by his beneficial ownership of over 44% of LBSV's shares, including through his agreements with the LBSV Owners which gave him 80% of the pooled shares and the LBSV Director's ongoing presence on the LBSV Board. It was also evidenced by Genovese's having hand-picked LBSV's management and Board and retaining significant influence over them.  This influence was reflected in Genovese's engineering of LBSV's listing of its securities on the TSX, and direction, with the acquiescence of the then-CEO and the President of LBSV, of many financing, publicity and corporate strategies on behalf of the Company.  In various communications during this time period, Genovese himself claimed to have control over LBSV.

96.     To ensure that the Look Back shares could be sold pursuant to Rule 144's safe harbor, Mirman had to provide his own representations in the form of a Broker's Representation Letter.  In the Broker's Representation Letter Mirman executed, he affirmed that he had read the representations in Look Back's Seller's Representation Letter and confirmed his role as a broker under the Securities Act.  However, he falsely attested to the following representation: "After reasonable inquiry, the undersigned is not aware of any circumstances indicating that [Look Back] is an underwriter with respect to the transaction or that the sale is part of a distribution of securities of the issuer."

97.     According to JTF's written compliance procedures, a reasonable inquiry for purposes of proposed Rule 144 resales would have included "taking whatever steps necessary to insure that the sale does not involve an issuer, a person in a control relationship with an issuer, or an underwriter with a view to offer or sell the securities in connection with an unregistered distribution."  In addition, the procedures required a "searching inquiry" when a customer "physically deposits certificates or transfers in large blocks of securities when the firm does not know the source of the securities," and required that the broker not rely "solely on others, such as clearing firm, transfer agents, or issuers' counsel" to fulfill its obligations.

98.     Mirman made no inquiry into Look Back's status.  However, even without a formal inquiry, by virtue of his experience as a broker in the penny stock industry, involvement with Genovese's scheme and his role as BGC's and Look Back's account representative, Mirman knew, recklessly disregarded, or should have known that the circumstances indicated that Look Back was a statutory underwriter with respect to the proposed transaction and/or that the sale was part of a distribution.  The circumstances of which Mirman was aware included multiple "red flags" indicative of a distribution, including: (i) Genovese was a stock promoter; (ii) Genovese was proposing to sell 13.1 million LBSV shares, amounting to over 16% of LBSV's outstanding common shares and an even higher percentage of the public float of non-restricted shares; (iii) LBSV was a thinly-traded penny stock; (iv) Genovese's sales and attempted sales of the BGC and Look Back shares occurred within days of the transfer and deposit of the shares, respectively; (v) Genovese beneficially owned shares and/or controlled brokerage accounts under multiple different corporate names, including BGC, Look Back and Outlook; (vi) Genovese had acquired over 2 million shares from an "original guy" in the LBSV deal, raising questions about whether a large block of Genovese's shares had been acquired from a member of the original

LBSV control group, with a view to distributing them; (vii) Genovese and BGC were engaged in promotional activity in LBSV while simultaneously selling LBSV securities; and (viii) other suspicious activity, including that Mirman had been present when Genovese offered to make a kickback to Belesis in exchange for selling his LBSV shares.

99.     Both Genovese and Mirman also knowingly or recklessly made it falsely appear that LBSV was a reporting company under Commission regulations with an applicable six month holding period pursuant to Rule 144.  In reality, they both knew, or were reckless in not knowing, that LBSV was a non-reporting company whose restricted securities required a 12-month holding period after issuance to qualify for resale under Rule 144.  They both also knew that the Look Back shares were acquired in December 2011, which meant that they had been held over six months, but not the 12 months required for a non-reporting company.

100.     Genovese's and Mirman's deceptive conduct was material because the true facts rendered the Look Back shares ineligible for resale pursuant to Rule 144.  But LBSV's counsel was provided with the false and misleading Representation Letters and relied on them in issuing an opinion letter that the applicable Rule 144 requirements had been met.  Counsel's opinion letter, in turn, resulted in the removal of the restrictive legend from the Look Back shares as required for resale.

101.     Belesis solicited his customers and invited certain JTF's representatives to solicit their customers to purchase the Look Back shares.  The representatives were not informed of the source of the shares.  JTF customers authorized purchases of the Look Back shares.

102.     On or about September 27, 2012, the day the Look Back sales were anticipated to be executed, Mirman celebrated the "$9.8M in new money" – *i.e.*, the amount of money that JTF

customers would pay to purchase the Look Back shares at the current inflated price – that he had brought into JTF.

103.    However, the transaction did not occur on September 27, 2012 because JTF's clearing broker-dealer developed concerns about the proposed trades of large blocks of LBSV shares, a thinly-traded issue.  The following week, the clearing broker-dealer advised JTF that it would not clear the Look Back share sale.

