**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 17-CV-05821 (RJS) |
| RONALD DONALD BRUCE GENOVESE, B.G. CAPITAL GROUP, LTD., and ABRAHAM "AVI" MIRMAN | **ORAL ARGUMENT** **REQUESTED** |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ABRAHAM MIRMAN'S MOTION TO DISMISS

William J. Leone
NORTON ROSE FULBRIGHT
1301 Avenue of the Americas
New York, NY, 10019-6022
Tel.: 212-318-3000
Fax: 212-318-3400
william.leone@nortonrosefulbright.com

*Counsel for Defendant Abraham Mirman*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND ...........................................................................................2

LEGAL STANDARD .......................................................................................................10

ARGUMENT .....................................................................................................................10

   I. The SEC Does Not Adequately Allege Violations
      of Section 5(a) or (c) of The Securities Act ...............................................................10

       A.   The SEC Fails to Plead that Mirman Was the "But For" Reason for The Sale of
            Unregistered Liberty Silver Stock from the BGC Account ...................................11

       B.   The SEC Fails to Plead that Mirman Was the "But For" Reason for The Offer of
            Look Back's Unregistered Shares of Liberty Silver...............................................13

   II. The SEC Does Not Adequately Allege Violations
       of Section 17(a)(1) of the Securities Act ....................................................................15

       A.   Mirman Did Not Have Motive or Opportunity to Commit Fraud ........................16

       B.   Mirman Had No Actual Knowledge of Genovese's Scheme ...............................17

       C.   Mirman Was Not Reckless In Not Knowing About Genovese's Scheme ............17

   III. The SEC Does Not Adequately Allege that Mirman
       Aided and Abetted Violations of Section 17(a)(1) and (3)
       and Section 10(b) and Rule 10b-5(a) and (c)..............................................................22

       A.   Mirman Had No Actual Knowledge of Genovese's Scheme ...............................22

       B.   Mirman Did Not Substantially Assist Genovese's Scheme ..................................23

   IV. The SEC Does Not Adequately Allege that Mirman
       was Negligent Under Section 17(a)(3) ........................................................................23

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Armstrong v. McAlpin*,
    699 F.2d 79 (2d Cir. 1983)..................................................................................................23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................................10

*ATSI Commun., Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007).................................................................................................10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................................................10

*In re CBI Holding Co., Inc.*,
    419 B.R. 553 (S.D.N.Y. 2009)...........................................................................................21

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996).................................................................................15, 16, 19

*JP Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005)...............................................................................23

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001).........................................................................................16, 17

*Krys v. Pigott*,
    749 F.3d 117 (2d Cir. 2014)...............................................................................................10

*Pope Investments II, LLC v. Deheng L. Firm*,
    10 CIV. 6608 LLS, 2013 WL 3946126 (S.D.N.Y. July 31, 2013) .........................................22

*Prickett v. New York Life Ins. Co.*,
    896 F. Supp. 2d 236 (S.D.N.Y. 2012)................................................................................19

*Rolf v. Blyth, Eastman Dillon & Co.*,
    570 F.2d 38 (2d Cir. 1978).............................................................................................15, 17

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...............................................................................................10

*Ross v. Bolton*,
    639 F. Supp. 323 (S.D.N.Y. 1986) ....................................................................................23

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir.2006)...................................................................................11

*SEC v. Murphy*,
    626 F.2d 633 (9th Cir. 1980) ...............................................................................11

*Saltz v. First Frontier*,
    LP, 782 F. Supp. 2d 61 (S.D.N.Y. 2010) ..............................................................19

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012)..................................................................................23

*SEC v. Chinese Consol. Benev. Ass'n, Inc.*,
    120 F.2d 738 (2d Cir. 1941).................................................................................11

*SEC v. Ginder*,
    752 F.3d 569 (2d Cir. 2014).................................................................................24

*SEC v. Lek Securities Corp.*,
    2017 WL 3705077 (S.D.N.Y. Aug. 25, 2017) .....................................................15

*SEC v. Mudd*,
    885 F. Supp. 2d 654 (S.D.N.Y. 2012).............................................................23, 24

*SEC v. Pimco Advisors Fund Mgmt. LLC*,
    341 F. Supp. 2d 454 (S.D.N.Y. 2004)..................................................................22

*SEC v. Universal Exp., Inc.*,
    475 F. Supp. 2d 412 (S.D.N.Y. 2007)............................................................11, 15

*SEC v. Universal Major Indus.*,
    546 F.2d 1044 (2d Cir. 1976).........................................................................11, 12

*SEC v. Wey*,
    246 F. Supp. 3d 894, 912 (S.D.N.Y. 2017).................................................22, 24, 25

*SEC v. Zubkis*,
    97 CIV 8086 JGK, 2000WL 218393 (S.D.N.Y. 2000).......................................16, 17

*Shanghai Weiyi Intern. Trade Co., Ltd. v. Focus 2000 Corp.*,
    15 CIV. 3533 CM, 2015 WL 6125526 (S.D.N.Y. Oct. 16, 2015)...........................23

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)...........................................................................19, 22

*Tarsavage v. Citic Tr. Co., Ltd.*,
    3 F. Supp. 3d 137, 145–46 (S.D.N.Y. 2014).........................................................25

*U.S. v. Am. Intl. Group, Inc.*,
    16-CV-5694 (KBF), 2017 WL 3610514 (S.D.N.Y. Aug. 21, 2017) ......................................17

**Statutes**

15 U.S.C. § 77e ............................................................................................................................11

15 U.S.C. § 77q(a)(1)....................................................................................................................15

**Other Authorities**

Fed. R. Civ. P. 9(b) ............................................................................................... *passim*

Fed. R. Civ. P 12(b)(6)...........................................................................................................1, 10

Defendant Abraham "Avi" Mirman ("Mirman") respectfully submits this memorandum of law in support of his motion to dismiss the Complaint ("Complaint") filed by Plaintiff United States Securities and Exchange Commission ("SEC") for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P 12(b)(6), and for failure to comply with the pleading requirements of Fed. R. Civ. P. 9(b).

