UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,       :
                                          :
            Plaintiff,                    :    17 Civ. 5821 (LGS)
                                          :
    -against-                             :
                                          :
ROBERT DONALD BRUCE GENOVESE,             :
B.G. CAPITAL GROUP, LTD.,                 :
and ABRAHAM "AVI" MIRMAN,                 :
                                          :
            Defendants.                   :
-----------------------------------------------------------------------x

**PLAINTIFF'S RULE 56.1 STATEMENT IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANT ABRAHAM "AVI" MIRMAN**

Pursuant to Local Rule 56.1, and the Court's Individual Rule III.C.6., Plaintiff Securities and Exchange Commission ("Commission"), respectfully submits this statement of material undisputed facts in support of its Motion for Partial Summary Judgment against Defendant Abraham "Avi" Mirman ("Mirman").[1]

**I.    Background – Mirman and JTF**

1.    Before joining JTF, Mirman had worked in the securities industry for thirteen years – first as a "retail stock broker" at a series of five brokerage firms, and then as an "investment banker" at four other firms. (Ex. 1 at 10-19; Ex. 2.)[2]

2.    At the time Mirman joined JTF, he had been avoiding retail brokerage firms "like

---

[1] The Commission offers the following facts as undisputed solely for the purposes of its Motion for Partial Summary Judgment. The Commission reserves the right to challenge particular facts, to the extent necessary, at any subsequent proceeding in this case.

[2] "Ex." refers to the Exhibits attached to the Declaration of Jack Kaufman in support of the Commission's Motion for Partial Summary Judgment, filed concurrently herewith.

the plague" because most of them went out of business because of a compliance or financial issues. (Ex. 3 at 1.)

3. In January 2012, Mirman joined JTF as its head of investment banking. (Ex. 4, at 37; Ex. 2 at 1).

4. JTF was a Manhattan broker-dealer registered with the Commission, which employed nearly 200 retail securities brokers. (Ex. 5; Ex. 6 at 3536-37; Ex. 7 at 40-41.)

5. Thomas Belesis ("Belesis") controlled and indirectly owned JTF, through his holding company ATB Holding Co., LLC ("ATB"). (Ex. 12 at 23-24; Ex. 8 at 9; Ex. 10.)

6. Mirman joined JTF despite the fact that, in his own words, his "friends thought that I should have my head examined because of the reputational issues of JTF and Tommy Belesis." (Ex.3 at 2.)

7. JTF's offices housed both an investment banking and retail brokerage department. (Ex. 7 at 36-37.)

8. The retail side of JTF operated on a large open trading floor where approximately 200 brokers pitched stocks to their customers. (Ex. 1 33-37; Ex. 7 at 17-18, 37-41.)

9. JTF's trading floor had the atmosphere of a movie "boiler room." (Ex. 7 at 17-18, 37-41; Ex. 1, at 37).

10. JTF's chief compliance officer was Joseph Castellano ("Castellano"). (Ex. 1 at 38).

11. By August 2012, Mirman had formed the impression that Castellano was a "weak" head of compliance, who had been compromised by Belesis – that Castellano did what Mr. Belesis asked him to do, regardless of whether it was contrary to applicable securities laws and regulations. (Ex. 1 at 38-40; Ex. 6 at 3546-51, 3640, 3644, 3650-52; Ex. 9 at 23-24.)

12.     JTF's outside counsel, Robert Bursky, did not focus on Section 5 compliance. (Ex. 9 at 16, 22-24.)

## II.  Mirman Introduced Genovese to JTF in August 2012

13.     In January 2012, when Mirman began at JTF, he executed an agreement with ATB that entitled him to 20% of capital he raised for ATB, and set out a goal of raising $10 million. (Ex. 4 at 40-41; Ex. 3 at 3; Ex. 11 at 1-2.)

14.     Mirman's initial efforts in 2012 proved unsuccessful, due in part to Belesis' negative SEC regulatory history – which also effectively required JTF or ATB to raise capital to meet SEC net capital requirements. Consequently, Mirman abandoned conventional financing and, instead, approached individual wealthy investors. (Ex. 4 at 73-74; Ex. 3 at 3-4.)

15.     In early August 2012, Mirman contacted Genovese – a wealthy investor – as a potential ATB investor, although Mirman hadn't spoken to Genovese in three years. (Ex. 3 at 4; Ex. 4 at 73-74; Ex. 12 at 21-22.)

16.     In an August 7, 2012 telephone call, Mirman and Genovese began discussing the possibility of Genovese's investing in ATB, and Genovese began pitching Mirman on getting involved with Liberty, a silver mining company in which Genovese was an investor. (Ex. 3 at 4; Ex. 4 at 73-75; Ex. 12 at 21-22; Ex. 13, at 4-5.)

