**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

ROBERT DONALD BRUCE GENOVESE,
B.G. CAPITAL GROUP, LTD.,
and ABRAHAM "AVI" MIRMAN,

Defendants.

Case No. 17-CV-05821 (LGS)

### DEFENDANT ABRAHAM "AVI" MIRMAN'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**NORTON ROSE FULBRIGHT US LLP**

By: */s/ William J. Leone*
    William J. Leone
    Jacob Laksin
    1301 Avenue of the Americas
    New York, NY 10019-6022
    Tel.: 212-318-3000
    Fax: 212-318-3400
    william.leone@nortonrosefulbright.com
    jacob.laksin@nortonrosefulbright.com

    *Attorneys for Defendant Abraham "Avi" Mirman*

**<u>TABLE OF CONTENTS</u>**

SUMMARY JUDGMENT STANDARD .....................................................................................1

ARGUMENT ...........................................................................................................................2

I.      Numerous Disputed Issues of Material Fact Preclude Summary Judgment on the
        SEC's Claim that Mr. Mirman Violated Sections 5(a) and (c) of the Securities Act.....2

II.     Disputed Issues of Fact Exist With Respect to Whether Mr. Mirman was a
        "Necessary Participant" or a "Substantial Factor" in the Sale of the
        First  Block  of  Mr. Genovese's Liberty Stock Through His BG Capital Account ......3

III.    The Purported Attempted Second Sale of Mr. Genovese's Liberty Silver Shares
        Through His Look Back Account Did Not Constitute an "Offer" to Sell Securities...12

IV.     Mr. Mirman Was Neither A "Necessary Participant" Nor A "Substantial Factor" in
        the Purported Attempted Second Sale of Mr. Genovese's Liberty Silver Stock..........13

V.      Disputed Issues of Fact Exist As to Whether the Sale of the First Block of Mr.
        Genovese's Liberty Silver Stock and the Purported Attempted Second Sale Qualified
        for an Exemption From the Registration Requirements Under Rule 144...................16

VI.     Disputed Issues of Fact Exist as to Whether the Sale of the First Block of Mr.
        Genovese's Liberty Silver Stock and the Purported Attempted Second Sale
        Qualified  for an Exemption Under 4(a)(1) of the Securities Act...............................27

VII.    Disputed Issues of Fact Exist as to Whether the Sale of the Purported Attempted
        Second Sale Qualified  for the Broker Exemption Under 4(a)(4) of the Securities Act29

CONCLUSION.......................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................................................1

*Aramony v. United Way of Am.*,
    No. 96 CIV. 3962 (SAS), 1998 WL 205331 (S.D.N.Y. Apr. 27, 1998)...................................7

*Ass'n of Car Wash Owners Inc. v. City of New York*,
    911 F.3d 74 (2d Cir. 2018).........................................................................................1, 22

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................................................1

*Diskin v. Lomasney & Co.*,
    452 F.2d 871 (2d Cir. 1971)..............................................................................................12

*Pugliese v. Verizon New York, Inc.*,
    No. 05-CV-4005 (KMK), 2008 WL 2882092 (S.D.N.Y. July 9, 2008)................................21

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998)..............................................................................................12

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006)..............................................................................................17

*SEC v. Caledonian Bank Ltd.*,
    145 F. Supp. 3d 290 (S.D.N.Y. 2015)................................................................................27

*SEC v. CMKM Diamonds, Inc.*,
    729 F.3d 1248 (9th Cir. 2013) .....................................................................................4, 5, 8

*SEC v. ConnectAJet.com, Inc.*
    No., 09 Civ. 1742, 2010 WL 2484280 (N.D. Tex. June 17, 2010)..........................................9

*SEC v. Curshen*,
    No. 11 Civ. 20561, 2012 WL 1981878 (S.D. Fla. June 1, 2012) ...........................................9

*SEC v. Gibraltar Glob. Secs., Inc.*,
    No. 13 Civ. 2575 (GBD)(JCF), 2016 WL 153090 (S.D.N.Y. Jan. 12, 2016)..........................8

*SEC v. Hemp, Inc.*,
    No. 216CV01413JADPAL, 2018 WL 1220566 (D. Nev. Mar. 8, 2018) .............27, 28, 29, 30

*SEC v. Kern*,
    425 F.3d 143 (2d Cir. 2005)..............................................................................................27

*SEC v. Longfin Corp.*,
    316 F. Supp. 3d 743 (S.D.N.Y. 2018).............................................................16, 17, 18, 19

*SEC v. Lybrand*,
    200 F. Supp. 2d 384 (S.D.N.Y. 2002)..................................................................27

*SEC v. Mapp*,
    No. 4:16-CV-00246, 2017 WL 5177960 (E.D. Tex. Nov. 8, 2017)..................................5, 16

*SEC v. Mattera*,
    No. 11 CIV. 8323 PKC, 2013 WL 6485949 (S.D.N.Y. Dec. 9, 2013)..............................9, 10

*SEC v. Softpoint, Inc.*,
    958 F. Supp. 846 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998)..........................4, 12

*SEC v. Universal Express, Inc.*,
    475 F. Supp. 2d 412 (S.D.N.Y. 2007)..............................................................28, 30

*Smsw Enterprises LLC v. Halberd Corp.*,
    No. CV1301412BROSPX, 2014 WL 12588682 (C.D. Cal. May 30, 2014) .........................15

*Trustcash Holdings, Inc. v. Moss*,
    668 F. Supp. 2d 650 (D.N.J. 2009) ...................................................................18

*United States Commodity Futures Trading Comm'n v. Hunter*,
    No. 07 CIV. 6682 BSJ FM, 2012 WL 297838 (S.D.N.Y. Jan. 31, 2012) .............................1

*United States v. Corr*,
    543 F.2d 1042 (2d Cir. 1976).........................................................................18

*United States v. Sprecher*,
    783 F. Supp. 133 (S.D.N.Y. 1992), *aff'd*, 988 F.2d 318 (2d Cir. 1993)..............................18

*Winston v. Verizon Servs. Corp.*,
    633 F. Supp. 2d 42 (S.D.N.Y. 2009)..................................................................1

## **Rules and Statutes**

15 U.S.C. § 77e (Section 5 of Securities Act of 1933) ...........2, 3, 4, 5, 8, 9, 10, 11, 12, 14, 15, 25

15 U.S.C. § 77b (Section 2 of Securities Act of 1933).......................................................12, 27

15 U.S.C. § 77d(a)(1) (Section 4(a)(1) of the Securities Act of 1933)....................................3, 24

15 U.S.C. § 77d(a)(4) (Section 4(a)(4) of the Securities Act of 1933)....................................3, 24

17 C.F.R. § 230.144 (SEC Rule 144) .......................................3, 15, 16, 17, 22, 23, 24

Fed R. Civ. P. 56...............................................................................................21

**Administrative Authorities**

*In the Matter of Owen v. Kane*,
SEC Release No. 23827, 1986 WL 626043 (Nov. 20, 1986) ...........................................................5

*In the Matter of Proudian*,
CMS040165, 2008 WL 3822919 (FINRA, Aug. 7, 2008) ...............................................................5

*Revisions to Rules 144 and 145,*
SEC Release No. 8869, 2007 WL 4270700 (Dec. 6, 2007)................................................17, 23, 26

**Other Authorities**

Thomas Hazen, *Treatise on the Law of Securities Litigation*, § 2:22 (Dec. 2019).......................12

Thomas Hazen, *Treatise on the Law of Securities Litigation*, § 4:100 (Dec. 2019)....................27

Thomas Hazen, *Treatise on the Law of Securities Litigation*, § 4:106 (Dec. 2019)...............15, 24

Defendant Abraham "Avi" Mirman ("Mr. Mirman"), by his undersigned attorneys, respectfully submits this memorandum of law in opposition to plaintiff Securities and Exchange Commission's ("SEC") motion for partial summary judgment, dated March 20, 2020 (the "Motion").

