UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SECURITIES AND EXCHANGE          :
COMMISSION,                      :
                      Plaintiff, :
                                 :          17 Civ. 5821 (LGS)
          -against-              :
                                 :          OPINION & ORDER
ROBERT DONALD BRUCE GENOVESE et al., :
                     Defendants. :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") moves for

partial summary judgment[1] against Defendant Abraham "Avi" Mirman ("Mirman") on its claims

that he violated Securities Act Section 5, 15 U.S.C. § 77e, by acting as a broker for settled

Defendant Robert Genovese ("Genovese") in two unregistered securities offerings of the stock of

Liberty Silver Corporation ("Liberty").  Mirman opposes.  For the reasons stated below, the

motion is granted in part and denied in part.

## I.    BACKGROUND

The relevant undisputed facts are as follows.  In January 2012, Mirman joined John

Thomas Financial ("JTF") as its head of investment banking.  JTF, a broker-dealer registered

with the Commission, was controlled and owned by Thomas Belesis ("Belesis") through a

holding company, ATB Holding Co., LLC ("ATB").  In early August 2012, Mirman contacted

Genovese, a wealthy investor, regarding a potential investment in JTF.  On August 7, 2012,

Mirman and Genovese began discussing the possibility of Genovese's investing in ATB, and of

Mirman becoming involved in Liberty, a silver mining company in which Genovese was an

---

[1] The Commission does not seek summary judgment on its claims that Mirman engaged in
securities fraud.

investor.  Shortly thereafter, Genovese emailed Mirman marketing materials regarding Liberty. Following a visit to Genovese's Canadian residence between August 18 and 20, 2012, Mirman and Belesis obtained Genovese's commitment to invest $2 million in ATB.  During that meeting, Genovese expressed an interest in investing up to $10 million in ATB, and the participants discussed a potential investment relationship between JTF and Liberty.  From August 22 to 23, 2012, Mirman traveled to Liberty's silver mine in Nevada to conduct due diligence.

Mirman subsequently invited William Tafuri ("Tafuri"), Liberty's president and chief operating officer, to give a promotional presentation regarding Liberty to JTF.  On August 28, 2012, Tafuri and Genovese each gave a brief presentation to JTF brokers, describing Liberty as undervalued and encouraging the traders to sell Liberty stock to customers.  Mirman introduced Genovese and Tafuri at that presentation.  Following the presentation, a one-page summary and marketing materials for Liberty were disseminated to JTF's brokers.  Mirman validated the representations in the one-page summary with the help of an analyst and had copies made for dissemination to JTF's traders.  JTF's brokers subsequently sold Liberty stock to their customers.

In late September 2012, Genovese sold a block of 6.6 million Liberty shares through a JTF account he had opened for his offshore entity BG Capital Group Limited ("BGC") (the "BGC Sale").  Mirman agreed that he was listed as the broker on documents related to that sale and collected a $300,000 commission related to his work with Genovese.  Belesis solicited the purchasers for the BGC Sale without Mirman's involvement.  The BGC Sale was not registered with the Commission.  Mirman was listed as the registered representative for Genovese's BGC account at JTF.  On September 13, 2012, a sales assistant emailed Mirman and the JTF operations department the BGC account opening documents, which identified Mirman as the broker for the account.  On September 17, 2012, that assistant sent Mirman and others at JTF an

email asking for confirmation of the trade dates for the transfer of shares for the BGC Sale, and on September 19, 2012, that assistant sent dates relating to the sale. Shortly thereafter, Mirman, Genovese and Belesis discussed the possibility that Genovese would reinvest some of the proceeds of the BGC Sale in JTF.

On September 19, 2012, a sales assistant forwarded Mirman an email from Genovese's assistant stating that Genovese was interested in selling an additional 6.5 million shares of Liberty stock through the JTF account of Look Back Investments ("Look Back"), an offshore entity owned by Genovese (the "Look Back Offering"). Liberty issued the relevant stock to Look Back on December 14, 2011. No registration statement was in effect for the Look Back Offering. As with the BGC Sale, Mirman was the representative identified on the relevant accounts at JTF, and he signed a document titled "New Account Application" for use in the Look Back Offering. Look Back also sent JTF a letter requesting that Mirman contact Look Back to arrange an account opening. Mirman also signed a document titled "Sample Brokers Representation Letter For Sales by Non-Affiliates" (the "Broker Rep Letter"). The letter read: "After reasonable inquiry the undersigned [Mirman] is not aware of any circumstances indicating that the seller [Look Back] is an underwriter with respect to the transaction or that the sale is part of a distribution of securities of the issuer." Liberty's counsel attached that document to a September 21, 2012, legal opinion letter ("Opinion Letter") for the Look Back Offering, which authorized Liberty's stock transfer agent to remove any restriction on the sale of the Look Back shares because the transfer could be consummated without a registration statement under a registration exemption. That letter stated that it had been issued in reliance on the representations of the Broker Rep Letter signed by Mirman. The Look Back shares were never sold after the Commission suspended trading in Liberty stock.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (quotation marks omitted).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Liberty Lobby*, 477 U.S. at 248; *accord Saleem v. Corp. Transp. Grp.*, 854 F.3d 131, 148 (2d Cir. 2017).  "Only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013); *accord Starr Indem. & Liab. Co. v. Brightstar Corp.*, 388 F. Supp. 3d 304, 323 (S.D.N.Y. 2019).