## IV.    Manipulative Trading on October 3, 2012

104.    After September 27, 2012, JTF representatives were not actively marketing LBSV stock to their customers as they awaited the Look Back transaction.  Accordingly, the stock price began to decrease, from $1.46 at closing on September 26 to $1.33 at closing on October 2.

105.    On October 3, 2012, with the purpose of increasing LBSV's stock price while maintaining control over the stock, and creating the appearance of liquidity to entice investors to purchase shares he intended to dump, Genovese engaged in coordinated trading activity of LBSV common stock, including trades between accounts he controlled.  These latter trades were "wash trades," because no actual change in beneficial ownership occurred.

106.    On the morning of October 3, Genovese called the trading clerk at JTF (the "Clerk") before the market opened, explaining that he planned to buy a large quantity of LBSV through a series of limit orders in his BGC account at JTF, but that he wanted an "open ticket," *i.e.*, to have the trades aggregated and allocated to his account at the close of the market so that they appeared to be a single large trade.

107.    Genovese initially gave the Clerk three limit orders to buy 25,000 shares, at prices of $1.33, $1.34 and $1.35, respectively.  The Clerk had been instructed by Mirman to accept orders placed by Genovese.  The stock opened at $1.35.

108.    In multiple phone calls with the Clerk throughout the morning, Genovese asked about the status of his orders, where the stock was trading, and other information about the LBSV market.  As the stock price moved higher, Genovese gave new buy limit orders, as follows: (a) 50,000 shares at $1.35; (b) 25,000 shares at $1.36; (c) 25,000 shares at $1.38; (d) 25,000 shares at $1.37; (e) 25,000 shares at $1.36; (f) 25,000 shares at $1.36; (g) 25,000 shares at $1.37; (h) 50,000 shares at $1.38; (i) 50,000 shares at $1.39; (j) 50,000 shares at $1.40; (k) 50,000 shares at $1.39; (l) 50,000 shares at $1.40; and (m) 15,000 shares at $1.41.  Genovese's intention in placing this series of orders was to steadily, and artificially, increase the price of the stock throughout the day.

109.    In the early afternoon, while knowing many of his buy limit orders at JTF remained open, Genovese caused sell limit orders at the same prices and similar quantities to be placed on behalf of the accounts he controlled at Verdmont and the Canadian Broker-Dealer. Genovese executed 8 wash trades between 1:28 pm and 1:48 pm, selling 190,000 LBSV shares from his Verdmont and Canadian Broker-Dealer accounts and buying 170,808 shares into his BGC account at JTF to fill his open limit orders at prices between $1.35 and $1.40.  The trades were designed to allow Genovese to maintain beneficial ownership, and therefore control, of the stock while inflating its price and creating the false appearance of trading volume.  This, in turn, was intended to encourage investors to purchase LBSV stock.

110.    Before noon on October 3, JTF was informed by its clearing broker-dealer that it would not process the Look Back transaction.

111.    In the mid-afternoon, after successfully inflating the price of the stock, Genovese dumped nearly 500,000 shares at the inflated price of $1.40 from the Canadian Broker-Dealer account he controlled.  Over 425,000 of these were purchased in the accounts of JTF customers.

112.     The apparent trading volume of 1,806,498 was more than three times the prior day.  However, Genovese's total sales of 1,096,000 LBSV shares on October 3 amounted to approximately 61% of the day's sell-side volume, and his purchases of 508,400 amounted to about 28% of the buy-side volume.  Other JTF customers' purchases of 1,085,755 shares amounted to about 60% of the buy-side volume.  The stock closed at $1.43– a $.10 increase over the prior day's closing price.

## V.     Trading Suspension

113.     In the three months prior to August 20, 2012, LBSV traded with low weekly volume and at prices not exceeding $0.88 per share.  By taking the steps described above, Genovese and BGC, with Mirman's knowing or reckless substantial assistance, successfully increased LBSV's share price to a high of $1.55 on October 4, 2012 and apparent weekly trading volume of 3,162,357 between October 1 and October 4, 2012.

114.     On October 5, 2012, the Commission suspended trading in LBSV securities.  OTCBB never resumed its quotation of LBSV shares.

115.     Between August 21, 2012 and October 5, 2012, Genovese sold 12,856,242 shares in the United States through his BGC and Outlook accounts, for proceeds of over $17.5 million and an estimated profit of just under $8 million.

116.     Over 70 JTF representatives solicited their customers to buy more than 19 million LBSV shares.  Mirman earned over $300,000 in commissions from BGC's sales and purchases of LBSV.