## PRELIMINARY STATEMENT

Stripped of all the conclusory allegations and unsupported collective references to "they" "the defendants," and "Mirman and Genovese," the Complaint alleges only two things against Mirman:  that he aided and abetted Genovese's alleged fraudulent stock promotion and that he "directly unlawfully distributed" Genovese's stock.  Compl. at ¶1.  To prevail on the first theory the SEC must allege that Genovese made fraudulent statements or omissions, that Mirman knew they were false, that Mirman intended to further Genovese's fraudulent communications and that Mirman did something specific to further the making of the fraudulent statements.  Conclusory statements to that effect are insufficient.  These elements must be alleged with particularity, meaning that the SEC must allege sufficient facts from which a fact finder could find the required elements, including specifically what Mirman did to intentionally further the making of these alleged fraudulent statements or omissions.  To prevail on the second theory, since Mirman was not a seller of the stock, the SEC must allege that Mirman was the but for cause of the sales in contravention of the applicable registration requirements.  It is not enough that he did something connected to the sales.  The SEC must allege that without Mr. Mirman's participation, the sales would not have occurred.  Because the SEC fails to plead sufficient facts to sustain either theory, the Complaint should be dismissed in its entirety.

## FACTUAL BACKGROUND

### A.    Defendant Avi Mirman

For approximately 12 months in 2012, defendant Avi Mirman was an employee of John Thomas Financial ("JTF"), a former registered broker-dealer that was controlled and indirectly owned by JTF's CEO, Anastasios Belesis ("Belesis").  Compl. at ¶¶ 3, 19, 21, 22.  Mirman served as the head of JTF's Investment Banking Department and not as a broker.  *Id*. at ¶¶ 19, 22. Mirman held several securities licenses and was a registered representative through JTF even though his duties were those of an investment bank manager.  *Id*. at ¶ 19.  Mirman is not an attorney and was not responsible for JTF's retail compliance processes or procedures.  *See id*. at ¶ 97.  In short, Mirman's involvement in the transactions that form the core of the Complaint was to (1) introduce Genovese to Belesis for which he ultimately received a commission; (2) introduce Genovese at a presentation for brokers; (3) sign a broker's representation letter, which could have been signed by anyone at JTF including Belesis, for a transaction that was never consummated; and (4) perform his duties as head of investment banking for JTF, which included determining whether Genovese would consider making an investment in JTF, ultimately resulting in a $2 million dollar loan from Genovese to JTF.

### B.    Liberty Silver's and Genovese's Alleged Scheme

According to the SEC, beginning in 2010, long before Mirman even worked at JTF, the founders and sole officer and director of Liberty Silver ("Liberty Silver Owners"), a penny stock listed on the Toronto Stock Exchange ("TSX") until 2014, Compl. ¶ 20, "devised a stock manipulation and promotion scheme that would inflate the price and trading volume for the stock," *Id*. at  ¶ 28.

Between 2011 and July 2012, as part of this scheme, Genovese acquired stock in Liberty Silver from its managers and on the open market, and established an account in the name of

Outlook Investments at a broker-dealer other than JTF to hold these shares, *Id*. at ¶¶ 23, 36.  By July 30, 2012, Genovese, or his wholly owned company BGC, allegedly controlled Liberty Silver through its beneficial ownership of over 10.4 million purportedly unrestricted Liberty Silver common shares through market purchases and over 25 million shares through private transactions with Liberty Silver and its affiliates.  *Id*. at ¶ 41, 48.

Mirman, however, was not aware of any of this, and the Complaint makes no factual allegations regarding how, when or from whom he would have acquired this knowledge. Mirman did not work for Genovese, BGC or Liberty Silver.

**C.**     **Genovese's Efforts to Use JTF to Further His Alleged Scheme**

In the summer of 2012, Genovese allegedly expanded his scheme by disseminating false and misleading promotional materials regarding Liberty Silver and by using JTF as a broker-dealer to sell inflated Liberty Silver shares.  Compl. at ¶ 43.  A fair reading of the Complaint is that most of the contact between Genovese and JTF occurred through Belesis, who owned JTF and was the person ultimately in charge of the retail brokers.  The facts, as opposed to the unsupported conclusory invective aimed at Mirman, of Mirman's involvement are minimal, and none of them permit an inference of illegality.  The alleged facts are that:

- Genovese and Mirman reconnected in July 2012, *Id*. at ¶45.

- On August 7, 2012, Genovese forwarded Mirman "a small blurb from [a writer] on Liberty Silver," and vaguely noted that "[w]e are working with him for a full blown buy recommendation in his September letter."  *Id*. at ¶ 55.

- On or about August 18, 2012, Genovese invited Belesis and Mirman to a meeting where "Genovese pitched Mirman and Belesis to sell LBSV to JTF customers.  Genovese told Mirman and Belesis that he was a significant shareholder in LBSV, that he had purchased a large quantity of LBSV shares on the market and through a private placement, and that he was interested in increasing LBSV's trading volume."  *Id*. at ¶ 45.

- During this meeting, Belesis and Mirman, now working as an investment banker, also discussed the possibility of Genovese investing $10 or $20 million in JTF.  *See id*. at ¶ 46.

- Genovese was invited to make a presentation to JTF brokers about Liberty Silver.  *Id*.

- Mirman forwarded Genovese's August 7 email containing the "small blurb" about Liberty Silver to 1 of the nearly 200 registered representatives.  *See id*. at ¶ 55.  The SEC does not allege that Genovese's email or the blurb was false or misleading, or that Mirman knew or should have known they were.  Nor does it allege that the broker acted on the information or sold any stock to anyone.

The SEC does not allege that Genovese told Mirman about his secret arrangement with the Liberty Silver Owners, his beneficial ownership of Liberty Silver, or what he meant when he bragged that he was a "significant shareholder" or that he had purchased a "large quantity" of shares.

On August 21, 2012, Belesis began soliciting JTF customers to buy Liberty Silver stock. *Id*. at ¶ 47.  That same day, Genovese began selling shares of Liberty Silver from his Outlook account.  *Id*. at ¶ 47.  The SEC does not allege, because it cannot, that Mirman solicited or sold Liberty Silver shares to anyone, or communicated with a single purchaser about Liberty Silver, or directed or controlled any such communications by Belesis or the retail brokers, who were not under his control or supervision.