17.     Shortly after their August 7, 2012 telephone call, Genovese emailed Mirman introductory information on the Liberty deal, including marketing materials. (Ex. 3 at 4; Ex. 4 at 73-75; Ex. 12 at 21-22; Ex. 13, at 4-5.)

18.     During the weekend of August 18-20, 2012 – while visiting Genovese at his Canadian lakeside retreat – Mirman and Belesis obtained Genovese's commitment to invest $2 million in ATB and understood that Genovese would be interested in investing up to $10 million,

which gave Mirman a great sigh of relief. (Ex. 3 at 4-5; Ex. 4 at 83; Ex. 13, at 5-6.) Mirman expected to personally receive at least $400,000 in return for obtaining Genovese's investment in ATB, and potentially up to $2 million (20% of $10 million). (Ex. 4 at 40-41.)

19. During the same August 18-20 visit, Genovese spoke to Mirman and Belesis about their potential involvement in Liberty. (Ex. 3 at 5.)

20. From August 22 to 23, Genovese arranged for Mirman to travel to Liberty's silver mine in Nevada to conduct due diligence, and Liberty's president and chief operating officer William Tafuri ("Tafuri") joined them on the trip. (Ex. 3 at 5; Ex. 12 at 30-31; Ex. 13 at 68-73.)

21. Mirman and Genovese then arranged for Genovese and Tafuri to make an August 28, 2012 presentation to JTF's retail brokers in New York, aimed at encouraging the brokers to pitch Liberty stock to their retail customers (the "Liberty Presentation"). (Ex. 3 at 6; Ex. 12 at 116-18; Ex. 14 at 125-141; Ex. 13 at 93-96, 99-100, 103-04; Ex. 16.)

22. Mirman helped Genovese prepare a one-page Liberty promotional summary for the Liberty Presentation, which Mirman helped distribute to JTF's brokers. (Ex. 3 at 6; Ex. 4 at 143-45; Ex. 15; Ex. 16 at 2; Ex. 17.)

23. At the Liberty Presentation, over JTF's loudspeaker system, Mirman introduced Genovese to JTF's dozens of assembled brokers and described him as a personal friend and wealthy investor. (Ex. 14 at 136; Ex. 4 at 38.)

24. At the Liberty Presentation, Genovese made a spirited sales pitch, claiming that Liberty's stock price was tremendously undervalued. (Ex. 14 at 136-37.)

25. Tafuri spoke next at the Liberty Presentation, informing the brokers that Liberty's silver mine had everything going for it, and that it had the potential to make money. (Ex. 14 at 137.)

26.     The Liberty Presentation was the first of at least three such presentations by Genovese at JTF in August and September 2012, two of which Mirman admits he attended. (Ex. 12 at 116; Mirman December 13, 2019 Letter to Court, at 1 (DE 135).)

27.     The Liberty Presentation was successful, in that JTF retail brokers sold Liberty stock to their customers, Liberty's stock price and trading volume rose from $.70 per share to $1.25 to $1.50 per share, and JTF was elated. (Ex. 3 at 6.)

28.     In late August 2012, Genovese also promoted Liberty stock to the public through on-line newsletter writers and his own press release, and he kept Mirman and Belesis apprised of those activities. (Ex. 4 at at 101-04, 158-59, 166-70; Exs. 18-20.)

29.     As of August and September 2012, Mirman believed that Genovese was a "scummy stock promoter," who was interested in "creating liquidity in the market" by "[p]romoting the stock" of Liberty. (Ex. 21 at 92-95.)

**III.    Genovese Sold 6.6 Million Shares of Liberty Stock Through JTF in September 2012, and Mirman Served as Genovese's Broker on the Sale**

30.     On September 20, 2012, Genovese sold a block of 6.6 million Liberty shares through a JTF account he had opened for BG Capital Group Limited ("BGC"), an offshore entity Genovese owned (the "BGC Sale"). (Ex. 1 at 72-73; Ex. 4 at 199-202, 225-26; Ex. 21 at 83-84, 112-13; Ex. 22.)

31.     The BGC Sale was not an open-market transaction. Rather, it was a solicited trade, and the buyers were four JTF customers solicited by Belesis – who had pre-arranged their purchases. (Ex. 12 at 195-97; Ex. 8 at 24-29; Ex. 22.)

32.     According to Mirman, Belesis instigated the BGC Sale by asking Genovese if he wanted to sell some of his Liberty stock to JTF customers. (Ex. 4 at 196-97; Ex. 21 at 19; Ex. 8 at 25-29.)