## SUMMARY JUDGMENT STANDARD

Summary judgment is a "drastic device" that "should not be granted when there are major factual contentions in dispute." *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 83 (2d Cir. 2018). The moving party bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *U.S. Commodity Futures Trading Comm'n v. Hunter*, No. 07 CIV. 6682 BSJ FM, 2012 WL 297838, at *1 (S.D.N.Y. Jan. 31, 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Only if the moving party meets this initial burden does the non-moving party have the "limited burden of production" to show that there is a triable issue of fact. *Winston v. Verizon Servs. Corp.*, 633 F. Supp. 2d 42, 46 (S.D.N.Y. 2009) (citations omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Hunter*, 2012 WL 297838, at *1; *see also Winston*, 633 F. Supp. 2d at 46 (the court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party") (citations omitted). Where "the evidence is susceptible of different interpretations or inferences by the trier of fact," summary judgment is inappropriate. *Hunter*, 2012 WL 297838, at *1 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)).

The summary judgment standard requires the SEC to make a clear showing that there is no genuine issue of material fact as to each element of its claim under Section 5 of the Securities Act of 1933 ("Securities Act").  The SEC has not, and cannot, satisfy this burden.

## ARGUMENT

### I.   Numerous Disputed Issues of Material Fact Preclude Summary Judgment on the SEC's Claim that Mr. Mirman Violated Sections 5(a) and (c) of the Securities Act

The SEC is not entitled to summary judgment on its claims that Mr. Mirman violated Sections 5(a) and 5(c) of the Securities Act because factual disputes persist regarding numerous issues.  If anything, the overwhelming weight of the evidence favors entry of judgment in favor of Mr. Mirman.  However, the weight of the evidence is not the standard for summary judgment.  There is virtually no case to be made for summary judgment in favor of the SEC.  Factual disputes in the case include the following:

1.   Whether the sale of the first block of 6.6 million Liberty Silver shares through Robert Genovese's BG Capital account required registration.  The SEC has no evidence that these shares were acquired other than in the open market.  These shares were held for over a year, as the SEC admits.  And, there is a factual dispute about whether Mr. Genovese was an "affiliate" of Liberty Silver who would be subject to any restrictions in selling his stock.

2.   Even assuming that the sale of the first block of Liberty Silver shares did require registration, there is a factual dispute about whether Mr. Mirman was a "necessary participant" and "substantial factor" in bringing about that sale.

3.   Whether there was ever an "offer" to sell the second block of Liberty Silver stock, or merely efforts to remove the restrictive legend for a possible future sale.

4.   Even assuming that there was an offer to sell the second block of Liberty Silver stock, whether Mr. Mirman was a "necessary participant" or "substantial factor" in that "offer" or the

unconsummated future sale of Mr. Genovese's shares through his Look Back Investments account.

5.   Even assuming that there was a plan to sell the second block of Liberty Silver stock, whether such sales would have violated any securities laws because they would have occurred at a time after which their sale could occur without registration.

6.   Even assuming that the elements of a Section 5 claim have been established, a factual dispute exists with respect to whether either the sale or the proposed future sale of Mr. Genovese's Liberty stock qualified for an applicable exemption, whether under the safe harbor of SEC Rule 144, 17 C.F.R. § 230.144, or the exemption under Section 4(a)(1) of the Securities Act, 15 U.S.C. § 77d.  Factually, the seller, Mr. Genovese, has testified that he did not acquire the shares with a view to "distribution" and he others have testified that he is not an "affiliate" of the issuer, and Liberty's counsel provided a legal opinion that Mr. Genovese was not an affiliate. He was also not a dealer.

7.   Even assuming there was no dispute as to the above facts, which there is, the determination of a reasonable remedy would require a full factual vetting of the underlying facts to determine whether Mr. Mirman acted willfully, or relied on others, including the compliance department, legal department, and administrative sales departments at JTF.  Therefore, summary judgment will not materially advance the case.

Mr. Mirman addresses these disputed facts in descending order, beginning with those that are most obvious.

## II.   Disputed Issues of Fact Exist With Respect to Whether Mr. Mirman was a "Necessary Participant" or a "Substantial Factor" in the Sale of the First Block of Mr. Genovese's Liberty Stock Through His BG Capital Account

Summary judgment on Section 5 should be denied because the undisputed facts do not establish that Mr. Mirman was a "necessary participant" or a "substantial factor" in bringing

3

about the sale of the first block of Mr. Genovese's Liberty Silver stock via his BG Capital Group Ltd. ("BG Capital") trading account.

To establish a *prima facie* case that a defendant violated Section 5, the SEC must produce admissible summary judgment evidence establishing that (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly sold or offered to sell these securities; and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale.  *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 859 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998).  Where a defendant did not directly pass title to any securities, as Mr. Mirman did not, Section 5 liability cannot attach absent a showing that the defendant was a "necessary participant" or "substantial factor" in the offer or sale of securities by another.  *Softpoint*, 958 F. Supp. at 859; *SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255-56 (9th Cir. 2013).  Whether a defendant was a "necessary participant" and a "substantial factor" is normally a factual determination for a jury.  *CMKM Diamonds, Inc.*, 729 F.3d at 1255-56.  This requirement is elemental and the SEC, as the moving party, bears the burden of proof as to it. *Softpoint*, 958 F. Supp. at 859.

A person does not become a "necessary participant" merely because he had some involvement in the offer or sale of unregistered stock.  *Id.* at 860.  Instead, the undisputed facts must demonstrate that the defendant's role "was clearly necessary and substantial and not simply 'de minimis.'"  *Id.* (defendant who was extensively "involved at every stage of the stock liquidation scheme" was a "necessary participant" under Section 5).  Moreover, because "numerous persons perform mechanical acts without which there could be no sale," it is firmly settled that "the substantial factor test requires more than a finding of 'but for' causation," and to be liable under Section 5 a defendant also must be a "substantial factor in bringing about the

transaction." *CMKM*, 729 F.3d at 1255.  As the SEC's guidance has recognized, "not everyone in the chain of intermediaries between a seller of securities and the ultimate buyer is sufficiently involved in the process to make him responsible for an unlawful distribution." *In the Matter of Owen v. Kane*, SEC Release No. 23827, 1986 WL 626043 at *3 (Nov. 20, 1986).

Summary judgment is not appropriate based on a defendant's designation as a "broker" because "[a] participant's title, standing alone, cannot determine liability under Section 5[.]" *CMKM*, 729 F.3d at 1258.  Thus, "the mere fact that a defendant is labeled as . . . a broker . . . does not adequately explain what role the defendant actually played in the scheme at issue. Instead, whether a defendant is a substantial factor in the distribution of unregistered securities is a question of fact requiring a case-by-case analysis of the nature of the securities scheme and the defendant's participation in it." *Id*.; *see also In the Matter of Proudian*, CMS040165, 2008 WL 3822919 (FINRA, Aug. 7, 2008) (broker who entered orders that effected the sale of unregistered securities but had no contact with the purchasers of the securities was neither a "necessary participant" nor a "substantial factor" in the sale).

Summary judgment based on "necessary participant" liability also should be denied where evidence indicates that others played a more significant role than the defendant in the offer or sale of unregistered securities.  *See, e.g.*, *SEC v. Mapp*, No. 4:16-CV-00246, 2017 WL 5177960, at *8 (E.D. Tex. Nov. 8, 2017) (denying summary judgment on SEC's Section 5 claim because, although defendant played a "significant role in the distribution" of unregistered securities, evidence indicated that investments in the unregistered offerings were attributable to the efforts of others and thus "[a] reasonable jury could conclude that [defendant] was not a substantial participant").

Nothing in the voluminous record in this case indicates Mr. Mirman was so extensively involved in the sale of the first block of Mr. Genovese's shares as to render his involvement "necessary."  Mr. Mirman had no involvement with the buyers of the first block of Liberty Silver stock.  (Mirman Ex.[1] 4 at 234-39.)  Mr. Mirman was the head of investment banking at JTF.  (Mirman Ex. 6 at 164.)  He had worked at JTF for less than a year.  (SEC Ex.[2] 2 at 1.)  Mr. Mirman had no management or supervisory responsibility for the retail brokers.  (Mirman Ex. 6 at 164-65; Mirman Ex. 4 at 234-37.)  Mr. Mirman did not hire JTF's brokers, fire them, review them, compensate them, or manage them.  (Mirman Ex. 4 at 234-41.)  Mr. Mirman had no responsibility for retail customers of JTF.  (*Id*.)  He had no relationship with the four individuals who purchased the first block of shares and did not even know that any of them had purchased Mr. Genovese's stock until after the sale took place.  (*Id*.)  Mr. Mirman had no communications with these purchasers, did not solicit them, did not give them information or advice about the stock, did not solicit their interest in the stock, and provided them with no information about the stock, directly or indirectly.  (*Id*.)  Mr. Mirman did not execute any trades for the sale, and had no control over whether any trades took place.  (*Id.* at 234-41, 262-63; Mirman Ex. 16 at 3; Mirman Ex. 7 at 130.)  In fact, Mr. Mirman sought to separate himself from any retail trading activity at JTF.  (Mirman Ex. 4 at 234-41.)