## III.    DISCUSSION

### A.  Applicable Law on Section 5 Violations

Section 5 of the Securities Act makes it unlawful, directly or indirectly, to offer publicly or sell unregistered stock unless the offering is covered by an exemption.  *See* 15 U.S.C. § 77e; *SEC v. Sourlis*, 851 F.3d 139, 143 (2d Cir. 2016).  First, the Commission bears the burden of proving a prima facie case of a Section 5 violation.  If the Commission does so, then the defendant bears the burden of proving the applicability of an exemption to the registration

requirement.  *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006); *accord SEC v. Sason*, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020).

For a prima facie case of a Section 5 violation, the SEC must establish "(1) lack of a required registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale."  *Sourlis*, 851 F.3d at 143 (internal quotations and alterations omitted).  Where a defendant did not directly pass title to any securities -- i.e., if the defendant, like Mirman, did not sell the securities -- the SEC also must establish that he was a "necessary participant" or "substantial factor" in the sale.  *In re Lehman Bros. Mortg.-Backed Secs. Litig.*, 650 F.3d 167, 178 n.8 (2d Cir. 2011); *accord Sason*, 433 F. Supp. 3d at 513.  The Commission need not prove scienter or negligence by the defendant, as Section 5 imposes strict liability.  *See SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1046 (2d Cir. 1976); *accord Sason*, 433 F. Supp. 3d at 513.

As noted, if the Commission proves a prima facie case of Section 5 liability, then the burden shifts to the defendant to prove that an exemption excuses the requirement that the stock be registered before it was sold.  Two exemptions are relevant here:  the Section 4(a)(1) exemption and the Rule 144 "safe harbor" thereunder.  Section 4(a)(1) of the Securities Act exempts from registration "transactions by any person other than an issuer, underwriter, or dealer."  15 U.S.C. § 77d(a)(1); *see also SEC v. Longfin Corp.*, 316 F. Supp. 3d 743, 765 (S.D.N.Y. 2018).  In other words, a holder of securities -- like Genovese here -- may sell his securities without registration if he is not an issuer, dealer or underwriter.  An "underwriter" is statutorily defined as a person who "participate[s], directly or indirectly, in purchasing securities from an issuer *with a view to* distribution, in offering or selling securities for an issuer in

connection with a distribution, or in the underwriting of such an offering." *Fed. Deposit Ins. Corp. v. Credit Suisse First Bos. Mortg. Sec. Corp.*, 414 F. Supp. 3d 407, 413 (S.D.N.Y. 2019) (quoting *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 177 (2d Cir. 2011)) (citing 15 U.S.C. § 77b(a)(11)) (emphasis added).  Rule 144 provides a safe harbor from this fact intensive definition of underwriter, excluding from underwriter status any person who meets its five conditions.  *See* 17 C.F.R. § 230.144.

As explained below, summary judgment is denied as to the BGC Sale because the SEC has not established a prima facie case as a matter of law; a question of fact remains as to whether Mirman was subject to Section 5 as a "necessary participant" or "substantial factor" in the transaction.  Summary judgment is granted as to the Look Back Offering because, although there is a material factual dispute as to Genovese's status as an affiliate for purposes of Rule 144 and Section 4(a)(1), those exemptions do not apply regardless of his affiliate status.

### B.  The SEC's Prima Facie Case of a Section 5 Violation

#### 1.  The BGC Sale

The undisputed evidence shows that the BGC Sale was an unregistered sale of securities that used interstate means.  The parties dispute whether Mirman was a "necessary participant" or "substantial factor" in bringing about that sale.  Although the main facts of Mirman's participation are not in dispute, a reasonable jury viewing the evidence in the light most favorable to Mirman could conclude that he did not have the requisite involvement.  First, although Mirman was directly involved in the BGC Sale to some degree, a reasonable jury could conclude that his actions were peripheral to consummation of that sale, which was primarily negotiated and executed by others.  Second, although Mirman took actions that introduced Genovese and Liberty to JTF in the month leading up the BGC Sale, those ancillary activities are

sufficiently remote from the BGC Sale to permit the reasonable inference that Mirman was neither a "necessary participant" nor "substantial factor" in the sale.  These inferences preclude granting summary judgment to the SEC on its Section 5 claim against Mirman based on the BGC Sale.