### FIRST CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Against All Defendants)

117.     Paragraphs 1 through 116 are incorporated by reference as if set forth fully herein.

118.    By virtue of the foregoing, Defendants, directly or indirectly, singly or in concert

with others, made use of the means or instruments of transportation or communication in

interstate commerce, or of the mails, to offer and sell securities through the use or medium of a

prospectus or otherwise, or carried or caused to be carried through the mails or in interstate

commerce, by any means or instruments of transportation, securities for the purpose of sale or

for delivery after sale, when no registration statement had been filed or was in effect as to such

securities and when no exemption from registration was applicable.

119.    By virtue of the foregoing, Defendants violated and, unless restrained and

enjoined, will continue violating, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§

77e(a) & (c).

**SECOND CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**
**(Against Genovese and BGC)**

120.    Paragraphs 1 through 116 are incorporated by reference as if set forth fully herein.

121.    By virtue of the foregoing, Genovese and BGC, directly or indirectly, singly or in

concert with others, by use of the means or instruments of transportation or communication in

interstate commerce, or of the mails, in the offer or sale of securities:  (1) with scienter,

employed devices, schemes, or artifices to defraud;  (2) obtained money or property by means of

untrue statements of material fact or omissions to state material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading;

and (3) engaged in transactions, practices, or courses of business which operated or would

operate as a fraud or deceit upon the purchasers.

122.    By virtue of the foregoing, Genovese and BGC violated and, unless restrained and

enjoined, will continue violating, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## THIRD CLAIM FOR RELIEF
### Violations of Section 9(a) of the Exchange Act
**(Against Genovese and BGC)**

123.    Paragraphs 1 through 116 are incorporated by reference as if set forth fully herein.

124.    By virtue of the foregoing, Genovese and BGC, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (a) For the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security: (1) effected transactions in such security which involved no change in beneficial ownership thereof; or (2) entered an order or orders for the purchase or sale of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale or purchase of any security, had been or would be entered by or for the same or different parties; or; (b) Effected, alone or with one or more other persons, a series of transactions in any security other than a government security or in connection with any security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

125.    By virtue of the foregoing, Genovese and BGC violated and, unless restrained and enjoined, will continue violating, Section 9(a) of the Exchange Act, 15 U.S.C. § 78i.

## FOURTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
**(Against Genovese and BGC)**

126.    Paragraphs 1 through 116 are incorporated by reference as if set forth fully herein.

127.     By virtue of the foregoing, Genovese and BGC, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (1) to employ devices, schemes, or artifices to defraud; (2) to make untrue statements of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

128.     By virtue of the foregoing, Genovese and BGC violated and, unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5(a) and (c) Thereunder
### (Against Mirman)

129.     Paragraphs 1 through 116 are incorporated by reference as if set forth fully herein.

130.     By virtue of the foregoing, Mirman, directly or indirectly, provided knowing and substantial assistance to persons who, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (a) to employ devices, schemes, or artifices to defraud; and (b) to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

131.     By virtue of the foregoing, Mirman aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5, in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

### SIXTH CLAIM FOR RELIEF
#### Violations of Section 17(a)(1) and (3) and
#### Aiding and Abetting Violations of Section 17(a)(1) and (3) of the Securities Act
#### (Against Mirman)

132.    Paragraphs 1 through 116 are incorporated by reference as if set forth fully herein.

133.    By virtue of the foregoing, Mirman, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities (a) with scienter, employed devices, schemes and artifices to defraud; or (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of the securities.

134.    By virtue of the foregoing, Mirman, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities, provided knowing and substantial assistance to persons who, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities (a) with scienter, employed devices, schemes and artifices to defraud; or (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of the securities.

135.    By virtue of the foregoing, Mirman violated and aided and abetted, and, unless restrained and enjoined, will continue violating and aiding and abetting, violations of Section 17(a)(1) and Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1) &77q(a)(3).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Finding that Defendants violated the securities laws and rules promulgated thereunder as alleged against them herein.

### II.

Permanently restraining and enjoining Defendants, their agents, servants, employees, attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a), 5(c) and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c) and 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### III.

Permanently restraining and enjoining Genovese, BGC, their agents, servants, employees, attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 9(a) of the Exchange Act, 15 U.S.C. §78i.

### IV.

Ordering Defendants to disgorge their ill-gotten gains received as a result of the conduct alleged herein, plus prejudgment interest thereon.

## V.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VI.

Permanently prohibiting Genovese and Mirman from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

## VII.

Granting such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.

Dated: August 1, 2017
      New York, New York

                SECURITIES AND EXCHANGE COMMISSION

                By:

                    Lara S. Mehraban
                    Associate Regional Director
                SECURITIES AND EXCHANGE COMMISSION
                Brookfield Place, 200 Vesey Street
                New York, New York 10281-1022
                (212) 336-1023 (Brown)
                Attorney for Plaintiff

Of Counsel:
Andrew M. Calamari
Thomas P. Smith, Jr.
Nancy A. Brown
Margaret D. Spillane