## D.     Genovese's Initial Attempts to Promote Liberty Silver Stock with JTF

On August 28, 2012, Genovese made his first presentation to JTF brokers about Liberty Silver.  As with earlier events, the facts of Mirman's involvement are sparse:

- According to the SEC, "Mirman arranged the presentation," whatever that means.  *Id*. at ¶ 48.

- Although Mirman is alleged to have "help[ed]" draft a one page document for brokers.  *Id*.,  the document simply included the number of Liberty Silver shares outstanding, "but did not disclose . . . Genovese's beneficial ownership."  *Id*.  There is no allegation that Mirman knew of Genovese's alleged controlling interest through his various companies.

4

- Mirman "introduced Genovese to the sales floor by describing him favorably as a client, and a wealthy successful investor," and then, along with 100 JTF brokers, sat through Genovese's presentation. *Id*. at ¶ 49.

- Mirman then forwarded a promotional video from Genovese to Belesis, who on his own then sent it to the JTF brokers. *Id*. at ¶ 54.

The Complaint, however, does not plead any facts specifying how Mirman "arranged" or "help[ed] draft," that Mirman made any misrepresentations in the document, that he knew or should have known about Genovese's secret scheme, that Genovese "had commissioned" the promotional video, that he misrepresented Genovese when introducing him to the brokers, or that he even made any statements about Liberty Silver at all. *See id*. at ¶ 54. As noted, Mirman did not manage, control, supervise or work as a retail broker.

The Complaint alleges that during the period between late August and early September, Genovese, Belesis and Mirman exchanged several phone calls and emails on the topic of selling Liberty Silver shares to JTF customers. *Id*. at ¶ 63. During one exchange, Genovese informed Mirman that Genovese "had bought more than 2 million shares of Liberty Silver from 'an original guy in the deal who had 3,000,000 shares.'" *Id*. at ¶ 64. In other exchanges, Genovese forwarded Mirman additional promotional recommendations for Liberty Silver. *See id*. at ¶¶ 59, 65. Mirman forwarded "some" of the materials to Belesis, and Belesis independently forwarded "some" of those materials to JTF brokers. *Id*. at ¶ 65.

The SEC does not allege that Genovese informed Mirman of his scheme during any of these exchanges; that there was anything misleading contained in the materials Mirman received; that Genovese paid for, wrote or otherwise inappropriately obtained any of the materials; or if he did, that Mirman knew or should have known of Genovese's actions. At most, Genovese sent a vague "note" to Mirman during this period stating that he was "[w]orking it from my end!!!" *Id*.

5

On September 12, 2012, Genovese gave a second presentation to JTF brokers during which he touted Liberty Silver's prospects, emphasized its recent increase in share price, and encouraged the brokers to sell the stock to their customers.  Belesis also spoke at the meeting to "encourage" the brokers to sell more of the stock to their customers.  *Id.* at ¶ 67.  Mirman attended the presentation, but did not speak and had no active role whatsoever.[1]  Again, the SEC fails to allege any facts that, during that presentation, Mirman knew or should have known of Genovese's true ownership of Liberty Silver, or that he secretly paid for promotional recommendations.

**E.**    **Genovese's Scheme to Sell Liberty Silver Shares from His Outlook Account**

On September 12, 2012, Genovese further proposed to Belesis and Mirman that JTF sell an unspecified "large block" of Genovese's Liberty Silver shares and that Genovese would also invest in JTF 50% of the profits he made from that sale.  *Id.* at ¶ 68.  As alleged, it was Belesis, and not Mirman, who was involved in accepting Genovese's proposal, and JTF's attorney, and not Mirman, who was involved in drafting documentation for a purported loan from Genovese to the holding company controlled by Belesis.  *Id.*  Genovese's loan was "directed . . . to an escrow account, with a notation that Belesis was the intended beneficiary of the funds," not Mirman.  *Id.* at ¶ 79.

The SEC claims that Mirman then "invited" Genovese to open an account at JTF, "with the understanding" that Genovese would be selling an unspecified "large block" of shares through it.  *Id.* at ¶ 68.  After the account was opened in the name of BGC ("BGC Account"),

---

[1]    The SEC strains to give an active role to Mirman at this presentation, during which he was nothing more than a member of the audience, by vaguely asserting that "Mirman provided Genovese with access to the JTF sale force for another presentation."  *Id.* at ¶ 67.

Genovese directed the transfer of 6.6 million shares of Liberty Silver stock from his Outlook account to his new BGC Account to sell to JTF customers. *Id*. at ¶ 70. ("the Outlook Stock"). Mirman received the title of "representative of record" for the BGC Account, which entitled Mirman to commissions on any transactions. *See id*. at ¶ 69. However, despite having the title of "representative of record," Mirman did not act as the broker for the BGC Account, did not sign any documents, did not solicit any customers or make any trades.[2] In fact, it was Belesis, not Mirman, who later sold all of Genovese's stock transferred to the BGC Account to Belesis's own customers. *Id*. at ¶ 77.

A few days later, Genovese "also began preparations for the sale, through JTF, of 6.5 million restricted LBSV shares . . . registered to Look Back [Investments]", a corporation beneficially owned and controlled by Genovese ("Look Back"). *Id*. at ¶ 71. [3]

On or about September 20, 2012, Genovese made a third presentation at JTF. *Id*. at ¶ 75. Genovese again recommended that the registered representatives solicit their customers to buy Liberty Silver stock, and that he was "'going into the market and grabbing a little more,' *i.e.*, buying more LBSV," without disclosing his intentions to sell some of his own shares. *Id*. Belesis and Mirman allegedly attended, and "encouraged" the registered representatives to recommend Liberty Silver to their customers, "but made no other disclosures." *Id*.

---

[2]   The SEC asserts that, as representative of record of the BGC Account, Mirman earned over $300,000 in commissions. Compl. ¶ 116. The only action allegedly taken in that capacity was to instruct the JTF trading clerk "to accept orders placed by Genovese." *See id*. at ¶ 107.

[3]   The SEC makes two conflicting conclusory allegations: that Mirman "knew [Look Back was] controlled by Genovese," *id*. at ¶ 72, but also that Mirman knew nothing about Look Back and "made no inquiry into Look Back's status," *id*. at ¶ 98.