33. The BGC Sale generated $8,646,000 for Genovese, less $410,953 in sales commissions and fees. (Ex. 22.) Of that amount, Mirman received a $304,361.67 commission. (Ex. 4 at 216-20; Ex. 23 at 2; Ex. 12 at 195.)

34. No registration statement was in effect for the BGC Sale. (Ex. 24 ¶ 4.)

35. Mirman was JTF's registered representative and broker for the BGC account – including for purposes of the BGC Sale. (Ex. 21 at 83-84; Ex. 12 at 195; Ex. 22.)

36. Mirman knew at the time that Genovese was opening a JTF account to sell 6.6 million shares of his Liberty stock to JTF customers, and that the 6.6 million share trade constituted at least six or seven percent of Liberty's outstanding shares. (Ex. 4 at 199-202, 220-21.)

37. On September 13, 2012, in connection with Mirman's role as the transaction's broker, JTF sales assistant Bari Latterman emailed Mirman the BGC account opening documents, which identified Mirman as broker for the account (by his account representative identification number). (Ex. 25 at 3.) Latterman attached to her email a "Letter of Invitation" – signed by Genovese on BGC's behalf – inviting "Avi Mirman" to telephone BGC "so that we may open an account with your firm." (Ex. 25 at 2.)

38. Four days later, on September 17, 2012, Latterman sent Mirman an email asking him to "[p]lease confirm that you agree with the trade dates for the transfer of shares" for the BGC Sale. (Ex. 26 at 1.) Mirman understood that Latterman sent him the email because Mirman was the account representative for BGC's JTF account. (Ex. 21 at 83-84.)

39. Two days later, on September 19, 2012, Latterman emailed Mirman the BGC sale "trade date" and "settlement date." (Ex. 27.)

40. On September 20, 2012, the day after the BGC Sale was executed, Mirman sent

$225 in floral arrangements to Genovese's assistants at BGC. (Ex. 28; Ex. 21 at 120-21.)

41. In a September 22, 2012 text-message exchange between Mirman and Belesis, the two celebrated JTF's $400,000 commission from the BGC Sale. (Ex. 21 at 138-40; Ex. 30 at 1.)

42. Over JTF's loudspeaker system, either Belesis or Mirman announced the BGC Sale to JTF's retail brokers – including the number of shares sold and JTF's sale commission. (Ex. 29 at 39-42.)

43. During a mid-to-late September 2012 meeting at JTF's offices that Mirman, Genovese, and Belesis attended, Genovese offered to pay Belesis 50% of the proceeds of any Liberty stock sales Genovese made through JTF, and Belesis "was thrilled" and accepted Genovese's offer. (Ex. 12 at 133-35; Ex. 21 at 17-21, 24-26, 28.) Genovese also offered to deposit for Mirman in an offshore account either 500,000 shares of liberty stock or $500,000, but Mirman declined Genovese's offer. (Ex. 21 at 25-26.)

44. Concurrently with JTF's preparations for the BGC Sale, Mirman also assisted in formalizing Genovese's $2 million loan to ATB. (Ex. 4 at 207; Ex. 12 at 138-40, 174-75; Ex. 9 at 63-64, 67, 73-74; Ex. 31 at 1-8.)

45. Genovese did not transfer the $2 million to ATB until early October, 2 2012, shortly after receiving the $8,646,000 proceeds from the BGC sale. (Ex. 9 at 63-64, 76-77; Ex. 31 at 9-11; Ex. 22.)

**IV.    Genovese Offered for Sale 6.5 Million Additional Liberty Shares in September 2012, and Mirman Again Acted As Genovese's Broker**

46. By September 19, 2012 – prior to execution of the BGC Sale – Genovese was preparing to sell an additional 6.5 million shares of his Liberty stock, through the JTF account of Look Back Investments ("Look Back"), another offshore entity that Genovese owned (the "Look Back Offering"). (Ex. 4 at 225-226; Ex. 12 at 49-50; Ex. 1 at 82-83.)

7

47. On September 19, JTF sales assistant Latterman forwarded Mirman an email from Genovese assistant Stacey Vogel ("Vogel") stating, "Look Back Investments would like to sell 6,500,000 shares of Liberty Silver under the 144 exemption." (Ex. 1 at 83-85; Ex. 32.)

48. Like the BGC Sale, the Look Back Offering was not an open-market offering. Rather, JTF brokers solicited JTF customers as the targeted purchasers. (Ex. 12 at 203-208; Ex. 8 at 24-25, 36, 61.)