Similarly, Mr. Mirman had no relationship with the seller of the first block of Liberty Silver stock that related to the sale of that stock.  (Mirman Ex. 4 at 234-37.)  He did not solicit Mr. Genovese, had no discussions with Mr. Genovese about his Liberty Silver stock, how much

---

[1]   All references to "Mirman Ex.___" are to the exhibits attached to the Declaration of William J. Leone submitted in support of Defendant's Motion in Opposition to Plaintiff's Motion for Partial Summary Judgment. (ECF 154.)

[2]   All references to "SEC Ex.___" are to the exhibits attached to the Declaration of Jack Kaufman in Support of Plaintiff's Motion for Partial Summary Judgment. (ECF 151.)

stock he owned, or whether he should sell his stock, gave Mr. Genovese no information about what he might receive from selling his stock, and provided no advice to Mr. Genovese about whether it was a good or bad idea to sell his stock.  (Mirman Ex. 4 at 234-37, 262-63.)  Mr. Mirman's sole relationship with Mr. Genovese had nothing to do with Mr. Genovese's sale of his stock.  Mr. Mirman approached Mr. Genovese, whom he knew to be a successful investor, about whether Mr. Genovese was interested in investing or loaning money to JTF.  (SEC Ex. 4 at 73-74, 76.)  Subsequently, Mr. Genovese asked whether Mr. Mirman would be interested in doing due diligence on Liberty Silver for a possible future capital raise.  (Mirman Ex. 4 at 237; SEC Ex. 3 at 5; SEC Ex. 12 at 30-31.)  None of these limited interactions is implicated in the SEC's summary judgment motion.

Stripped of background static, the SEC seeks to hold Mr. Mirman liable as a "necessary participant" in the sale of the first block of Mr. Genovese's shares based on the following alleged "facts," which the SEC purports to be "essential"[3]: (1) Mr. Mirman's designation on a form as the "broker-of-record" for the sale of the first block of stock of Liberty Silver shares; (2) Mr. Mirman's alleged role in "facilitating JTF's opening" of the Mr. Genovese's BG Capital account; and (3) Mr. Mirman's receipt of a $300,000 "broker commission" for his supposedly "necessary role" in the sale of the first block of Mr. Genovese's shares.  (Motion at 19.)  All of these "facts" are disputed.  None are sufficient to render Mr. Mirman liable as a "necessary participant."

---

[3]   Unable to produce evidence of any "necessary" participation by Mr. Mirman, the SEC simply declares that his role was "essential"—a word the SEC uses at least half a dozen times in its brief.  (*See, e.g.*, Motion at 1, 2, 19, 20.)  Conclusory assertions that Mr. Mirman's role was "essential" or "necessary" do not satisfy the SEC's burden of production on summary judgment, *see Aramony v. United Way of Am.*, No. 96 CIV. 3962 (SAS), 1998 WL 205331, at *5 (S.D.N.Y. Apr. 27, 1998), and serve only to highlight the dearth of evidentiary support for its strained theory of Section 5 liability.

First, the case law is clear that Mr. Mirman's designation on a form as a broker of record for Mr. Genovese's trading accounts at JTF does not, without more, render him a "necessary participant" under Section 5. *CMKM*, 729 F.3d at 1258. Imposing Section 5 liability based on Mr. Mirman's designation as a broker of record would be particularly unjustified here, given the overwhelming record evidence that Mr. Mirman did not perform any role as a retail broker in connection the sale and purported attempted second sale of Mr. Genovese's Liberty Silver stock. (SEC Ex. 8 at 28-29; Mirman Ex. 4 at 234-36, 238, 262-63; Mirman Ex. 7 at 130; Mirman Ex. 16 at 2; Mirman Ex. 17.) Mr. Mirman's designation as a broker of record on a form for Mr. Genovese's accounts serves only to create a disputed issue of fact. But for that single designation, Mr. Mirman would be moving for summary judgment.

Moreover, the SEC is simply wrong when it claims that "[e]very court that has considered the matter has found that a broker for a securities transaction is a necessary participant for Section 5 purposes." (Motion at 18.) This claim is not only incorrect, *see CMKM*, 729 F.3d at 1258, but it is belied by the very cases on which the SEC relies, each of which involved defendants whose overall role in the securities transaction at issue were far more extensive and significant than Mr. Mirman's.

In *SEC v. Gibraltar Glob. Secs., Inc*., No. 13 Civ. 2575 (GBD)(JCF), 2016 WL 153090, (S.D.N.Y. Jan. 12, 2016), the court approved a magistrate judge's report—issued after the entry of a default judgment—finding that the defendants, a Bahamian broker-dealer and its founder, president and sole shareholder, violated Section 5. *Id*. at *2-3. Section 5 liability was premised not on the individual defendant's mere status as a "broker" but, rather, on his ability to direct and control the defendant broker-dealer, including by supervising and directing brokers who sold millions of shares of unregistered stock. *Id*. at *2.

Similarly, in *SEC v. Curshen*, No. 11 Civ. 20561, 2012 WL 1981878, *1, *3 (S.D. Fla. June 1, 2012), the court entered summary judgment on Section 5 against the defendant, a "recidivist securities law violator" who ran a Costa Rica-based brokerage firm, based on his prior criminal conviction for conspiracy to commit securities fraud, which established that "[a]t his direction and under his supervision, his firm, Red Sea, offered and sold" unregistered stock. *Id*. at *3. Defendant was therefore collaterally estopped from contesting that he was a "necessary participant and substantial factor" in the offer and sale of securities. *Id*.

And in *SEC v. ConnectAJet.com, Inc.* No., 09 Civ. 1742, 2010 WL 2484280, at *4 (N.D. Tex. June 17, 2010), the court considered a motion to dismiss—not a summary judgment motion—and found that the SEC sufficiently pleaded a Section 5 claim against the defendant, a registered broker at a broker dealer, based on allegations that the defendant directly sold unregistered stock. The court did not state or suggest that the defendant was liable under Section 5 solely by virtue of his status as a broker, and specifically cautioned that the "issue is not whether the plaintiff will ultimately prevail" but whether the case would be dismissed. *Id*. at *4. [4]

---

[4]   Similarly here, Judge Sullivan, affording the SEC all favorable inferences as the non-movant, assuming the pleaded "facts" as true, and without the benefit of any contrary evidence which is now before the Court, found that the SEC's Complaint was sufficient to survive a motion to dismiss on Section 5. Since then, discovery has confirmed that Mr. Mirman was very much a bystander in the transactions at issue on the SEC's motion, and that many others at JTF were responsible for Section 5 compliance, vetting customers, communicating with sellers, and executing trades, and that Mr. Mirman had no involvement with retail trading activity, including Mr. Genovese's trading. Thus, despite eight years of and investigation and discovery, the SEC still has not been able to produce competent evidence supporting the claims in the Complaint. Those claims may have been sufficient for the SEC to survive a motion to dismiss. They do not come close to satisfying the SEC's moving burden on summary judgment.