Courts in this district have held that the "necessary participant" inquiry asks whether, "but for the defendant's participation, the sale transaction would not have taken place -- in other words, whether the defendants' acts were a substantial factor in the sale transactions." *Sason*, 433 F. Supp. 3d at 513.  "As for substantial participation, to be sure it is a concept without precise bounds, but one who plans a scheme, or, at the least, is a substantial motivating factor behind it, will be held liable as a seller." *SEC v. Elliott*, No. 09 Civ. 7594, 2011 WL 3586454, at *7 (S.D.N.Y. Aug. 11, 2011) (internal quotations and citations omitted).  "In practice, however, the 'necessary participant' and 'substantial factor' standards differ little, for no court using the 'necessary participant' test has found liable a defendant whose acts were not a substantial factor in the sales transaction." *Id.* (internal quotations and citations omitted).

### i.    **Mirman's Direct Involvement in the BGC Sale**

The undisputed facts show that Mirman had a degree of direct involvement in the BGC Sale: he (1) received a commission in connection with the sale; (2) was designated as the sale's broker at JTF; (3) was listed as BGC's registered representative for the JTF account used on the sale; (4) received emails containing account opening documents and (5) was copied on email correspondence regarding the logistics of the sale.

Cases in this circuit finding Section 5 liability on the "necessary participant" and "substantial factor" bases have involved a greater degree of direct involvement in more aspects of the sale. *See SEC v. Carrillo Huettel LLP*, No. 13 Civ. 1735, 2017 WL 213067, at *5

(S.D.N.Y. Jan. 17, 2017), *report and recommendation adopted*, No. 13 Civ. 1735, 2017 WL 1162199 (S.D.N.Y. Mar. 28, 2017) (recommending default judgment where defendants directly prepared misleading corporate resolutions and documentation, solicited false opinion letters and actively concealed true ownership of securities sold); *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 452 (E.D.N.Y. 2016) (on summary judgment, noting defendant CFO authorized, directed and managed issuance of securities to investors); *SEC v. Mattera*, No. 11 Civ. 8323, 2013 WL 6485949, at *3-5 (S.D.N.Y. Dec. 9, 2013) (on summary judgment, noting defendants formed entities for use in sale, solicited investments, provided subscription agreements, communicated with buyers and sellers, and directed broker action); *SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 264 (N.D.N.Y. 2014), *aff'd* 652 F. App'x 35 (2d Cir. 2016) (on summary judgment, noting that defendants authorized stock sales and directed transfer agent to issue stock certificates, marketed stock nationwide through telephone, email and face-to-face meetings, served as designated contact for investors, handled paperwork relating to stock sales and facilitated issuance of shares); *SEC v. Boock*, No. 09 Civ. 8261, 2011 WL 3792819, at *16 (S.D.N.Y. Aug. 25, 2011) (on summary judgment, noting that defendant found private parties as clients for deals, filed paperwork with regulators, served as president, CEO and director of transfer agency and handled promotion of stock); *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 860 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998) (in granting permanent injunction, noting that defendant prepared stock transfer agreements, contacted brokerage firms, made arrangements with broker-dealers and arranged compensation, acted as intermediary between broker-dealers and sellers, was kept apprised of sellers' progress in selling shares and remitting proceeds); *see also Sason*, 433 F. Supp. 3d at 514 (denying motion to dismiss because defendants allegedly approved stock transactions and originated, negotiated or assisted in them).  An issue

of fact exists as to whether Mirman was a "necessary participant" or "substantial factor" in bringing about the BGC Sale.

The Commission invites the inference that, because Mirman admits that he was designated as the "broker" and was paid a $300,000 "broker commission" on the BGC Sale, he must have brokered the deal and his involvement must have been necessary and substantial. This inference is not supported by undisputed record evidence. To the contrary, Mirman asserts that he did not perform any role as a broker in connection with the BGC Sale and that the payments he received were to compensate him for introducing Liberty to JTF. The evidence in the record does not contradict his assertion and suggests that the transaction was handled by others at JTF. Although Mirman was copied on various emails relating to opening of the JTF account and the logistics of the sale, there is no evidence that he acted on those emails. *See SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 435-36 (S.D.N.Y. 2007), *aff'd sub nom. SEC v. Altomare*, 300 F. App'x 70 (2d Cir. 2008) (noting that defendant had "successfully raised enough of an issue as to the extent of his participation to warrant deferring any . . . conclusion [as to necessary or substantial participation] until the evidence may be more fully evaluated at trial," where undisputed evidence showed that the defendant negotiated consulting agreement pursuant to which shares were issued and consulted on trades, but other evidence suggested that different individuals authorized, directed and executed trades). Considering the lack of evidence of Mirman's direct involvement in the BGC Sale, and drawing all inferences in his favor, a reasonable jury could find that (1) he was not paid for brokering the sale and (2) despite appearing on documentation and correspondence relating to the sale, he did not actually broker or execute it.