However, Belesis himself, and not any of the other registered representatives, sold all of the 6.6 million Outlook shares to Belesis's own customers that day from the BGC Account. *Id.* at ¶ 77. The SEC does not allege that Mirman had any role in the September 20 sale of Liberty Silver stock to Belesis's customers, and asserts no facts that Mirman knew or should have known any material information to disclose to the JTF brokers, or that even if he had, that the JTF brokers solicited, sold or took any action with respect to the sale from the BGC Account.

**F.**     **Genovese's Undisclosed Commissions to Writers**

The SEC alleges that Genovese from time to time paid writers to recommend purchase of Liberty Silver stock. *Id.* at ¶¶ 58, 59, 89, 90. Genovese sometimes forwarded a copy of these recommendations to Mirman. There are no allegations that Mirman knew or should have known that Genovese paid for, reviewed, edited, or approved these recommendations.[4]

**G.**     **Genovese's Scheme to Sell Liberty Silver Shares from His Look Back Account**

On or about September 27, 2012, Genovese allegedly furthered his scheme, in part, by using JTF to attempt to execute the sale of the second block of 6.5 million restricted Liberty Silver shares ("Look Back Offer"). Compl. ¶ 71; *see* Sec. E *supra*. Genovese sought to obtain an unrestricted stock certificate to resell the restricted securities without registration pursuant to Securities Act Rule 144's safe-harbor provision. *Id.* at ¶¶ 92-93.

The SEC alleges that Mirman conducted a single act with respect to the Look Back Offer: He signed a "Broker's Representation Letter" affirming that he read the representations in Look

---

[4]     Between August and October 2012, Genovese additionally allegedly made, as well as paid or promised payment to others to make, additional false or misleading statements about Genovese, BGC and Liberty Silver, including on August 28, September 10, September 27 and September 28, and one scheduled to be published on October 10. *Id.* at ¶¶ 86, 90. The SEC does not allege that Mirman knew about any of this, received any of these publications, or sent them to anyone.

Back's "Seller's Representation Letter" and "confirming his role as a broker under the Securities Act."[5]  The letter represented that "[a]fter reasonable inquiry, the undersigned is not aware of any circumstances indicating that [Look Back] is an underwriter with respect to the transaction or that the sale is part of a distribution of securities of the issuer."  *Id*. at ¶ 96.

According to the SEC, "[a]s the efforts to clear the shares proceeded, Genovese caused an account in Look Back's name to be opened at JTF, again with Mirman as the account representative."  *Id*. at ¶ 71.  The SEC does not allege that a JTF account was opened for Genovese when Mirman signed the Broker's Letter or that Mirman knew or directed that the account be opened in his name at any time.  While further waiting for the Look Back Offer to clear, Genovese allegedly engaged in a series of "wash trades."  *Id*. at ¶ 105.  On October 3, Genovese instructed the JTF trading clerk to purchase large quantities of Liberty Silver stock with an "open ticket'" to have the trades aggregated and allocated to his account at the close of the market to appear as a single large trade.  *Id*. at ¶¶ 106-09.  The SEC does not allege that Mirman ever knew of any wash trades or instructed the JTF trading clerk to accept requests for an "open ticket" trading scheme.

On October 3, 2012, JTF's clearing broker-dealer informed JTF that it would not process the Look Back Offer.  *Id*. at ¶ 110.  On October 5, 2012, the SEC suspended trading of Liberty Silver.  *Id*. at ¶ 114.

---

[5]  The SEC alleges that Belesis solicited his customers and invited certain JTF's representatives to solicit their customers to purchase the Look Back shares.  *Id*. at ¶ 101.  Again, Mirman did not solicit any customers.

## LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must be dismissed if it fails to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Although the plausibility standard does not require a showing of probability, it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "'[L]abels and conclusions,' or 'a formulaic recitation of a cause of action's elements will not do,'" *id.*, and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545. The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

In addition to the pleading requirements of Rule 12(b)(6), a complaint alleging securities fraud must satisfy the heightened pleading requirements of Rule 9(b). *See ATSI Commun., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Rule 9(b) requires that a party alleging fraud "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9.[6]

## ARGUMENT

### I.   THE SEC DOES NOT ADEQUATELY ALLEGE VIOLATIONS OF SECTION 5(A) OR (C) OF THE SECURITIES ACT

The SEC has failed to sufficiently allege that Mirman violated Sections 5(a) and 5(c) of the Securities Act because Mirman was not a necessary participant, and his *de minimis* activity

---

[6]   Rule 9(b) applies to all of the SEC's claims, regardless of whether scienter is an element of the claims, because all the claims sound in fraud. *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (Rule 9(b)'s heightened pleading standard applies to all claims that "are premised on allegations of fraud . . . and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action").

could not be a substantial factor, in (1) the sale Liberty Silver shares in the BGC Account or (2) the offer of the Look Back shares.  Section 5 requires that all non-exempt securities offered for sale to the public be registered with the SEC prior to the offer or sale of such securities.  *See* 15 U.S.C. § 77e; *see also SEC v. Cavanagh,* 445 F.3d 105, 111 (2d Cir. 2006).  To state a Section 5 claim the SEC must show (1) "[t]hat the defendant directly or indirectly sold or offered to sell securities; (2) that no registration statement was in effect for the subject securities; and (3) that interstate means were used in connection with the offer or sale."  *See SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007).

The SEC does not allege that Mirman had any direct involvement in the offer or sale of unregistered securities.  Accordingly, Mirman can only be liable if, as an "indirect participant," he has "engaged in steps necessary to the distribution of [unregistered] security issues."  *Id.* at 422 (quoting *SEC v. Chinese Consol. Benev. Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir. 1941)).  "The 'necessary participant test . . . essentially asks whether, but for the defendant's participation, the sale transaction would not have taken place' – in other words, whether the defendants' acts were a 'substantial factor in the sales transaction.'"  *Id.* (quoting *SEC v. Murphy*, 626 F.2d 633, 650-51 (9th Cir. 1980)); *see also SEC v. Universal Major Indus.*, 546 F.2d 1044, 1046 (2d Cir. 1976) (finding liability for individual who was "indispensable" to another's sale of stock).