49. Belesis announced the Look Back Offering to JTF's assembled brokers at one of their regular morning meeting. (Ex. 29 at 41-45.)

50. Mirman understood that Belesis had buyers lined up to purchase the Look Back Offering stock, and Mirman informed at least certain JTF brokers that Genovese was depositing additional Liberty shares at JTF. (Ex. 4 at 248; Ex. 29 at 44-45.)

51. Part of the Look Back Offering stock was to be sold to Belesis's own clients, and the rest through other JTF brokers whose clients were interested as well. (Ex. 8 at 24-25, 36, 61; Ex. 34, at 88-91; Ex. 35.)

52. By October 2, 2012, JTF's clearing broker Sterne Agee was aware of the Look Back Offering and, based on conversations with JTF, was expecting approximately 75 JTF customers to purchase Look Back's Liberty stock. (Ex. 33 at 1-2.)

53. No registration statement was in effect for the Look Back Offering. (Ex. 24 ¶ 4.)

54. Mirman served as Look Back's broker for the Look Back Offering. (Ex. 21 at 83-84.)

55. Mirman signed Look Back's JTF account opening documents, dated September 24, as Look Back's "Registered Representative," and JTF copied Mirman on emails between JTF and its clearing firm to open the Look Back account. (Ex. 36 at 1, 3; Ex. 37.)

56. Look Back sent JTF a "Letter of Invitation" specifically requesting that "Account Executive Avi Mirman" contact Look Back "so that we may open an account with your firm." (Ex. 38.)

57. As broker for the Look Back Offering, Mirman expected to receive a sales commission similar to the one he was expecting for the BGC Sale. (Ex. 4 at 233.)

58. On September 19 or 20, 2012, Mirman also executed the required "Brokers Representation Letter" for the Look Back Offering ("Broker Rep Letter") – identifying himself as "broker" on the transaction. (Ex. 32 at 1, 4; Ex. 39; Ex. 1 at 86-87.)

59. Latterman's September 19, 2012 email to Mirman attached "the broker's representation letter to be executed." (Ex. 32.) The following morning, September 20, Latterman emailed to Vogel (copying Mirman) Mirman's executed Broker Rep Letter, stating: "Please see attached signed by Avi [Mirman]." (Ex. 39.)

60. Liberty's counsel attached Mirman's Broker Rep Letter to its September 21, 2012 legal opinion letter for the Look Back Offering (the "Opinion Letter") (Ex. 40 at 3.)

61. The Opinion Letter – addressed to Liberty's stock transfer agent – authorized the transfer agent to remove any restriction on the sale of the Look Back shares. (Ex. 40 at 2.)

62. The Opinion Letter stated that Look Back's proposed 6.5 million-share sale of Liberty stock could be "consummated" without a registration statement "by virtue of the exemption from registration afforded by Rule 144." (Ex. 40 at 2.)

63. The Opinion Letter further stated that it was made "in reliance upon the accuracy of the representations contained" in two attached documents – one of which was Mirman's Broker Rep Letter. (Ex. 40 at 1.)

64. When Mirman first learned of the Look Back Offering, he understood that

Genovese owned more than ten percent of Liberty's stock and, thus, understood that Genovese might be considered a Liberty "affiliate" for SEC disclosure-filings purposes. (Ex. 12 at 50-51.) Mirman also understood that, in the United States, an individual who owns more than ten percent of a public company, is considered an "affiliate" or "insider" of that company, which triggers certain public reporting requirements for the affiliate. (Ex. 12 at 51-52.)

65. On September 27, 2012, Mirman and Belesis exchanged text messages celebrating the Look Back Offering's anticipated "9.8 million in new money." (Ex. 21 at 140-41; Ex. 30 at 3.)

66. To Belesis' consternation, the Look Back Offering ultimately did not become a consummated stock sale – because JTF's clearing broker refused to clear the trade. (Ex. 1 at 119-20; Ex. 21 at 142-43; Ex. 30 at 1-2.)

## V. Genovese's Liberty Stock Ownership and Influence on Liberty Management

67. As of August 2012, Genovese owned 22.5% of Liberty's total outstanding stock – in his own name and the names of entities he owned. (Ex. 43 at 2; Ex. 41 at 245-48; Ex. 42 at 1-2.) At that time, Liberty had 80.7 million shares outstanding. (Ex. 43 at 2.) As of August 2012, Genovese owned 18,149,382 shares (plus 6.5 million warrants), or approximately 22.5%. (Ex. 41 at 245-48; Ex. 42 at 1-2.)