*SEC v. Mattera*, No. 11 CIV. 8323 PKC, 2013 WL 6485949, (S.D.N.Y. Dec. 9, 2013), also does not support the SEC's claim that designation as a broker is sufficient to confer "necessary participant" liability under Section 5.   In *Mattera*, the court granted summary judgment on Section 5 against a *pro se* defendant in a civil case that followed a criminal prosecution where another co-defendant had pleaded guilty to charges of security fraud for, among other criminal acts, soliciting millions of dollars in investments into several funds by falsely representing that the funds held the stock of pre-IPO companies.  *Id*. at *3.  In addition to other involvement with this fraudulent scheme, the defendant (1) acted as a liaison between the brokers and the fund's principals, (2) answered brokers' questions, (3) provided instructions about actions the brokers should take with their clients, and (4) earned a commission on the broker-dealers' sales based on the volume of the brokers' sales.  *Id*. at *3-5, 11.  As discussed above and further set forth in Mr. Mirman's response to the SEC's statement of undisputed facts under Rule 56.1 (the "Response"), Mr. Mirman did none of these things.  Thus, the SEC's claim that Mr. Mirman "participated at least as much" in the sale of Mr. Genovese's first block of shares and the purported attempted second sale of his shares as the defendant in *Mattera* did with the transactions at issue in that case is plainly incorrect.   (Motion at 20.)   Moreover, the defendant in *Mattera* "d[id] not dispute that he played a role in the sale of the [funds'] securities, that the sales at issue would not have taken place but for [his] introductions, and that he communicated with broker-dealers regarding what actions they should take with clients." *Mattera*, 2013 WL 6485949 at *10-11.  Based on these admissions, the court concluded that there was "no material dispute that [defendant] was a substantial factor in the sale of unregistered securities."  *Id*.  Mr. Mirman of course disputes that he was either a "necessary participant" or a "substantial factor."

10

Just as Mr. Mirman's mere designation as a broker of record cannot establish Section 5 liability, the other factors on which the SEC's relies to support Mr. Mirman's supposedly "necessary" participation in the sale of the first block of shares are also disputed and fail to support any inference of "necessary" participation.  Mr. Mirman did not "facilitate" the opening of Mr. Genovese's accounts at JTF.  (Motion at 19.)  JTF's "operations" department facilitated the opening of Mr. Genovese's accounts at JTF.  (Mirman Ex. 18.)  Mr. Mirman also did not earn a $300,000 "broker commission" for the sale of the first block of Mr. Genovese's stock.  (Motion at 19.)  While Mr. Mirman did receive a fee following the sale of the first block of Liberty Silver shares, this was a finder's fee intended to compensate Mr. Mirman for introducing Mr. Genovese to JTF, and not compensation for performing the duties of a broker.  (Mirman Ex. 4 at 216-17, 234-36.)  Even at that, the finder's fee was paid to Mr. Mirman in the context of his argument with Mr. Belesis about whether he was entitled to compensation for obtaining a commitment from Mr. Genovese to loan $2 million to JTF's holding company.  (*Id.*)  There is not a shred of evidence, other than a broker's representative number on a form, that suggests Mr. Mirman performed a single act that a retail broker would do, or that he ever accepted or was charged with the responsibility at JTF for acting as a broker on this first sale of stock.  Even the SEC's own expert has acknowledged that within a broker dealer, the firm can allocate responsibility among its members as it sees fit.  (Mirman Ex. 44 at 72-73, 90-92.)  Here, Mr. Mirman was not expected to act as the broker, did not act as the broker, and did not play a "necessary" or "substantial" role in the sale.  All of that was handled by JTF's owner, Mr. Belesis, who controlled the retail side of JTF and who was the person communicating with Mr. Genovese and the buyers about the first sale.  (SEC Ex. 8 at 9, 24-25, 28-29; Mirman Ex. 6 at 164-65.)

**III.    The Purported Attempted Second Sale of Mr. Genovese's Liberty Silver Shares Through His Look Back Account Did Not Constitute an "Offer" to Sell Securities**

Summary judgment also should be denied based on the proposed future sale of Mr. Genovese's Liberty Silver stock via his Look Back account because a factual dispute exists as to whether this unconsummated transaction ever ripened into an "offer to sell" subject to enforcement under Section 5.  Again, the requirement of a sale or offer to sell is elemental and the SEC bears the burden of proof.  *Softpoint*, 958 F. Supp. at 859.

Section 2(a)(3) of the Securities Act defines "offer" or "offer to sell" as an attempt or offer "to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value."  15 U.S.C.A. § 77b.  The determination of whether there is an offer to sell is "a question of federal law depending upon whether the challenged conduct has conditioned the offeree's or public's mind by generating a buying interest."  Thomas Hazen, *Treatise on the Law of Securities Litigation*, § 2:22.  Though broader than the common law contract concept of an offer, the definition of "offer" under the Securities Act is not limitless and typically requires some evidence of discussions or negotiations with potential investors concerning the securities to be offered.  *Id*. ("A letter or other communication that solicits investor interest prior to the filing of the registration statement will ordinarily be an illegal offer to sell."); *see also SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998) (finding an "offer to sell" in violation of Section 5 where there was an exchange of documents outlining the sale of the unregistered shares to third parties, discussions of the terms of the contemplated sales, drafting and transmittal of purchase agreements for the shares, and a wire transfer payment for the shares, notwithstanding that the shares could not be sold until the closing of an acquisition agreement); *see also Diskin v. Lomasney & Co*., 452 F.2d 871 (2d Cir. 1971) (shareholder-dealer's letter to customer stating that if the customer purchased 1,000 shares in a registered offering then broker would commit to

12

selling another 5,000 shares to the customer in another unregistered offering was an "offer" under the Securities Act).

The SEC does not dispute that there was no sale of any second block of Liberty Silver stock by Mr. Genovese.  (Motion at 1.)  The SEC also lacks any admissible evidence, let alone evidence that is undisputed, that these shares were "offered" to anyone.  Thus, the SEC cannot identify any admissible evidence that customers were made aware that *this* stock would be offered for sale, that any customers were solicited to purchase the stock, or that any documents or purchase agreements for the sale of this second block of stock were ever prepared.  Evidence shows that JTF had not solicited any customers to purchase this stock and JTF's brokers had no knowledge of any intended customers for the stock.  (Mirman Ex. 16 at 3; Mirman Ex. 24 at 12, 48, 78-79.)  The SEC points to evidence indicating that someone at JTF was assisting Mr. Genovese in having the restrictive legend removed from a second block of stock.  (Mirman Exs. 32-34, 43.)  However, assistance in the removal of a restrictive legend alone does not constitute an "offer" to sell that stock.  There is nothing in the record to suggest that the efforts to remove the restrictive legend were anything other than an effort to enable "future" sales of the stock *after any restrictions had lapsed and the shares were freely tradeable.*  (*See also* SEC Ex. 12 at 206.) In sum, if this unconsummated transaction was not a proper "offer" under the Securities Act—a material fact that is disputed—then, by definition, it was not subject to Section 5 scrutiny, and Mr. Mirman cannot be held liable.

## IV.    Mr. Mirman Was Neither A "Necessary Participant" Nor A "Substantial Factor" in the Purported Attempted Second Sale of Mr. Genovese's Liberty Silver Stock

Even if the purported attempted second sale of Mr. Genovese's shares in his Look Back account constituted an "offer" to sell within the meaning of Section 2(a)(3) of the Securities Act, summary judgment should be denied because Mr. Mirman was not a "necessary participant" or a

"substantial factor" with respect to this unconsummated transaction (sometimes referred to herein as a Purported Attempted Second Sale or "PASS").

As with the sale of the first block of Mr. Genovese's stock, Mr. Mirman's duties as the head of investment banking did not include anything relating to removing restrictive legends to permit retail sales, finding buyers for blocks of restricted stock, or communicating information to buyers or sellers about the wisdom of selling or buying stock already issued and outstanding. (Mirman Ex. 4 at 234-41.)  He was an *investment banker,* not a retail broker.  (Mirman Ex. 6 at 164-65.)   Instead, JTF had an operations department, a compliance department, a legal department and a retail sales department that was charged with these duties.  (Mirman Ex. 7 at 216-18; Mirman Ex. 4 at 220-22; Mirman Ex. 3 at 181-83; Mirman Ex. 6 at 160, 163-165, 167-68.)

The SEC premises its claim on the purported attempt to sell a second block of stock, again, on a singular action by Mr. Mirman.  It claims that Mr. Mirman signed a broker representation letter that was "essential" for the purported attempted second sale.  (Motion at 19.) However, as set forth in Mr. Mirman's response to the SEC's statement of undisputed facts under Rule 56.1, this fact is likewise subject to substantial dispute.  (*See* Response to ¶ 54).  Mr. Mirman did not prepare the broker's representation letter.  (SEC Ex. 32.)  Mr. Mirman was given it unsigned and in blank form by the administrative department at JTF.  (SEC Ex. 1 at 87-88.) His signature was not necessary.  (Mirman Ex. 29 at 189-90, 192.)  Anyone at JTF could have signed it.  (*Id*.)  Mr. Mirman signed it as a matter of convenience only.  (*Id.* at 191-92.)  He was not told it related to the PASS, did not know it was related to the PASS and relied on the administrative, legal and compliance departments to do whatever was required to be done to satisfy JTF's Section 5 obligations.  (SEC Ex. 39; SEC Ex. 1 at 87; Mirman Ex. 7 at 89, 92-93.)