The Commission argues that failing to find Mirman a necessary participant by virtue of

his designation as the BGC Sale's broker would "gut the broker's gatekeeper role" of conducting a reasonable inquiry into the status of stock registrations under the Securities Act by establishing a rule that "a broker-of-record who does not personally solicit a trade cannot be a 'necessary participant.'"  The Commission's argument is that the broker-of-record to a sale cannot be said to play a merely ministerial role -- and must by definition have a necessary or substantial role -- because the broker has a duty to ensure that the transaction is not an illegal stock distribution. This argument is unpersuasive.  The Commission relies on *World Trade Fin. Corp. v. SEC*, 739 F.3d 1243, 1248 (9th Cir. 2014).  This case is not binding.  Even if it were, it holds that a broker must undertake a reasonable inquiry before qualifying for the Section 4(4) exemption for routine market orders that would otherwise violate Section 5.  *Id.*  It does not address whether a participant is necessary or substantial to an unregistered stock offering -- the inquiry required in this circuit.  *See In re Lehman Bros.*, 650 F.3d at 178 n.8.  Whether to impose Section 5 liability on Mirman is not determined by whether he was a listed as a broker for the BGC Sale but instead by a qualitative analysis of whether his activities were necessary or substantial.

### ii.   Mirman's Activities Ancillary to the BGC Sale

The undisputed facts establish that Mirman was initially responsible for the client relationship between JTF and Liberty, which eventually facilitated the BGC Sale of Liberty stock to JTF clients: (1) Mirman approached Genovese to discuss funding for JTF, resulting in a discussion of the potential for JTF's involvement with Liberty; (2) Mirman conducted diligence as to Liberty; (3) Mirman and Belesis obtained Genovese's commitment to invest $2 million in AGC, with Mirman involved in finalizing that loan around the same time as the BGC Sale; (4) Mirman invited Tafuri to present regarding Liberty at JTF, and Tafuri and Genovese subsequently gave presentations to JTF's brokers regarding Liberty's value and (5) Mirman

worked with an analyst to review a one-page summary on Liberty that was distributed to JTF brokers around the time of that presentation.

These activities are too remote from the actual sale to rise to the level of necessary or substantial participation. That Mirman approached Genovese a month before the BGC Sale to solicit a potential unrelated investment in JTF, and that Genovese subsequently introduced Mirman to Liberty for purposes of a potential unrelated capital raise, resulting in Mirman's diligence and the Liberty presentation at JTF, does not show any substantial or necessary involvement in the BGC Sale. Courts finding individuals necessary or substantial participants due to their role in the sell side of unregistered stock sales have required the participants' activity to be directed at the unregistered sales themselves. *See Mattera*, 2013 WL 6485949, at *3, *11 (on summary judgment, finding defendant a necessary participant because he acted as a liaison to broker-dealers who sold unregistered securities, and advised them on those sales); *Softpoint*, 958 F. Supp. at 860 (in granting permanent injunction, finding a participant necessary who approached and acted as intermediary for (1) broker-dealers who sold stock and (2) foreign distributors whose stock was sold in unregistered stock scheme). Nor is there evidence showing that Mirman ever solicited, discussed or advised Genovese, Belesis, JTF, BGC or investors regarding the BGC Sale -- the parties do not dispute that the four buyers in the BGC Sale were solicited by Belesis, not Mirman, and that Mirman did not have a direct role in solicitation activities for the sale. *See Mattera*, 2013 WL 6485949, at *3-5 (on summary judgment, finding defendant a necessary participant when he solicited buyers); *Boock*, 2011 WL 3792819, at *16 (same). And as discussed above, factual disputes preclude finding Mirman's direct involvement in the BGC Sale necessary or substantial. Mindful that "not everyone in the chain of intermediaries between a seller of securities and the ultimate buyer is sufficiently involved in the

11

process to make him responsible for an unlawful distribution," *In re Owen v. Kane*, Exchange Act Release No. 23827, 1986 WL 626043, at *3 (Nov. 20, 1986), summary judgment is denied to the Commission on this issue.