### A.  The SEC Fails to Plead that Mirman Was the "But For" Reason for The Sale of Unregistered Liberty Silver Stock from the BGC Account

The SEC fails to sufficiently allege that Mirman engaged in any act that would make him a "necessary participant," a "substantial factor" or the "but for" reason in the sale of the shares from Genovese's BGC Account.

None of Mirman's alleged conduct, either separately or in the aggregate, was "necessary" or "substantial" for the sale of securities from the BGC Account.  Despite receiving the title of

"representative of record" for the BGC Account, Mirman did not act as a broker, did not solicit any customers, never communicated with a buyer of Liberty Silver securities, never drafted any sales materials or other communications to buyers of Liberty Silver securities, did not draft or participate in the drafting of any publicity concerning Liberty Silver, and did not directly cause or participate in any sales of Liberty Silver securities.  Nor does the SEC allege that Mirman controlled the communications to any buyer of Liberty Silver securities in a way that gave him control over any omissions in connection with these transactions.

Moreover, any of the vague "help[]" or "encourage[ment]" that Mirman allegedly provided regarding Genovese's presentations to JTF brokers could not have been the "but for" reason for sale of the BGC Account securities.  As the SEC alleges, not one of the JTF brokers sold a single share from the BGC Account.  *See id*. at ¶ 77.  In fact, it was Belesis, not Mirman, who sold all of the stock from Genovese's BGC Account to Belesis's own customers.  *Id*.  Not only was Mirman's *de minimis* conduct insubstantial or unnecessary, it was wholly irrelevant to Belesis's sale of the securities from Genovese's BGC Account.[7]

The only alleged action that Mirman affirmatively took as a representative of record was to instruct the JTF trading clerk "to accept orders placed by [the owner of the account]," *id*. at ¶ 107, as would be the instructions for any account.  Simply "inviting" Genovese to open a JTF

---

[7]   Moreover, the SEC does not allege that Mirman misrepresented Genovese in his introduction to the JTF brokers, that he had a duty or obligation to make any additional disclosures, or that, even if he had such a duty, he possessed the requisite knowledge concerning Genovese to make such disclosures.

account, indeed only *after* Genovese asked to open a JTF account, cannot be a substantial factor in Belesis's sale of the securities from Genovese's BGC Account and a Section 5 violation.[8]

### B.  The SEC Fails to Plead that Mirman Was the "But For" Reason for The Offer of Look Back's Unregistered Shares of Liberty Silver

The SEC alleges that Mirman performed a single act -- he signed a "Broker's Representation Letter," in which he affirmed that he read the representations in Look Back's "Seller's Representation Letter," and stated "[a]fter reasonable inquiry, the undersigned is not aware of any circumstances indicating that [Look Back] is an underwriter with respect to the transaction or that the sale is part of a distribution of securities of the issuer."  Compl. ¶ 96.  This Broker's Letter does not establish liability on Mirman's part.

First, no securities were ever sold pursuant to it.

Second, the SEC's logic is circular.  The Broker's Representation Letter  relied on the Seller's Representation Letter.   The officers of Liberty Silver (the alleged conspirators) represented "that Look Back did not beneficially own more than 10% of LBSV's shares, and was not at the time, nor within the preceding three months, an affiliate of LBSV."  *Id.* at ¶¶ 94, 96. The Look Back shares became eligible for resale only when counsel to Liberty Silver issued an opinion letter that the applicable Rule 144 requirements had been met.  *Id.* at ¶ 100. The SEC alleges that the Seller's Representation Letter was a misrepresentation because Genovese had control of Liberty Silver by virtue of (1) "his beneficial ownership of over 44% of LBSV's shares," (2) the Liberty Silver's directors ongoing presence on the Board, (3) "Genovese's having

---

[8]    Section 5 liability also cannot be premised on Mirman's alleged receipt of $300,000 in commissions in connection with the sale of the BGC Account shares, since there is no allegation that the commission itself was a "substantial factor" in the sale, or even that Mirman received the commission for any act that was a "substantial factor" in the sale.

hand-picked LBSV's management and Board and retaining significant influence over them," (4) "Genovese's engineering of LBSV's listing of its securities on the TSX," (5) "direction . . . of many financing, publicity and corporate strategies on behalf of [Liberty Silver]", (6) statements by "Genovese himself claim[ing] to have control over LBSV." *Id*. at ¶ 95.  There is no allegation of any facts to suggest that Mirman knew any of this.  His letter was, according to the Complaint, procured by the alleged architects of the fraud: Liberty Silver's management.

The SEC also does not allege any facts that would have put Mirman on notice that Genovese had specifically conspired with the Liberty Silver Owners to conceal Look Back's alleged true beneficial ownership of Liberty Silver stock, including in its SEC filings.[9]  *See* Sec. B *supra*.

Third, Mirman's execution of the Broker's Representation Letter was a formality.  The letter was not prepared by him, nor did it require his signature.  It could have been signed by any representative of JTF based on the Seller's Representations and work performed by JTF's compliance and legal department.  Even if the Broker's Representation Letter did make a difference, which it did not under the circumstances alleged by the SEC, Mirman's involvement did not.

As alleged, the Seller's Representation Letter was the product of a coordinated fraudulent scheme by Genovese and Liberty Silver to misrepresent the true extent of Genovese's ownership

---

[9]   Indeed, Liberty Silver filed Form 10-K reports with the SEC that purported to disclose "each person who . . . [beneficially owned] more than 5%" of Liberty Silver's issued and outstanding common stock.  *Id*. at ¶ 42.  As alleged by the SEC, while Genovese beneficially owned at least 44% of Liberty's approximately 80.7 million outstanding shares, *id*. at ¶ 41, his beneficial ownership was not disclosed in any SEC filing, *id*. at ¶ 42.

of Liberty Silver, as part of a larger overall scheme to promote and manipulate Liberty Silver stock.  As part of this scheme, Liberty Silver recruited Genovese, *Id*. at ¶¶ 33, 35, 38-39, 94.