68. Liberty's total outstanding stock included both restricted and unrestricted (tradable) shares. Genovese owned approximately 22% of Liberty's unrestricted shares. As of August 31, 2012, Liberty had 50.09 million unrestricted shares outstanding. (Ex. 44.) Genovese owned 10,999,382 unrestricted Liberty shares (22%) – *i.e.*, all of his Liberty shares except his Look Back shares, which bore a restrictive legend. (Ex. 42; Ex. 12 at 203-04; Ex. 32 at 2-3; Ex. 49 at 1-2.)

69. In addition, Genovese had an agreement with a group of Liberty's other largest shareholders (the "Liberty Partners") that gave him additional control over Liberty's unrestricted shares.

70. In August 2010, the Liberty Partners had recruited Genovese to help them install a new Liberty management team, market Liberty stock to the public, manage Liberty's public trading, and raise desperately-needed capital for Liberty. (Ex. 45 ¶ 20; Ex. 13 at 47-50; Ex. 46 at 2.) In return, and in aid of those services, the Liberty Partners agreed that: (1) they would not sell their Liberty shares without Genovese's permission; and (2) when they ultimately sold their shares, Genovese would receive a large portion of the sales proceeds. (Ex. 45 ¶¶ 20-24; Ex. 13 at 37-39, 57-59, 177-79, 183-86; Exs. 50-51.)

71. The Liberty Partners owned at least 23.5% of Liberty's unrestricted shares. The Liberty Partners owned at least 11,779,535 unrestricted shares (Ex. 24 ¶ 6; Ex. 45 ¶ 20), or 23.5% of Liberty's 50.09 million unrestricted shares.

72. Thus, Genovese effectively controlled approximately 45.5% of Liberty's unrestricted (tradeable) shares – his 22% plus the Liberty Partners' 23.5%.

73. Genovese's control of 45.5% of Liberty's public float afforded him the ability to purchase stock on the open market to support its stock price and trading volume. (Ex. 13 at 199, 202; Ex. 45 ¶ 22.)

74. As of August 2012, Genovese also was persistently urging Liberty management to meet with as many investment banking firms as possible to obtain financing, including JTF. (Ex. 13, at 76, 78, 93-94.)

75. In addition, Genovese was trying to communicate with as many analysts, investment bankers, portfolio managers, newsletter writers, TV commentators, and radio

personalities as possible, to market Liberty to the public in order to obtaining financing and put its mine into production. (Ex. 13 at 78, 93-94.)

76. Genovese's efforts influenced Liberty management. Genovese arranged his and Liberty COO Tafuri's successful August 28 JTF presentation. Also at the end of August 2012, Genovese arranged for Tafuri to give a promotional video interview to an online journal called "Gold Stocks," which was disseminated to 6500 readers. (Ex. 13 at 110-11.)

77. Tafuri supported Genovese's August-September 2012 financing and marketing efforts. On September 7, 2012, Liberty CFO Manish Kshatriya emailed Tafuri (and Liberty's board members) positive on-line press reports regarding Liberty. CFO Kshatriya noted that "[t]he recent trading volumes and the increase in Liberty stock price may be a result of the positive press we've been getting." Tafuri responded that the positive press reports were "part of the group that Bobby [Genovese] and I gave mine tours . . . too [sic]. Bobby is a master at getting us before the right folks." (Ex. 47 at 124-25; Ex. 48 at 1.) In a September 20, 2012 email to Genovese regarding an upcoming marketing event Genovese was sponsoring on behalf of Liberty, Tafuri stated, "of course, I will be at the Silver Summit wine event with you . . . I will help in your marketing efforts as much as I can and I stand 100% behind you." (Ex. 48 at 3.)

78. Look Back's Liberty stock was restricted. (Ex. 12 at 203-04; Ex. 32 at 2-3; Ex. 49 at 1-2; Ex. 40.)

79. In 2012, Liberty was not subject to the Exchange Act Section 13 or 15(d) reporting requirements. (Ex. 24 ¶ 5; Ex. 43 at 1, 3; Ex. 4 at 220-21.)

80. As of September 2012, Look Back had held its Liberty shares for less than one year. (Ex. 32; Ex. 49 at 2.)

|  | Respectfully submitted, |
|---|---|
| Dated: March 20, 2020<br>New York, N.Y. | /s/ Jack Kaufman<br>Nancy A. Brown<br>Jack Kaufman<br>Margaret D. Spillane<br>SECURITIES AND EXCHANGE COMMISSION<br>New York Regional Office<br>200 Vesey Street, Suite 400<br>New York, New York 10281-1022<br>(212) 336-0106 (Kaufman)<br>Attorneys for Plaintiff |