14

The undisputed testimony has been that Section 5 compliance was never assigned to Mr. Mirman and was not a necessary, substantial or incidental part of his job description.  (Mirman Ex. 7 at 216-18; Mirman Ex. 4 at 220-22; Mirman Ex. 3 at 181-83; Mirman Ex. 6 at 160, 163-65, 167-68).  That has been confirmed by JTF's legal counsel (as to which Mr. Mirman sought and obtained a waiver of attorney client privilege), JTFs compliance staff, JTF's Anti-Money Laundering head Michael Egan, and JTF's outside compliance consultant, Richard Nummi, who also served at one time as an SEC enforcement counsel. (Mirman Ex. 6 at 160-61, 167-68; Mirman Ex. 3 at 181-84.)

The SEC's claim that the broker representation letter was "essential" to the purported attempted second sale also finds no support in the case law, including authority on which the SEC itself relies, which recognizes that it is the attorney's opinion letter, and not a broker representation letter or any other document, that is deemed necessary to the process of removing a restrictive legend.  *See Smsw Enterprises LLC v. Halberd Corp.*, No. CV1301412BROSPX, 2014 WL 12588682, at *9 (C.D. Cal. May 30, 2014) ("Generally, the restrictive legends are removed based upon an attorney's opinion letter, upon which the transfer agent relies in issuing the transfer."); *accord* Thomas Hazen, *Treatise on the Law of Securities Regulation*, § 4:106 ("[T]ransfer agents generally require an opinion letter from counsel that the restrictions no longer apply before allowing a transfer of the securities.")

Of all the numerous "participants" in the PASS, Mr. Mirman's involvement was the least substantial.  The PASS was approved by legal counsel for the issuer who opined that the restrictive legend could be removed and the shares sold; by a written representation from the seller that he was not an "affiliate;" by the efforts of JTF's head of Anti-Money Laundering, Michael Egan, who personally undertook to work with the transfer agent to have the legend

removed; and by the owner of JTF, Mr. Belesis, who was personally responsible for the firm's relationship with Mr. Genovese and who personally attempted to convince JTF's clearing broker to clear the sale.  (Mirman Ex. 31; Mirman Ex. 3 at 183-84; Mirman Ex. 43; Mirman Ex. 33; Mirman Ex. 34; SEC Ex. 8 at 9, 24-25, 28-29; Mirman Ex. 6 at 164-65; SEC Ex. 1 at 119-20; SEC Ex. 21 at 142-43; SEC Ex. 30 at 2.)  At a minimum, the scope and significance of others' involvement in the process of removing the restrictive legend creates a factual dispute about the comparative significance of Mr. Mirman's role in this process that cannot be resolved on summary judgment.  *See Mapp*, 2017 WL 5177960, at *8.

## V.  Disputed Issues of Fact Exist As to Whether the Sale of the First Block of Mr. Genovese's Liberty Silver Stock and the Purported Attempted Second Sale Qualified for an Exemption From the Registration Requirements Under Rule 144

Because the SEC cannot satisfy its initial burden of proving a Section 5 violation as to either the sale of the first block or the purported attempted second sale of Mr. Genovese's Liberty Silver stock, as set forth above in Sections II-IV, Mr. Mirman is not required to establish that either transaction qualified for an applicable exemption.  *See SEC v. Longfin Corp.*, 316 F. Supp. 3d 743, 756 (S.D.N.Y. 2018).  However, summary judgment also should be denied because factual disputes persist about whether the sale of the first block of Liberty Silver stock and the purported attempted sale of the second block of Mr. Genovese's stock qualified for Rule 144's exemption from registration requirements for non-affiliate sales.

As a threshold matter, the SEC does not present any evidence as to the nature of the shares in either transaction.  The first block bore no restrictive legend and the shares were classified by the clearing broker as received "free delivery," as in free trading.  (Mirman Ex. 5 at 1; Mirman Ex 29 at 155, 159.)  The SEC does not establish whether these were restricted shares or shares acquired on the open market.  The second block of stock did bear a restrictive legend and would be re-saleable if certain requirements were met.  (SEC Ex. 32.)

Under Rule 144, shares acquired directly from an issuer not involving any public offering are deemed "restricted" securities. *Longfin Corp.*, 316 F. Supp. 3d at 757. Restricted securities nonetheless may be sold under Rule 144's safe harbor if the seller complies with its conditions. *Id*. Thus, under Rule 144, a non-affiliate that has held restricted securities of a reporting issuer for more than six months and less than one year can resell the securities in reliance on Rule 144, if current information is available about the issuer. *See* 17 C.F.R. § 230.144; *see also Revisions to Rules 144 and 145*, SEC Release No. 8869 (Dec. 6, 2007), 2007 WL 4270700.[5] After one year, a non-affiliate may freely resell the restricted securities of an issuer without complying with any of the Rule 144 requirements. *Id.*; *see also Longfin*, 316 F. Supp. 3d at 765 (S.D.N.Y. 2018) ("[A] non-affiliate may sell shares acquired more than one year earlier, even if the issuer is out of compliance with its current public information duties.") (citing 17 C.F.R. § 230.144(b)). Unrestricted shares may be sold unless they are "control shares" as described in SEC guidance. *See* "Rule 144: Selling Restricted and Control Securities," SEC.gov.[6]

Under either scenario, the shares can be sold by Mr. Genovese if he is not an affiliate of the issuer or an underwriter. Under either scenario, Mr. Mirman is not the seller and can be liable only if he is a "necessary participant" and a "substantial factor" in bringing about the transaction. Under either scenario, there are disputed issues of fact both with respect to Mr. Genovese and Mr. Mirman that preclude summary judgment.

Rule 144 defines an "affiliate" as a "person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1). Rule 144 does not define "control," but Rule 405 of Regulation C

---

[5]    *Available at* http://www.sec.gov/rules/final/2007/33-8869.pdf

[6]    *Available at* https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144htm.html.

establishes a definition of "affiliate" identical to that of Rule 144 and defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise." *Longfin*, 316 F. Supp. 3d at 759 (citations omitted).  "Control" "is a question of fact which depends upon the totality of the circumstances including an appraisal of the influence upon management and policies of a corporation by the person involved."  *Id.* (citing *United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976)).  Accordingly, the case law in this circuit rejects "bright line" rules that ascribe affiliate status based on the percentage ownership of stock, in favor of a fact-specific inquiry that considers whether there was "actual control" of the issuer. *See SEC v. Cavanagh*, 445 F.3d 105, 113, n.19 (2d Cir. 2006); *see also United States v. Sprecher*, 783 F. Supp. 133, 159 (S.D.N.Y. 1992), *aff'd*, 988 F.2d 318 (2d Cir. 1993) ("[s]tock ownership is but one aspect of control" under Rule 144); *see also Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 660 (D.N.J. 2009) (absent other evidence of control, twenty percent ownership share did not make defendant an "affiliate" under Rule 144).

### A. There Is A Disputed Issue of Fact As to Whether the Sale of the First Block of Mr. Genovese's Liberty Silver Shares Qualified for Rule 144's "Safe Harbor"

Summary judgment should be denied because the record evidence shows that the sale of the first block of Mr. Genovese's Liberty Silver shares was exempt from registration requirements under the Rule 144 "safe harbor."  At a minimum, there is a material factual dispute about whether the Rule 144 safe harbor applied to this sale.

The SEC admits that Mr. Genovese satisfied the requisite holding period for the sale of his first block of stock under Rule 144.  (Motion at 3.)  Pursuant to Rule 144, Mr. Genovese was therefore entitled to sell his first block of shares without complying with any of the Rule 144 requirements, so long as he was not an "affiliate" of Liberty Silver.  *See* 17 C.F.R. § 230.144; *see*

*also Longfin*, 316 F. Supp. 3d at 765.  All the evidence revealed in discovery indicates Mr. Genovese was never an "affiliate" of Liberty Silver, including at the time he sold the first block of his Liberty Silver shares.