In response, the Commission argues that Mirman initially approached Genovese regarding an unrelated investment in JTF, and that without that approach, the BGC Sale would never have occurred. Some courts in this district have concluded that the "necessary participant" test is satisfied if, "but for the defendant's participation, the sale transaction would not have taken place -- in other words, whether the defendants' acts were a substantial factor in the sale transactions." *Sason*, 433 F. Supp. 3d at 513; *see also Mattera*, 2013 WL 6485949, at *10. But these cases qualify this conclusion with statements that the defendants' acts must be a "substantial factor in the sales transactions." *Sason*, 433 F. Supp. 3d at 513; *see also Mattera*, 2013 WL 6485949, at *10. Reading these non-binding cases strictly would require finding innumerable necessary participants to every unregistered securities offering -- everyone who played an intermediate role, no matter how small, in the chain of causation leading to the sale. This interpretation is at odds with Second Circuit guidance, which merely notes that "courts have held any person who is a 'necessary participant' or a 'substantial factor' in a sale of unregistered securities liable pursuant to § 5." *In re Lehman Bros.*, 650 F.3d at 178 n.8 (citation omitted). A strict "but-for" test also is at odds with the Commission's guidance, which provides that not every individual in the causal chain is a necessary participant. *Kane*, 1986 WL 626043, at *3. This is consistent with the Ninth Circuit's persuasive reasoning in *SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013): "Prior to the issuance of a security, numerous persons perform mechanical acts without which there could be no sale . . . but these acts nonetheless do not render the defendants sellers" because their "acts must also be a substantial factor in bringing

about the transaction."  Mirman's solicitation of Genovese for a purpose unrelated to the BGC Sale, more than a month before that sale was contemplated, cannot be said to have been a substantial or necessary factor as a matter of law, such that a jury could not find otherwise.

### 2. The Look Back Offering

The parties do not dispute that the Look Back Offering was not registered with the Commission and used interstate means.  The parties dispute whether the Look Back Offering was an offer to sell securities and whether Mirman was a necessary participant or substantial factor in bringing it about.  The SEC has established its prima facie case because no reasonable jury could answer either of these questions in the negative.

### i.   Whether the Look Back Offering Was an Offer to Sell Securities

Under the Securities Act, the "term 'offer to sell', 'offer for sale', or 'offer' shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value."  15 U.S.C. § 77b(a)(3).  "This definition extends beyond the common law contract concept of an offer," *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998), as "Congress expressly intended to define . . . broadly" terms "offer" and "sale," which are "expansive enough to encompass the entire selling process," *SEC v. Cole*, No. 12 Civ. 8167, 2015 WL 5737275, *7 (S.D.N.Y. Sept. 19, 2015) (quoting *United States v. Naftalin*, 441 U.S. 768, 773 (1979)).

Given this expansive definition, no reasonable factfinder could conclude that the Look Back Offering was not an "offer" to sell securities.  The undisputed evidence shows that (1) Look Back, which was owned by Genovese, communicated to JTF that it wished to sell 6.5 million shares of Liberty; (2) Belesis wished to sell some of those shares to JTF customers, and believed that such sales would have been encompassed within the contemplated Look Back Offering; (3) Belesis made arrangements in connection with a potential sale of the 6.5 million

shares; (4) JTF traders were preparing to sell the stock to customers, including emailing potential customers to offer Liberty Stock at discounted rates; (5) JTF's counsel repeatedly emailed JTF's clearing broker, Sterne Agee ("Sterne") to close the "9.5M" Look Back trade and (6) the Look Back Offering did not proceed because Sterne refused to process the trade and the Commission halted trading in Liberty stock. These activities plainly encompass aspects of the selling process, and so qualify as an "offer" for sale under the Securities Act's broad definition.

In response, Mirman argues that there is no evidence that JTF solicited any customers for the stock. This assertion is incorrect as testimony and correspondence show that one of JTF's traders offered discounted Liberty stock to a customer. Although Mirman argues that this evidence gives rise to a factual dispute because the testimony and correspondence do not connect the offered Liberty stock with the Look Back Offering, the record shows that the Look Back Offering was the only possible source of discounted Liberty stock at the time. Regardless of whether any solicitations were made, the undisputed evidence discussed above shows that JTF was preparing to sell the stock, and so was "offering" the stock under the statutory definition. Although certain JTF brokers and customers may have been unaware of the Look Back Offering, that fact does not contradict the undisputed evidence showing that the Look Back Offering was an "offer" under the Securities Act.