Indeed, any supposed reliance by Liberty Silver's counsel on the Broker's Representation Letter and the Seller's Representation Letter in issuing an opinion letter, which at some time later resulted in the removal of the restrictive legend, was orchestrated by Liberty Silver and Genovese.  *Id*. at ¶¶ 31, 33, 35, 38-39, 94.  The SEC alleges no facts that Liberty Silver's counsel would not have issued their subsequent opinion letter "but for" Mirman's act of executing the Broker's Representation Letter, and fails to sufficiently allege that Mirman was a "necessary participant" and "substantial factor" in the Look Back Offer.

## II.  THE SEC DOES NOT ADEQUATELY ALLEGE VIOLATIONS OF SECTION 17(A)(1) OF THE SECURITIES ACT

Section 17(a)(1) makes it unlawful "to employ any device, scheme, or artifice to defraud" in offering or selling a security. 15 U.S.C. § 77q(a)(1).  "Scienter is a required element for a violation of § 17(a)(1)."  *SEC v. Lek Securities Corp.*, 2017 WL 3705077, at \*7 (S.D.N.Y. Aug. 25, 2017).  Scienter can be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996).

Reckless conduct constitutes "an *extreme* departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978) (emphasis added and citation omitted).  *See, e.g.*, *Universal Exp., Inc.*, 475 F. Supp. 2d at 427 (defendants reckless in issuing fraudulent press releases based on documents they had

created, which were themselves misleading and served to give press releases a false appearance of substantiation).

### A. **Mirman Did Not Have Motive or Opportunity to Commit Fraud**

The SEC fails to sufficiently plead that Mirman had the motive or opportunity to commit fraud. Mirman had no opportunity to commit fraud because he had no involvement with the sales process. As alleged, the buyers of the Outlook shares were Belesis customers. Mirman had no motive to commit fraud because he received a commission simply for introducing Genovese to Belesis and not for any further activity. At most, Mirman had an interest in attracting an investment by Genovese into JTF itself. Although the SEC alleges generically that the loan by Genovese and the sale of Genovese's stock were quid pro quos, it does not, and cannot allege any facts to support that theory  To plead motive, a plaintiff must show that the defendant would have received a "concrete and personal benefit" from the fraud. *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001). In contrast, "a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter." *Chill*, 101 F.3d at 268. Speculative and conclusory allegations of motive also will not support scienter. *See Kalnit*, 264 F.3d at 140.

Although Mirman was listed as the account representative for the BGC and Look Back accounts, the SEC fails to plead any facts that Mirman stood to receive any "concrete and personal benefit" in that role from Genovese's fraudulent scheme. Mirman did receive commissions in connection with the sale of the BGC Account shares, but the mere prospect of profiting from the sale of the shares as a representative of record is too generalized to allege motive, particularly because the SEC pleads no facts that Mirman had the opportunity to direct the BGC account, that he acted as a broker for the BGC Account shares, or that he solicited or sold shares to any JTF customers. *See, e.g.*, *SEC v. Zubkis*, 97 CIV 8086 JGK, 2000 WL

218393, at *7 (S.D.N.Y. Feb. 23, 2000) (finding motive and opportunity to defraud where defendant not only stood to profit from sale of corporate entity's stock but also had the ability to "direct the activities" of corporate entity and its acquirer and had "direct contact with investors").

### B.  Mirman Had No Actual Knowledge of Genovese's Scheme

The Complaint asserts that Mirman "knew" of Genovese's true level of ownership and control of Liberty Silver, Compl. ¶¶ 54, 72, Genovese's secret payments for favorable written coverage of Liberty Silver, *id.* at ¶ 5, and of Genovese's secret "wash trades," *id.* at ¶ 105. However, the SEC does not allege any factual support for these conclusory allegations.  While the SEC alleges that Genovese, Mirman and Belesis "had dozens of phone calls and meetings between August and mid-September 2012," Compl. ¶ 73, the SEC does not allege, among other details, what was said during these calls and meetings, by who, or to whom.  Rule 9(b) prohibits precisely such pleading by innuendo.  *See U.S. v. Am. Intl. Group, Inc.*, 16-CV-5694 (KBF), 2017 WL 3610514, at *2 (S.D.N.Y. Aug. 21, 2017) ("In order to state a claim for fraud, under Rule 9(b), [a]t a bare minimum, plaintiffs must state who said what to whom, and when and where they said it.  Shadowy and suggestive gossip-column-style innuendos do not suffice.") (internal quotations and citation omitted).  There is no dispute that Mirman knew Genovese and was discussing investment banking business with him including the loan to JTF, or that the two occasionally bantered with each other, or that Mirman visited Genovese's home as part of his ordinary activities.  But, there is no further inference to be drawn and certainly not the nefarious one pleaded by the SEC.

### C.  Mirman Was Not Reckless In Not Knowing About Genovese's Scheme

The SEC further does not provide any factual basis as to how Mirman was reckless or exhibited "an extreme departure from the standards of ordinary care."  *See Rolf*, 570 F.2d at 47. As alleged, both Liberty Silver and Genovese made affirmative misrepresentations and

omissions about Genovese's true ownership and control of Liberty Silver. Liberty Silver, for example, failed to disclose Genovese's beneficial ownership in any SEC filing despite its knowledge of the fraudulent scheme and its recruitment of Genovese to facilitate it. *See* Compl. ¶¶ 32, 41-42. Genovese similarly actively misrepresented and concealed the amount and source of Liberty Silver shares he received from Liberty Silver and his control over the company. *Id.* at ¶¶ 36, 38, 40, 64. Indeed, Mirman was the recipient of much of the same misrepresentations as the other targets of Genovese's scheme, such as the presentations Genovese gave, the articles Genovese circulated and the Seller's Representation Letter. *Id.* at ¶¶ 48, 89, 94, 96.

Similarly, the SEC alleges no factual basis to infer scienter from Mirman's *de minimus* activity as an account representative with regards to the offer of the Look Back shares. Mirman's only role with regards to the offer of the Look Back shares was to sign the Broker's Representation Letter. The Complaint on its face pleads that Mirman had sufficient reason to believe Genovese and Look Back were not affiliates of Liberty Silver. *See id.* The SEC alleges that Genovese conspired with Liberty Silver's owners to misrepresent the level of Genovese's control over Liberty Silver, *id.* at ¶ 94, 95, including by falsifying the extent of Genovese's ownership of Liberty Silver stock in the Seller's Representation Letter and in Liberty Silver's public filings, and by directing others to write and publish "false and misleading" promotional information concerning Liberty Silver. *Id.* at ¶¶ 42, 90, 94. The SEC also does not allege that Genovese ever disclosed to Mirman the true extent of his control over Liberty Silver stock, either in the "dozens" of phone calls and meetings Mirman had with Genovese, *id.* at ¶¶ 68, 73, or in the several presentations he made at JTF, *id.* at ¶¶ 67, 75.