Mr. Genovese never served as an officer or director of Liberty Silver.  (Mirman Ex. 9 at 31-32; Mirman Ex. 11 at 24-26.)  Mr. Genovese had no involvement in selecting Liberty Silver's board of directors and had no power or authority to nominate or remove anyone to or from the company's board.  (Mirman Ex. 9 at 61; Mirman Ex. 26 at 47-48.)  Mr. Genovese had no authority or ability to direct or control Liberty Silver's board or its management team.  (Mirman Ex. 9 at 61-62), a fact confirmed by Liberty Silver's former Chief Financial Officer in sworn testimony and by other Liberty Silver officials.  (Mirman Ex. 35 at 87, 89-90, 92-96; Mirman Ex. 36 at 163-64; Mirman Ex. 26 at 47-48; Mirman Ex. 37 at 1.)  Mr. Genovese had no ability to direct or control Liberty Silver's operations or to set the company's business strategy or goals.  (Mirman Ex. 35 at 84-88, 93-95, 114; Mirman Ex. 9 at 62.)  Not only did Mr. Genovese lack the ability to direct Liberty Silver's management or to cause the direction of the company that is the *sine qua non* of affiliate status, *see Longfin*, 316 F. Supp. 3d at 759, but he was purposely kept at "arm's length" by Liberty Silver's management.  (Mirman Ex. 35 at 84-86, 95; Mirman Ex. 37.)

In the face of all this evidence, the most the SEC can muster that Mr. Genovese was an "affiliate" is to claim that he purportedly "influenced Liberty management"—whatever this may mean—by getting "management" to support his alleged efforts to publicly market the company and to raise its profile.  (Motion at 15.)  Even were such support somehow indicative of Mr. Genovese's status as an "affiliate," which it is not given the absence of any evidence that Mr. Genovese was able to exercise "actual control" over Liberty or its management, the evidence shows Mr. Genovese was unable to exert any such influence on Liberty's management.  Instead

19

of being "influenced" by Mr. Genovese, Liberty Silver's management repeatedly rejected his suggestions to market Liberty Silver to the public and developed their own marketing strategy. (Mirman Ex. 26 at 86-87; Mirman Ex. 37; SEC Ex. 47 at 128.)  At the direction of CEO Geoff Browne, Liberty Silver's management sought to ensure that Mr. Genovese had no involvement in the company beyond his status as a shareholder.  (Mirman Ex. 35 at 84-85, 190-91; Mirman Ex. 41; Mirman Ex. 26 at 48-50, 73-77, 95-96, 118-119; Mirman Ex. 8 at 39-40.)  Insofar as Mr. Genovese engaged in any efforts to market Liberty Silver, those efforts were independent of and unauthorized by Liberty Silver and, often were directly opposed by Liberty Silver.  (Mirman Ex. 26 at 48-50, 73-77, 95-96, 118-19; Mirman Ex. 8 at 39-40; SEC Ex. 48 at 3.)

The only "evidence" the SEC can point to that anyone in the management supported Mr. Genovese's freelance efforts to market the company is a solitary September 20, 2012 email from Liberty Silver's former chief operating officer William Tafuri to Mr. Genovese, in which Mr. Tafuri wrote that he would "help in your marketing efforts as much as I can and I stand 100% behind you."  (Motion at 15.)  As Mr. Tafuri testified, his email was intended to express his support for attending the specific event referenced in the email, a September 2012 silver mining summit, which Mr. Tafuri and Geoff Browne had planned to attend independent of Mr. Genovese's encouragement, and was not a intended as an expression of support for Mr. Genovese's "financing and marketing" efforts more broadly. (Mirman Ex. 8 at 191-93; Mirman Ex. 35 at 127-29.)  The SEC's claim that Mr. Tafuri's email evidenced any influence by Mr. Genovese on Liberty Silver's management is also directly contradicted by the SEC in its own brief, since the SEC concedes—as it must, based on the record evidence—that Mr. Tafuri's email was intended only to "support[] this September 2012 Genovese marketing effort" and that there

20

were a "lot of times that [Mr. Tafuri] absolutely balked and did not stand behind [Mr. Genovese]." (Motion at 16 n.18.)  Factual disputes thus exist even within the SEC's own motion.

Equally strained are the SEC's attempts to claim that Mr. Genovese was an "affiliate" because he purportedly "controlled" "at least 45.5% of Liberty Silver's public float."  (Motion at 3-4, 25.)  According to the SEC, Mr. Genovese was able to secure this "control" through an "agreement" he had with "certain other large Liberty shareholders" whereby "they agreed not to sell their shares without Genovese's consent and agreed to pay Genovese a portion of their eventual stock sales."  (*Id.*)  The SEC's only evidence of any such "agreement" is the declaration of John Pulos, a shareholder of Liberty Silver.  (SEC Ex. 45.)  That the SEC is forced to rely on Mr. Pulos' declaration is itself a testament to the thinness of the claims that Mr. Pulos makes. The SEC initially intended to depose Mr. Pulos in this case.  (Mirman Ex. 45.)  But, rather than have Mr. Pulos be subjected to cross-examination by Mr. Mirman's counsel, the SEC elected to cancel the deposition in exchange for the declaration that it now submits on summary judgment. (*Id.*)

Each of the claims that Mr. Pulos makes in his hearsay declaration is disputed—and indeed refuted—by the record evidence, including specific deposition testimony by Mr. Genovese that directly disputes Mr. Pulos' allegations.[7]  (Mirman Ex. 9 at 42-62, 176-77; *see also* Mirman Ex. 35 at 89-90, 92-96)  Thus, contrary to what Mr. Pulos claims, Mr. Genovese was not "recruited" to and did not "install" a new management team at Liberty Silver.  (Mirman

---

[7]    Rule 56 of the Federal Rules provides that a declaration used to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Fed R. Civ. P. 56(c)(4).  Thus, the court should strike those portions of Mr. Pulos' declaration—including ¶¶ 20-24—that are not made upon personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements. *See, e.g., Pugliese v. Verizon New York, Inc.,* No. 05-CV-4005 (KMK), 2008 WL 2882092, at *6 (S.D.N.Y. July 9, 2008).

Ex. 9 at 42-62, 176-77.)  Mr. Genovese had no role in determining Liberty Silver's management, which individuals were ultimately invited to serve on Liberty Silver's board, or what the company's business plan would be, and had no involvement in the company's day-to-day management.  (Mirman Ex. 26 at 48-50.)   Nor was Mr. Genovese recruited to "manage Liberty's public trading."  (Motion at 14.)  Mr. Genovese chose to invest in Liberty Silver with goal of buying and selling its stock.  (SEC Ex. 13 at 50-51.)  Mr. Genovese did not seek to and did not "manage" Liberty Silver's "public trading."  (*Id.*; Mirman Ex. 9 at 42-62, 176-77.)  And Mr. Genovese was not recruited to "market Liberty stock to the public." (Motion at 14.)   As discussed above, any marketing efforts pursued by Mr. Genovese were independent of and unauthorized by Liberty Silver.  Indeed, there were "no arrangements whatsoever" that required Mr. Genovese to perform any services for Liberty Silver.  (Mirman Ex. 8 at 25-27, 29.)

Moreover, there was no "agreement" between Mr. Genovese and any Liberty Silver shareholders that enabled Mr. Genovese to control "at least 45.5% of Liberty Silver's public float."  (Motion at 3-4, 25).  Mr. Genovese testified that he and several other Liberty Silver shareholders had discussed the possibility of an agreement whereby, in return for getting Liberty Silver financed and moving it forward, Mr. Genovese would have an option to purchase some portion of their shares in Liberty Silver.  (SEC Ex. 13 at 39-40, 57-58. 177-79.)  However, no such agreement was ever signed and the terms of an agreement remained under negotiation.  (*Id.*) Because no agreement was ever finalized, Mr. Genovese had no control over the shares of the other Liberty Silver shareholders and, therefore, no ability to prevent them from selling their shares. (*Id.* 39-40, 58.)   "[The other shareholders] could sell, they could do whatever they were going to do anyway."  (*Id.* at 39.)  Email correspondence cited by the SEC further confirms that

no such "agreement" existed, as it shows that Liberty Silver's shareholders continued to sell their shares without consulting with Mr. Genovese or seeking his permission.  (SEC Exs. 50-51.)