### ii.   Whether Mirman Was a Necessary Participant or Substantial Factor in the Look Back Offering

Mirman was both a necessary participant and substantial factor in the Look Back Offering. The undisputed evidence shows that JTF proceeded with the Look Back Offering after receiving the Opinion Letter stating that the sale could proceed under an exemption to the Securities Act's registration requirement. The Opinion Letter stated that it was made "in reliance upon the accuracy of the representations contained" in two attached documents, one of which

was Mirman's Broker Rep Letter, which stated that "[a]fter reasonable inquiry, [Mirman] is not aware of any circumstances indicating that [Look Back] is an underwriter with respect to the transaction or that the sale is part of a distribution of securities of the issuer."  Because the exemptions to the registration requirement in Rule 4(a)(1) and Rule 144 are unavailable to an "underwriter," as discussed above, no reasonable jury could conclude that the Opinion Letter would have blessed the contemplated stock offering had Mirman not made the certifications in the Broker Rep Letter.  Mirman's conduct was necessary for, and a substantial factor in, the Look Back Offering, and the Commission has made a prima facie case that the Look Back Offering violated Section 5.

In response, Mirman notes that his job responsibilities generally did not encompass organizing trades like the Look Back Offering and that he did not have any responsibility for Section 5 compliance.  That argument is unpersuasive as Section 5 liability is premised on a person's degree of involvement in the unregistered transaction, not his job responsibilities or training.  *Sason*, 433 F. Supp. 3d at 513.  Mirman also contends that Section 5 liability cannot attach because he signed the Broker Rep Form while it was blank "as a matter of convenience only," without any knowledge that it would be used for the Look Back Offering  That argument is unpersuasive because scienter is not required for Section 5 liability.  *Id.*  Whether Mirman understood what he was signing or performed the diligence underlying his assertion is immaterial to the question of whether his representation in the Broker Rep Letter was essential to the issuance of the Opinion Letter and the subsequent offer of unregistered Liberty stock in the Look Back Offering.  Finally, Mirman claims that others' involvement in the Look Back Offering creates a fact issue as to whether his involvement rose to the level of participant liability.  That argument does not address the relevant question -- whether Mirman's conduct was

substantial or essential, not whether it was greater than his colleagues'.

### C.  Whether the Look Back Offering Qualifies for the Rule 144 Safe Harbor

Because the Commission has sustained its burden of establishing a prima facie violation of Section 5 against Mirman as to the Look Back Offering, the burden shifts to Mirman to show that an exception to the registration requirement applies.  Summary judgment is granted to the Commission on the Section 5 claim as to the Look Back Offering because Mirman has not sustained his burden of showing that the offering was exempt from registration under Rule 144 or Section 4(a)(1).

As detailed below, the Look Back Offering was not exempt from registration under Rule 144.  The parties do not dispute that the Look Back shares were acquired directly from Liberty without a public offering and were thus "restricted."[2]  *See* 17 C.F.R. § 230.144(a)(3)(i); *Longfin*, 316 F. Supp. 3d at 757.  Ordinarily, restricted securities must be registered with the Commission to sell them in a public marketplace, but Rule 144 allows the public resale of restricted securities if certain conditions are met.  *See* 17 C.F.R. § 230.144(a)(3)(i).  Rule 144 provides a "safe harbor" exemption to sellers that is less fact intensive than the inquiry under Rule 4(a)(1).  *Longfin*, 316 F. Supp. 3d at 757.  Here Genovese may or may not have been an "affiliate" of the issuer, Liberty.[3]  Regardless of how this factual dispute is resolved, Rule 144 does not apply.  If

---

[2] It is undisputed that the Look Back shares bore a restrictive legend from December 14, 2011, to September 26, 2012.  Mirman generally notes that JTF's transfer agent removed the restrictive legend in reliance on the Opinion Letter, which, for the reasons set forth in the text, incorrectly stated that the restricted shares were subject to registration exemptions.  Mirman does not contest that such removal did not render the shares unrestricted as a matter of law.  *Sourlis*, 851 F.3d at 144-45.

[3] Whether Genovese was an affiliate is an issue of fact that cannot be resolved on summary judgment.  *See generally* 17 C.F.R. § 230.144(a)(1); *Longfin*, 316 F. Supp. 3d at 758-59.  He was not an officer or director of Liberty, did not exercise any direct authority over its board, management team or operations and "was maintained at arms' length" from Liberty's operations

Genovese was an affiliate, Rule 144 does not apply because the Look Back Offering involved the sale of more than 1% of Liberty's outstanding stock in a three-month period.  If Genovese was not an affiliate, Rule 144 does not apply because Genovese did not hold the stock for at least a year before the offering, which he was required to do since Liberty was not subject to SEC reporting requirements.