The SEC's repeated conclusory assertions that Mirman "knew or was reckless in not knowing" about various aspects of Genovese's alleged secret scheme, *see, e.g.*, Compl. at ¶¶ 5,

54, 72, 105, are similarly insufficient. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("[C]onclusory allegations – that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things – do not satisfy the requirements of Rule 9(b).").

The SEC also fails to plead scienter based on its allegation that Mirman ignored "multiple 'red flags' indicative of a distribution," *id*. at ¶ 98, because (1) it fails to plead with particularity any facts that Mirman was aware of certain "red flags," and (2) even if Mirman was aware of purported "red flags," his disregard for those red flags must rise to the level of recklessness or willful blindness. Disregard of red warning flags can support an inference of scienter based on recklessness or willful blindness where the defendant's conduct is "highly unreasonable and . . . represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Chill*, 101 F.3d at 269 (citation omitted). Red flags are insufficient to allege scienter where the plaintiff does not plead facts showing that the defendant was aware of the alleged red flags. *See, e.g.*, *Saltz v. First Frontier*, LP, 782 F. Supp. 2d 61, 71 (S.D.N.Y. 2010) (stating that the red flag theory of scienter "has been routinely rejected where . . . Plaintiffs offer no evidence Defendants were aware of most red flags, and those of which Defendants were aware, were not so serious as to infer intent to defraud"). Even if the defendant was aware of the red flags, the plaintiff still must allege facts that the defendant "then translated those red flags into a suspicion of fraud" such that the defendant's disregard for the red flags supports an inference of recklessness or willful blindness. *See Prickett v. New York Life Ins. Co.*, 896 F. Supp. 2d 236, 246 (S.D.N.Y. 2012).

The SEC alleges Mirman ignored the following "red flags":

1. Genovese was a stock promoter, Compl. ¶ 98;

2. Genovese was proposing to sell 13.1 million Liberty Silver shares, "amounting to over 16%" of Liberty Silver's outstanding common shares and an "even higher percentage of the public float of non-restricted shares," *id.*;

3. Liberty Silver was a thinly-traded penny stock, *id.*;

4. The sale of the BGC Account shares and the offer of the Look Back shares occurred "within days of the transfer and deposit of the shares," *id.*;

5. Genovese "beneficially owned shares and/or controlled brokerage accounts under multiple different corporate names," including BGC, Look Back and Outlook, *id.*;

6. Genovese had acquired "over 2 million shares from an 'original guy'" in the Liberty Silver deal, which the SEC alleges raises questions about "whether a large block of Genovese's shares had been acquired from a member of the original [Liberty Silver] control group, with a view to distributing them," *id.*;

7. Genovese and BGC were engaged in "promotional activity" for the Liberty Silver shares "while simultaneously selling [Liberty Silver] securities," *id.*;

8. "[O]ther suspicious activity," including that Mirman allegedly had been "present when Genovese offered to make a kickback to Belesis in exchange for selling his [Liberty Silver] shares," *id.*

None of these "red flags," individually or in the aggregate, create an inference that Mirman acted recklessly or was willfully blind to Genovese's fraudulent scheme, let alone that he had actual knowledge of that scheme.  Here, there is a complete lack of any facts or allegation that Mirman knew or would have known that Genovese exerted the degree of control alleged by the SEC.  To all outward appearances, Liberty Silver was managed by its officers and directors and Genovese was an enthusiastic and interested investor who was willing to sell some of his shares. Mirman's attending a meeting where Genovese allegedly offered Belesis a "kickback"  in exchange for selling his shares similarly fails to support any inference of recklessness.  It is not clear whether that word was even used in the meeting or is simply a reflection of the SEC's enthusiasm for its case.  There is no allegation that anything came of the offer, if it was made.

The SEC does not allege specifically what was said during this meeting, by who, and to whom. To the extent that there was nothing more than a discussion about whether Belesis would use the proceeds of his legitimate stock sales to make an investment in JTF, it is not even clear that there would be anything wrong with that, assuming proper disclosures and an appropriate structure. As to the other "red flags," even if Mirman knew that Genovese was a stock promoter, that Liberty Silver was a penny stock, or that Genovese was engaged in "promotional activity" for the Liberty Silver shares, the SEC fails to specify how these "red flags" reveal any details concerning Genovese's fraudulent scheme, whether Mirman translated those red flags into a suspicion of Genovese's fraud, how he was required to respond to the red flags, or whether his supposed disregard for these red flags was in any way reckless or willfully blind.  *See, e.g., In re CBI Holding Co., Inc.*, 419 B.R. 553, 568 (S.D.N.Y. 2009) (defendant's ignoring red flags was not reckless because the red flags did not reveal any details of the fraud).

The SEC's further conclusory allegation that Mirman "should have known . . . that the [Look Back] sale was part of a distribution," Compl. at ¶ 98, is on its face insufficient to establish recklessness.  It is well established in the Second Circuit that "an allegation that a defendant merely ought to have known is not sufficient to allege recklessness."  *See, e.g., SEC v. Wey*, 246 F. Supp. 3d 894, 912 (S.D.N.Y. 2017) (quoting *Hart*, 145 F. Supp. 2d at 368)); *see also Pope Investments II, LLC v. Deheng L. Firm*, 10 CIV. 6608 LLS, 2013 WL 3946126, at *6 (S.D.N.Y. July 31, 2013) (allegations that defendant "failed to investigate," or "was obliged to disclose," or "should have known" certain facts concerning fraud "were insufficient [to allege scienter] because plaintiffs did not allege what sources of information would have revealed to [defendant] the intended fraud").