Given all this evidence, it is clear that, at the very least, there is a factual dispute regarding whether Mr. Genovese was an "affiliate" of Liberty Silver, and thus a related factual dispute about whether the sale of the first block of his Liberty Shares qualified for an exemption under Rule 144.  The "drastic device" of summary judgment should not be granted based on such a disputed record.  *Ass'n of Car Wash* Owners, 911 F.3d at 83.

### B. There Is A Disputed Issue of Fact As to Whether the Purported "Offering" of Mr. Genovese's Liberty Silver Shares Qualified for Rule 144's "Safe Harbor"

A factual dispute also exists concerning the applicability of the Rule 144 safe harbor with respect to the purported "offering" of Mr. Genovese's shares through his Look Back account. Under Rule 144, a non-affiliate that has held restricted securities of a reporting issuer for more than six months and less than one year can resell the securities in reliance on Rule 144, if current information is available about the issuer.  *See* 17 C.F.R. § 230.144; *see also* SEC Release No. 8869 (Dec. 6, 2007), 2007 WL 4270700.  The SEC contends that the shares in the Look Back account were issued to Mr. Genovese on December 14, 2011.  (Motion at 23 n. 21.)  If that is correct, then the shares in the Look Back account would have been eligible for resale under the Rule 144 exemption as of June 14, 2012, and that their "offering" in September 2012—if in fact there was one—would have qualified for a Rule 144 safe harbor.

The SEC argues this exemption was unavailable for the Look Back "offering" because "Liberty was not subject to the Exchange Act Section 13 or 15(d) reporting requirements." (Motion at 22.)  The SEC draws a distinction between "mandatory" filers under Rule 144(d)(1) as to which it claims the holding period is six months, and voluntary filers under Rule 144(d)(2), as to which the holding period is one year.  (*Id*.)  The SEC claims that Liberty Silver, a foreign

issuer, was a voluntary filer. (*Id.*) There are several legal and factual disputes that prevent the SEC's claim from prevailing at this stage of the case.

First, Rule 144 does not use the words urged by the SEC in drawing its distinction. Rule 144 uses the phrase "subject to the reporting requirements" of section 13 or 15(d) in defining when the six-month holding period is applicable. 17 C.F.R. § 230.144. Mr. Mirman's counsel has been unable to find, and the SEC does not cite, a single reported case that explains or defines the meaning of the term "subject to" as used in Rule 144. The purpose of the requirement seems to be to ensure that information is publicly available as required by the Exchange Act of 1934 ("Exchange Act") in order to qualify for the six-month holding period for non-affiliates. *See* Thomas Hazen, *Treatise on the Law of Securities Regulation*, § 4:106 ("Compliance with Rule 144 requires dissemination of sufficient current public information concerning the issuer.") Some companies, which are not necessarily required to file under the Exchange Act, may elect to voluntarily file less than all the information required.

That is not the case here. Liberty Silver's Form 10-K for the period ending June 30, 2012, cited and relied upon by the SEC, expressly states that Liberty Silver was "subject to" the Exchange Act's reporting requirements. (SEC Ex. 43 at 1.) Specifically, this Form 10-K states that Liberty Silver "filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months . . . and . . has been subject to such filing requirements for the past 90 days."[8] (*Id.*) This language exactly parallels the required language

---

[8]   The SEC itself admits that Liberty Silver filed reports under Exchange Act Section 15(d), and then proceeds to speculate that it stopped doing so in 2012—even though the Form 10-K cited by the SEC indicates otherwise. The SEC's only other evidence that Liberty Silver was not a reporting company under the Exchange Act is Mr. Mirman's testimony that Mr. Genovese told Mr. Mirman that "he"—*i.e.*, Mr. Genovese—did not "file a 13(d)." (SEC Ex. 4 at 221.) Even if that were the case, it does not establish that Liberty Silver did not file reports under the Exchange Act, as the Form 10-K indicates that it did.

under Rule 144 to qualify for the six month holding period.  *See* 17 C.F.R. § 230.144.   In addition, a box is checked on the first page of the Form 10-K which, despite its double negative, and when read in conjunction with the second box on page one, clearly indicates that Liberty Silver believed and represented to the SEC and to the public that it was subject to the reporting requirements of the Exchange Act.  (SEC Ex. 43 at 1.)  In addition, the SEC concedes that a registration statement was filed in 2008 for an offering of Liberty Silver shares (Motion at 22 n.20), and it is undisputed that that registration statement became effective.  *See* EDGAR Company Search, SEC, Notice of Effectiveness, dated April 28, 2008.  Under Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), every issuer that has "filed a registration statement which has become effective" pursuant to the Securities Act is required to file supplemental and periodic reports in conformance with Section 13 of the Exchange Act.  These filings generally include reports on Form 10-Q and 10-K, audited financial statements and Forms 8-K.  15 U.S.C. § 78m. A review of the EDGAR filings for Liberty Silver shows that Liberty Silver made all such filings through and including the period at issue in this case.[9]  In fact, a review of the EDGAR database shows not only that Liberty Silver made all such required filings but that the SEC's Office of Corporate Finance reviewed them, criticized and commented on them, and referred to them in SEC correspondence as "required," sometimes indicating that Liberty Silver was again required to respond to the SEC's comments or explain what its plan was to remediate any shortcomings identified by the SEC.  (Mirman Ex. 46.)  It is hard to conceive why the SEC would take the position that remediation of the filings was "required" if the filings themselves were not.

---

[9]     *Available at* https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001407583&type=&dateb=&owner=exclude&start=200&count=40

Even the SEC's claim that Liberty Silver had only "29" shareholders and was therefore "automatically" relieved of any filing obligations is subject to a factual dispute.  (Motion at 22 n.20.)  First, the automatic suspension occurs if "persons" holding stock are less than 300.  15 U.S.C. § 78o.  The evidence cited by the SEC only makes reference to the number of registered shareholders, which does not necessarily equate to the number of "persons" holding a beneficial interest in the company.  Second, the claim that there were only 29 shareholders seems wildly inconsistent the fairly dramatic allegations in the SEC's Complaint alleging a scheme to dump millions of shares of stock on unwitting investors, especially when considered alongside the multi-year pattern and practice of Liberty Silver filing its Exchange Act reports and the SEC in reviewing and commenting on them.  *See* EDGAR Company Search, Public Filings for Liberty Silver.[10] (Mirman Ex. 46.)

Finally, even if there were fewer than 300 shareholders, there remains a factual dispute as to whether Liberty Silver could, by virtue of its representations to the SEC that it was subject to the Exchange Act's filing requirements, and its undertaking to file all the "required" reports, opt into the six-month holding period under Rule 144.  *Cf*. 15 U.S.C. 78o(d) (creating right to opt in for companies that filed before the effective date of the 1964 amendments).  The whole purpose of the reforms to Rule 144 to dramatically shorten the holding period to six months was to afford non-affiliates greater freedom to sell their shares and reduce unnecessary resale restrictions.  *See Revisions to Rules 144 and 145*, SEC Release No. 8869 (Dec. 6, 2007), 2007 WL 4270700.  A fact dispute therefore exists about whether Liberty Silver was "subject to" the reporting

---

[10]  *Available at* https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001407583&type=&dateb=&owner=exclude&start=80&count=40

requirements under Exchange Act Section 13 or 15(d) and whether a Rule 144 exemption was available for the Look Back "offering."

**VI.    Disputed Issues of Fact Exist as to Whether the Sale of the First Block of Mr. Genovese's Liberty Silver Stock and the Purported Attempted Second Sale Qualified  for an Exemption Under 4(a)(1) of the Securities Act**

Even if the sale of the first block of Mr. Genovese's shares did not qualify for an exemption under Rule 144, and even if the purported attempted second sale was an "offering," and even if this "offering" did not qualify for a Rule 144 exemption, summary judgment should still be denied because there is still a further factual dispute regarding whether these transactions could have been sold under Rule 4(a)(1) of the Securities Act.