### 1.  Rule 144 Does Not Apply if Genovese Was an Affiliate

If the seller of restricted securities is an affiliate of the issuer, two of Rule 144's conditions are that (1) the seller/affiliate cannot sell more than 1% of the outstanding stock of the class being sold in a three-month period, 17 C.F.R. § 230.144(e)(1)(i), and (2) the sales must not be solicited, 17 C.F.R. § 230.144(b)(2), (f)(1)(i), (g)(3).  The parties do not dispute that the Look Back Offering exceeded 1% of Liberty's outstanding stock.  The Rule 144 safe harbor does not apply if Genovese, who arranged the Look Back Offering through his company Look Back, is an affiliate of Liberty,

### 2.  Rule 144 Does Not Apply if Genovese Was Not an Affiliate

The Rule 144 safe harbor also does not apply if Genovese was not an affiliate of Liberty because there is no material dispute that he did not hold the Look Back stock for the year required by Rule 144.

---

and decision-making.  Yet the evidence suggests he controlled up to 22.5% of Liberty's outstanding stock, including 45.5% of Liberty's unrestricted stock, and "there is no bright-line rule declaring how much stock ownership constitutes 'control' and makes one an 'affiliate'" for purposes of a registration exemption.  *Cavanagh*, 445 F.3d at 113 n.19.  As discussed in the text, regardless of whether Genevese was an affiliate of Liberty or whether that issue can be determined on summary judgment, the Rule 144 safe harbor does not apply.

The Commission also submitted, with its reply brief, a sworn affidavit from a staff accountant providing evidence of Genovese's ownership and control of Liberty shares.  Mirman has moved to strike this declaration.  It is unnecessary to decide this issue because, even without the declaration, a factual dispute still exists as to whether Genovese's control of Liberty was sufficient to make him an "affiliate."

For sales of restricted securities by a non-affiliate of the issuing company, Rule 144 imposes a holding period.  Before restricted securities may be sold in the marketplace, the seller must hold them for a certain period, either a year or six months.  If the issuer of the securities, Liberty, was a reporting company -- i.e. was subject to the reporting requirements of Sections 13 or 15(d) of the Exchange Act -- for the 90 days immediately preceding any sale, then the seller, Genovese, must have held the securities for at least six months before any sale under Rule 144.  17 C.F.R. § 230.144(d)(1)(i).  But if the issuer, Liberty, was not a reporting company for the 90 days immediately preceding the sale, then the seller, Genovese, must have held the securities for at least a year before a sale under Rule 144.  17 C.F.R. § 230.144(d)(1)(ii).  It is undisputed that, before the Look Back Offering, Genovese held the securities for more than six months but not a year.

The Commission argues that Liberty was not a reporting company, and therefore Rule 144 does not apply because Genovese did not satisfy the Rule 144 one-year holding period.  Mirman argues to the contrary, that the Rule 144 exemption applies because Liberty was a reporting company -- i.e., subject to the Exchange Act's reporting requirements during the 90 days immediately preceding the offering -- and that the applicable holding period was therefore six months, which Genovese satisfied.  Based on the record evidence, no reasonable jury could conclude that Liberty was a reporting company.  Consequently, the Rule 144 safe harbor is inapplicable as a matter of law to the Look Back Offering.

### i. Liberty's Reporting Obligations Under Section 13

Section 13 of the Exchange Act requires an "issuer of a security registered pursuant to [Exchange Act] Section 12" to file periodic reports with the Commission, including annual Form 10-Ks, quarterly form 10-Qs and form 8-Ks for certain changes in circumstances.  15 U.S.C.

§ 78m.  No reasonable fact finder could conclude that Liberty was subject to Section 13's

reporting requirements.  The Commission submitted a sworn affidavit from a staff accountant

stating that a search of the Commission's public EDGAR database revealed no registration

statements for securities filed by Liberty under Section 12 of the Exchange Act -- the

precondition for Liberty being subject to the Section 13 reporting requirement.  15 U.S.C.

§ 78m(a).

In response, Mirman identifies evidence that does not bear on the question of whether

Liberty was required to report under Section 13.  Mirman first notes that the Commission's

EDGAR system shows that Liberty has filed periodic reports with the Commission since 2007

and that Liberty's June 30, 2012, Form 10-K, filed within 90 days of the Look Back Offering,

contained the annotation "No" next to the question, "Indicate by check mark if the registrant is

not required to file reports pursuant to Section 13 or Section 15(d)" (emphasis added), and

contained the annotation "Yes" next to the prompt, "Indicate by check mark whether the

Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities

Exchange Act . . . and (2) has been subject to such filing requirements for the past 90 days"

(emphasis added).  That Liberty filed periodic reports and represented that it believed itself to be

subject to Section 13's reporting requirements does not establish that it was *required* to submit

Section 13 reports.