**III.   THE SEC DOES NOT ADEQUATELY ALLEGE THAT MIRMAN AIDED AND ABETTED VIOLATIONS OF SECTION 17(A)(1) AND (3) AND SECTION 10(B) AND RULE 10B-5(A) AND (C)**

The SEC also fails to adequately allege that Mirman aided and abetted Genovese's alleged violations of Section 17(a), Section 10(b) and Rule 10b-5(a) because it fails to plead any particularized facts that (1) Mirman knew about Genovese's fraudulent scheme, or (2) that he substantially assisted in that scheme.  Aiding and abetting liability requires a showing of: "(1) the existence of a securities law violation by the primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and (3) proof that the aider and abettor substantially assisted in the primary violation."  *SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 467-68 (S.D.N.Y. 2004) (citations and quotations omitted).

### A.   Mirman Had No Actual Knowledge of Genovese's Scheme

Conclusory assertions that Mirman "knew" or "should have known" about various aspects of Genovese's scheme are insufficient to allege knowledge.  *See Shields*, 25 F.3d at 1128-29; *see also Shanghai Weiyi Intern. Trade Co., Ltd. v. Focus 2000 Corp.*, 15 CIV. 3533 CM, 2015 WL 6125526, at *3 (S.D.N.Y. Oct. 16, 2015) (dismissing aiding and abetting claims where plaintiff did not allege "*how* [defendant] could have known that the [co-defendants] intended to deceive Plaintiff") (emphasis in original).  Allegations that Mirman "made no inquiry" into the status of the Look Back shares, Compl. at ¶ 98, are also insufficient to establish any inference of knowledge.  *See Shanghai Weiyi Intern. Trade Co., Ltd.*, 2015 WL 6125526, at *3 (defendant's alleged failure to investigate "hardly gives rise to any inference that such investigation would have yielded knowledge that any of the [co-defendants] were perpetrating a fraud on the Plaintiff").

### B.  **Mirman Did Not Substantially Assist Genovese's Scheme**

The SEC also fails to sufficiently plead that Mirman provided substantial assistance to Genovese's scheme because it does not allege any conduct by Mirman that was intended to aid or that actively aided Genovese's fraudulent scheme.  Substantial assistance requires a showing that the defendant "associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed."  *SEC v. Mudd*, 885 F. Supp. 2d 654, 670–71 (S.D.N.Y. 2012) (quoting *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012)).  In other words, the defendant must "consciously assist[ ] the commission of the specific crime in some active way."  *Id.*  "Inaction on the part of the alleged aider and abettor ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act."  *Id.* (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983)).

The SEC fails to allege any acts by Mirman that would show substantial assistance of Genovese's fraud.  Making a complimentary introduction, listening to what Genovese said, receiving information from Genovese and forwarding it passively to his boss, Belesis, who had his own relationship with Genovese hardly rises to the level of substantial assistance.  Inaction generally does not constitute substantial assistance.  *See Ross v. Bolton*, 639 F. Supp. 323, 327 (S.D.N.Y. 1986) (substantial assistance requirement not met where there was no duty to act).  *See  JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 258 (S.D.N.Y. 2005) (defendant's attendance at meetings and receipt of emails "cannot suffice to show his assistance to the fraud").

## IV.   THE SEC DOES NOT ADEQUATELY ALLEGE THAT MIRMAN WAS NEGLIGENT UNDER SECTION 17(A)(3)

The SEC fails to adequately allege that Mirman was negligent under Section 17(a)(3) because it pleads no facts that Mirman knew, or by the exercise of reasonable care could have

known, about (1) the true extent of Genovese's beneficial ownership, or (2) the existence of Genovese's fraudulent scheme.  To plead a violation of Section 17(a)(3), the SEC must allege that Mirman was at least negligent.  *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).  Although the Second Circuit has not determined the standard of care that governs a negligence claim under Section 17(a)(3), some district courts have held that the definition of negligence under this section is "the failure to use reasonable care, which is the degree of care that a reasonably careful person would use under like circumstances." *Wey*, 246 F. Supp. 3d at 912–13 (internal quotations and citation omitted).

The SEC does not sufficiently allege that Mirman failed to use reasonable care under the circumstances.  For example, the SEC alleges that Mirman signed the Broker's Representation Letter that led Liberty Silver's counsel to remove the restrictive legend from the Look Back shares.  Compl. at ¶ 96.  However, as discussed in Sec. I.B., *supra*, the Broker's Representation Letter relied on the Seller's Representation Letter directly provided by Liberty Silver, and was part of a coordinated fraudulent scheme by Genovese and Liberty Silver to misrepresent the true extent of Genovese's ownership of Liberty Silver.  As the SEC does not allege that Mirman's reliance on the Seller's Representation Letter was unreasonable, Mirman's signing of the Broker's Representation Letter is insufficient to allege negligence.

Mirman's alleged failure to inquire into the status of the Look Back shares, *id*. at 98, is insufficient to plead negligence, since the SEC does not allege that any such inquiry could have reasonably led to the discovery of information concerning Genovese's beneficial ownership.  Indeed, the SEC alleges that Genovese and Liberty Silver actively sought to conceal this information as part of their scheme to promote and manipulate Liberty Silver stock.  *Id*. at ¶¶ 31, 33, 94.  Additionally, Mirman's "experience as a broker in the penny stock industry," *id*. at ¶ 98,

is wholly irrelevant to any allegation that Mirman failed to exercise reasonable care under the circumstances because, regardless of Mirman's industry experience, the SEC alleges no facts that Mirman knew or should have known about Genovese's alleged fraudulent scheme. *Cf. Tarsavage v. Citic Tr. Co.*, Ltd., 3 F. Supp. 3d 137, 145–46 (S.D.N.Y. 2014) (rejecting allegation that based on its "size and asserted sophistication" defendant "could have or 'would have' known of the fraud").

## **CONCLUSION**

For the foregoing reasons, Mr. Mirman respectfully requests that the Court dismiss the SEC's Complaint.

Dated:   New York, New York
         February 2, 2018

NORTON ROSE FULBRIGHT US LLP

By:         */s/ William J. Leone*
         William J. Leone
         NORTON ROSE FULBRIGHT US LLP
         1301 Avenue of the Americas
         New York, NY 10019-6022
         Tel.: 212-318-3000
         Fax: 212-318-3400
         william.leone@nortonrosefulbright.com

         *Counsel for Defendant Abraham Mirman*