Because Rule 144 is not "exclusive," and is only a safe harbor, a "person who does not meet all of the applicable conditions of Rule 144 still may claim any other available exemption under the Act for the sale of the securities." *SEC v. Hemp, Inc.*, No. 216CV01413JADPAL, 2018 WL 1220566, at *4 (D. Nev. Mar. 8, 2018) (citations omitted); *accord SEC v. Kern*, 425 F.3d 143, 152 (2d Cir. 2005).  As relevant here, Section 4(a)(1) of the Securities Act provides an exemption for transactions "by a person other than an issuer, underwriter, or dealer." 15 U.S.C.§ 77d.  An "issuer" under Section 4(a)(1) is defined the same as an "affiliate" under Rule 144.  15 U.S.C. § 77b; *Kern*, 425 F.3d at 152.  An "underwriter" is "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates . . . in any such undertaking[.]" *Id*.  A "distribution" is "equivalent to a public offering of securities." *SEC v. Lybrand*, 200 F. Supp. 2d 384, 393 (S.D.N.Y. 2002). Whether a seller acquired his shares "with a view to" distribution requires a fact-specific inquiry into the seller's purpose and "investment intent" behind acquiring the shares. *SEC v. Caledonian Bank Ltd*., 145 F. Supp. 3d 290, 309 (S.D.N.Y. 2015).  Although some courts have considered the holding period in examining whether securities were acquired "with a view to" distribution,

"[i]t is clear that when properly viewed, the holding period for securities acquired in a private placement or other nonpublic offerings is merely a very rough guideline and thus is not the be-all and end-all of the 'underwriter' issue."   Thomas Hazen, *Treatise on the Law of Securities Regulation*, § 4:100.  Rather, "whether or not the purchaser had intent to distribute is a question of fact to be answered by looking at all of the particular circumstances."  *Id.*[11]

"An individual who fails to satisfy Rule 144 may still not be an underwriter after a fact-intensive analysis—an analysis that is inappropriate at the summary-judgment stage."  *SEC v. Hemp, Inc.*, 2018 WL 1220566, at *4; *see also SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 438 (S.D.N.Y. 2007), *aff'd sub nom. SEC v. Altomare*, 300 F. App'x 70 (2d Cir. 2008) (denying SEC's motion for summary judgment against defendant where factual record was insufficient to establish if defendant "acted as an underwriter" for purposes of Section 4(1) exemption and would require court to draw "imprudent" inferences "without the opportunity to assess credibility and weigh evidence").

The SEC claims that the Section 4(a)(1) exemption is inapplicable to the PASS because "Genovese was an 'underwriter' in connection with that offering."  (Motion at 27.)  Here, as noted above, Mr. Genovese disputes that he acquired the Liberty Silver shares "with a view to" distribution and he disputes that he was an "affiliate" or held any form of control over Liberty Silver, actual or otherwise.  Mr. Genovese has testified that he acquired the shares as part of a

---

[11]   The SEC's claim that Mr. Genovese acquired the Look Back shares "with a view" to distribution because he did not satisfy the "two-year rule of thumb" holding period is incorrect on several levels.  (Motion at 27.)  Not only is the holding period not dispositive on this issue, as noted above, but two years is no longer the "rule of thumb."  It was based on an outdated version of the exemption provisions and fails to reflect reductions to the former two-year holding period under Rule 144, most recently following the SEC's 2007 revisions. *See Revisions to Rules 144 and 145*, 72 Fed.Reg. 71546–01, 71546 (Dec. 17, 2007).

long-term investment strategy that involved buying and selling shares in the company.  (SEC Ex. 13 at 51; Mirman Ex. 9 at 42-62, 176-77.)  Presumably, the SEC will claim that Mr. Genovese's intent to distribute can be inferred from all the facts and circumstances.  None of this is the proper subject of summary judgment.  *Hemp*, 2018 WL 1220566, at *4; *Universal Express*, 475 F. Supp. 2d at 438.

**VII.     Disputed Issues of Fact Exist as to Whether the Sale of the Purported Attempted <u>Second Sale Qualified  for the Broker Exemption Under 4(a)(4) of the Securities Act</u>**

A further factual dispute exists as to whether the purported attempted second sale of Mr. Genovese's stock qualified for the "broker's exemption" under Section 4(a)(4) of the Securities Act.  Section 4(4) provides for an exemption for "brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders." 15 U.S.C. § 77d(a)(4).

No dispute exists that JTF acted as a "broker" for the sale of a first block of liberty Silver Shares and would be deemed a broker with respect to the purported attempted second sale of Mr. Genovese's Liberty Silver shares.  But, there is no admissible evidence that JTF solicited any customers to trade in the second block of Liberty Silver shares.  While Mr. Belesis has testified that he "wanted" to sell additional shares of Liberty Silver to JTF customers as part of some "future sale," there is no evidence that any customers had actually been solicited—whether by Mr. Belesis or by other JTF brokers—to purchase the stock.  (SEC Ex. 12 at 206, 208; SEC Ex. 8 at 36.)  Evidence indicates, to the contrary, that Mr. Belesis never informed his customers— including those of his customers who had previously purchased Liberty Silver stock—about an additional sale of the 6.5 million shares of Liberty Silver.  (Mirman Ex. 24 at 12, 48, 78-79.) Indeed, the SEC has not provided evidence of a single JTF broker who "solicited" customers to purchase the second block of Mr. Genovese shares, or of a single JTF customer who was so

"solicited."  The record evidence further indicates that JTF brokers were not soliciting customers to purchase those shares and had no knowledge of any intended customers that would have purchased those shares.  (Mirman Ex. 16 at 3.)

The SEC claims that the broker's exemption is unavailable because there were purported "red flags" that the sale and PASS sale were "distributions" of Liberty stock, and that Mr. Genovese was a Liberty "underwriter."  (Motion at 28 n. 23.)  As discussed in Section VI above, however, both these issues implicate numerous contested facts and cannot be resolved on summary judgment.  *Hemp*, 2018 WL 1220566, at *4; *Universal Express*, 475 F. Supp. 2d at 438.

## CONCLUSION

From the beginning the case against Mr. Mirman has been precarious.  Mr. Mirman was asked by FINRA, the SEC and the Department of Justice to cooperate with their investigations and he did without hesitation.  No criminal case was ever brought.  Mr. Mirman helped the FINRA attorneys with whatever information he had and FINRA was successful in its case against Mr. Belesis. The SEC put JTF out of business and eventually banned the owner of JTF, Mr. Belesis, from the industry.  Mr. Mirman shared what he knew with FINRA and met many times with the SEC over a five-year period, generally without counsel, in full and total cooperation.  At the end of that long five-year process and without warning, the SEC changed Mr. Mirman's status to putative defendant, put him on the record and aggressively questioned him without an attorney present.  Then, it sued him on the eve of the expiration of the statute of limitations.

Despite all the SEC's efforts, the facts have not changed.  They are the same as when virtually every agency viewed Mr. Mirman as a quality potential cooperator and not a target or defendant.  Mr. Mirman was the head of investment banking at JTF for a short time.  He had

nothing to do with the retail brokerage operations and had no control or ability to control Mr. Belesis or JTF.  He was not the person responsible for Section 5 compliance at JTF and was not necessarily or substantially involved in the dealings between Mr. Belesis and Mr. Genovese concerning Mr. Genovese's stock sale.  He was a bystander who had other unrelated dealings with Mr. Genovese concerning whether Mr. Genovese would invest in JTF and whether JTF should consider doing a capital raise for Liberty Silver.  These facts support judgment, if at all, in Mr. Mirman's favor, not the SEC's.  However, adhering to the colloquy with the Court at our pre-motion conference and, unlike the SEC, at least acknowledging that there is a scintilla of evidence that creates a disputed issue of fact, Mr. Mirman's counsel have refrained from imposing additional work on the Court by filing a motion for summary judgment.  However, the Court's statement of legal principles in ruling on the SEC's motion can be helpful in informing the parties about the instructions that will be given to the jury and could help the parties resolve the case.

For the foregoing reasons, Mr. Mirman respectfully requests that the Court deny the SEC's motion for partial summary judgment.  If the SEC really believes that this marginal case is worth the effort, it should bring it to trial where the factual disputes listed above, and others, can be presented and decided.

Dated: April 13, 2020
        New York, New York

By:   /s/ *William J. Leone*
     William J. Leone
     Jacob Laksin
     **NORTON ROSE FULBRIGHT US LLP**
     1301 Avenue of the Americas
     New York, NY 10019-6022
     Tel.: 212-318-3000
     Fax: 212-318-3400
     william.leone@nortonrosefulbright.com
     jacob.laksin@nortonrosefulbright.com

*Attorneys for Defendant Abraham "Avi"
Mirman*