Mirman also claims that the Commission, through its Division of Corporation Finance,

requested changes on Liberty's filings and purportedly characterized them as "required."  In

support of this argument, Mirman cites a form 10-Q from 2012, which merely asked Liberty to

state whether it had complied with any applicable Section 13 reporting requirements.  Contrary

to Mirman's argument, it is not "hard to conceive" that the SEC would require any company

reports that were publicly filed to be correct and accurate, regardless of whether the reports themselves were required to be filed. Mirman's arguments do not create a question of fact as to whether Liberty was required to report under Section 13.

### ii. Liberty's Reporting Obligations Under Section 15(d)

Exchange Act Section 15(d) exempts from its reporting requirements, *inter alia*, securities that are "held of record by less than 300 persons." 15 U.S.C. § 78o(d)(1). Mirman has not carried his burden of showing that Liberty had at least 300 shareholders of record in 2012 and therefore was required to file reports under Section 15(d). Liberty's Form 10-K for the fiscal year ending June 30, 2012, reports "approximately 29 registered stockholders of record." Mirman identifies no contrary evidence showing that Liberty was subject to Section 15(d) reporting requirements in the 90 days immediately preceding the Look Back Offering. No reasonable fact finder could conclude that Liberty was required to report under Section 15(d).

In response, Mirman notes that Liberty made Section 15(d) reports in 2008 and later, as required due to its filing of a securities registration statement in 2008. This argument does not address the fact that Liberty was relieved of this reporting requirement in any year after 2008 when it had fewer than 300 shareholders of record. *See* 15 U.S.C. § 78o(d)(1) ("The duty to file under this subsection shall also be automatically suspended as to any fiscal year, other than the fiscal year within which such registration statement became effective, if, at the beginning of such fiscal year, the securities of each class . . . to which the registration statement relates are held of record by less than 300 persons."). Mirman also speculates that Liberty had more than 300 shareholders and that the phrase "subject to reporting requirements" in Rule 144 encompasses issuers that are not required to report but do so anyway. These arguments are unpersuasive due to their lack of evidentiary and legal support. *See SEC v. Revelation Capital Mgmt., Ltd.*, 246 F.

Supp. 3d 947, 951 (S.D.N.Y. 2017) (on summary judgment, the "non-moving party, however, must do more than simply show that there is some metaphysical doubt as to the material facts" and "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005))).

### D.  Whether the Look Back Offering Qualifies for the Section 4(a)(1) Exemption

"Rule 144 is not the exclusive method by which a person can demonstrate entitlement to a Section 4(a)(1) exemption . . . but a person claiming an entitlement to a Section 4(a)(1) exemption outside the contours of Rule 144 faces a 'substantial burden of proof.'"  *Longfin*, 316 F. Supp. 3d at 757 (quoting *Cavanagh*, 445 F.3d at 114).  As discussed above, Section 4(a)(1) exempts sales from Section 5's prohibition when the sales are from persons other than an issuer, underwriter, or dealer in securities.  The Section 4(a)(1) exemption does not apply to Genovese because, if he was an affiliate of Liberty, then he was an "issuer" under the statute.  If he was not an affiliate of Liberty, any reasonable jury would have to conclude that he was an "underwriter" under the statutory definition.

For purposes of Section 4(a)(1), "an 'issuer' is defined to include the same control persons as would be termed 'affiliates' under Rule 144."  *SEC v. Kern*, 425 F.3d 143, 152 (2d Cir. 2005); *accord Longfin*, 316 F. Supp. 3d at 765.  Although fact issues preclude finding Genovese was an affiliate, if he were so found, he would also be an issuer not eligible for the Section 4(a)(1) exemption.

Even if Genovese were not a Liberty affiliate, there is no material factual dispute that he is an underwriter for purposes of Section 4(a)(1), defined in the Securities Act as, *inter alia*, "persons who purchase from an 'issuer' with a view to distribution."  *Longfin*, 316 F. Supp. 3d at 766.  "In determining whether a person acquired shares with a view to distribution, courts look to

objective evidence, such as the length of time the shares were held and whether there has been an unforeseeable change in circumstances of the holder." *Id* (citing *Kern*, 425 F.3d at 152). The undisputed evidence shows that Genovese acquired the Liberty shares comprising the Look Back Offering as part of a Liberty trading strategy geared toward distribution. Genovese testified that he continually bought and sold Liberty stock in "thousands and thousands" of trades. Although Mirman notes that Genovese characterized his investment strategy as long-term, that testimony does not change the evidence of Genovese's strategy of continuously distributing Liberty shares. Mirman has failed to carry his heavy burden of showing the applicability of the Section 4(a)(1) exemption.

## IV.    CONCLUSION

For the reasons stated, the Commission's motion for summary judgment is denied as to the BGC Sale and granted as to the Look Back Offering. Mirman's request for oral argument is denied as moot. The Clerk of Court is respectfully directed to close docket numbers 150 and 162.

Dated:  March 26, 2021
      New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE